**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **TIMOTHY DENVER GUMM,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **NO. 5:15-CV-41-MTT-CWH** |
| | : | |
| **Warden BRUCE CHATMAN,** *et al.*, | : | **Proceedings Under 42 U.S.C. § 1983** |
| | : | **Before the U.S. Magistrate Judge** |
| **Defendants.** | : | |
| | : | |

## REPORT AND RECOMMENDATION

Before the Court is a Motion to Dismiss (Doc. 16) filed by Defendants, Bruce Chatman, Rick Jacobs, Rodney McCloud, and William Powell, as well as Plaintiff's third Motion to Amend (Doc. 26).

For the reasons set forth below, it is **RECOMMENDED** that the Motion to Dismiss be **DENIED** as to Plaintiff's due process claims related to his continuing confinement in the SMU after the transition to the Tier III program on August 1, 2013, and **GRANTED** as to any claims related to Plaintiff's original assignment to the SMU in 2010 or continued confinement prior to August 1, 2013.

It is further **RECOMMENDED** that Plaintiff's Motion to Amend be **DENIED** with regard to any Eighth Amendment claims, including all claims against Defendant Washington, and **GRANTED** with regard to Plaintiff's additional due process claims against Defendants Bishop, Logan, and Williams.

# I.   PROCEDURAL BACKGROUND

The procedural background of this case is complicated by the fact that Plaintiff has filed several different complaints, each more complicated than the last, making it difficult to distill his claims. Plaintiff filed his original complaint on February 12, 2015.  Doc. 1. Plaintiff's original complaint alleged a Due Process violation based on a protected liberty interest in Plaintiff's continued confinement in the Special Management Unit at the Georgia Diagnostic and Classification Prison. See e.g. Doc. 1. The Court conducted a frivolity review pursuant to 28 U.S.C. § 1915A, and summarized Plaintiff's allegations as follows:

> Plaintiff's claims arise out of his solitary confinement in the Special Management Unit ("SMU") at GD&CP.  Plaintiff was accused of attempted escape from Telfair State Prison, where he was previously confined, on January 26, 2010.  He was then transferred to GD&CP, where he was placed in SMU.  A disciplinary hearing was held and Plaintiff was convicted of attempted escape. On March 1, 2010, however, Plaintiff's disciplinary conviction was allegedly expunged.  Plaintiff states that he has remained in SMU to date. He claims that the conditions in SMU are substantially more restrictive than the general population and that his confinement there has prevented him from completing programs necessary for his parole consideration.

> Plaintiff alleges that his due process rights were violated by his confinement in SMU following expungement of the disciplinary conviction.  His allegations regarding any hearings and other process Plaintiff received are not entirely clear or consistent.

> Plaintiff sues the following four Defendants: (1) GD&CP Warden Bruce Chatman; (2) GD&CP Superintendent Rodney McCloud; (3) GD&CP Deputy Warden of Security William Powell; and (4) Georgia Department of Corrections' Field Operations Manager Rick Jacobs.  He asserts that each of these Defendants knowingly kept him confined in SMU in violation of due process.  In addition to

monetary damages, Plaintiff seeks injunctive relief in the form of reassignment into general population.

Doc. 6., pp. 3-4. The Complaint alleged that the SMU was redesignated as a "Tier III program" on August 1, 2013. Doc. 1, p. 10. One aspect of this policy change, involved the establishment of a classification committee to review each inmate's placement in the SMU every 90 days. Doc. 1, p. 11. According to the Complaint

> [T]he Warden, the SMU Superintendent and two Deputy Wardens of Security . . . have convened every 90 days since August 1, 2013 with the Field Operations Manager . . . and the Assistant Field Operations Manager and reviewed the recommendation of the Classification Committee collectively for final approval at the executive level. During Gumm's last eight (8) 90-day classification status reviews at both levels, the Warden, the SMU Superintendent, both Deputy Wardens of Security and the Classification Committee all, respectively, recommended and/or approved [Plaintiff's] transfer from the SMU: Tier III Program.

Doc. 1, p. 15.  It is not clear from the Complaint who ultimately decided to keep Plaintiff in the SMU Tier III program despite the repeated recommendations of the Classification Committee. Plaintiff was allowed to proceed with his claim against Warden Bruce Chatman, Superintendent Rodney McCloud, Deputy Warden of Security William Powell, and Field Operations manager Rick Jacobs.

On May 4, 2015, prior to the Defendants filing a responsive pleading, Plaintiff filed his first Motion to Amend (Doc. 11), which the Court granted on May 22, 2015. This amendment added little of substance to the original complaint.

After Defendants had filed the present Motion to Dismiss, on June 25, 2015, Plaintiff attempted to file a second amendment to his complaint. Doc. 21. This amendment sought to add new claims based on an alleged denial of access to the courts and cruel and unusual punishment.

Defendants objected to the amendment under Rule 15(a)(2), and Plaintiff filed a "Withdrawal of Amended Complaint" on July 23, 2015. Doc. 25. In his withdrawal, Plaintiff agreed with Defendants that "the focus of these proceedings should remain on the more important constitutional claims presently at issue." Doc. 25, p. 2.

On November 16, 2015, after the Motion to Dismiss had been fully briefed by both parties, Defendant filed a third motion for leave to file an amended complaint. Doc. 26. The attached amendment was 66 pages long. It names four new defendants, June Bishop, Rufus Logan, Dwayne Williams, and Margaret Washington. In this third proposed amendment, Defendant again seeks to introduce an Eighth Amendment conditions of confinement claims, based on an exhaustive list of grievances including inadequate food, poor sanitation, unclean clothing, and deficient medical care. These alleged conditions date back to 2010, the time when Plaintiff was initially confined in the SMU. Plaintiff also attempts to bring his due process claims against Defendants Bishop, Logan, and Williams, and to provide additional detail concerning the involvement of the individual defendants in the decision to keep him in the SMU. Defendants have objected to this Motion to Amend, arguing that the proposed amendments are futile.

## II.    MOTION TO DISMISS AND MOTION TO AMEND

The Court applies the same analysis for Defendants' Motion to Dismiss and Plaintiff's Motion to Amend. As to both motions, Defendants raise four arguments: (1) Plaintiff's claims are barred by the statute of limitations; (2) Plaintiff has failed to exhaust administrative remedies; (3) Plaintiff has failed to state a claim because he has not alleged deprivation of a liberty interest; and (4) Plaintiff has failed to state a claim against any of the named Defendants because his claims are based on vicarious liability.

A.     **Statute of Limitations**

Neither Plaintiff's claims for denial of due process, arising under the Tier III program and its 90-day review process, nor his Eighth Amendment conditions of confinement claims presented in his Motion to Amend are time-barred.

The statute of limitations in this case is two years, based on Georgia's statute of limitations for personal injury actions. *Lovett v. Ray*, 327 F.3d 1181, 1182 (11th Cir. 2003). The limitations period "does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Id*.

1.     **Due Process Claims**

Although any claim related to Plaintiff's original confinement in the SMU is time-barred, he has due process claims that accrued within the limitations period. Plaintiff was assigned to the SMU following an administrative hearing in 2010, a one-time event with consequences reaching into the future. Plaintiff's present claims, however, accrued on August 1, 2013, and thereafter. On August 1, 2013, GDCP instituted the "Tier III" Program and instituted a policy that every inmate in the Tier III program would have his continued confinement in the SMU reviewed every 90 days.  Confinement in the SMU itself was divided into several "phases" of greater or lesser severity. The 90-day review could result in the inmate being moved between phases within the SMU or transferred to a less restrictive "Tier II" environment when appropriate. Plaintiff alleges that he has received numerous such reviews and that each time the committee has recommended that Plaintiff be transferred to Tier II administrative segregation.  Nevertheless, he remains in the SMU. Plaintiff's continued confinement in the SMU despite these recommendations and initial expungement forms the basis of Plaintiff's complaint. He contends

that the 90-day reviews are meaningless and deny him due process. If his allegations are accepted, each new review would constitute a new violation of his rights subject to suit. Plaintiff's complaint is therefore timely with regard to the review process after August 1, 2013.

### 2. Conditions of Confinement Claims

In his Motion to Amend, Plaintiff alleges that a variety of factors, in their totality, make the conditions of confinement in the SMU inhumane. In addition to the prolonged solitary confinement, restricted recreation, and highly limited privileges described in the original complaint, Plaintiff alleges that inmates in the SMU are exposed to sleep deprivation, unsanitary housing conditions, soiled clothing, and spoiled food.[1]

The Complaint and Amended Complaint suggest that these conditions have remained largely unchanged since Plaintiff was first confined in the SMU in 2010. These claims are timely under the continuing violation doctrine. Under the continuing violation doctrine, a one-time violation with consequences reverberating into the present does not extend the limitations period, but a "continuation of that violation into the present" does extend the limitations period. *Knight v. Columbus Ga.*, 19 F.3d 579, 580-81 (11th Cir. 1994). "A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from the original violation." *Bergman v. United States*, 751 F.2d 314, 317 (10th Cir. 1984) (quoting *Ward v. Chaulk*, 650 F.2d 1144, 1147 (9th Cir. 1981)). Where a continuing violation is alleged, "the cause of action accrues, and the limitation period begins to run, at the time the unlawful conduct ceases." *Smith v. Shorstein*, 217 F.App'x. 877, 881 (11th Cir. 2007) (citing *Donaldson v. O'Connor*, 493 F.2d 507, 529 (5th Cir. 1974)). Plaintiff's Complaint and Motion to Amend allege that the inhumane conditions of the SMU have not ceased and continue to subject Plaintiff to cruel and unusual punishment.

---

[1] Compare *Atkinson v. Johnson*, 74 Fed. App'x. 365 (5th Cir. 2003) (holding that sleep deprivation could constitute an Eighth Amendment violation if supported by evidence at summary judgment) with *Brown v. Withrow*, 985 F.2d 559, 559 (6th Cir.1993) (having rats, roaches and ants present in the cell is not below the constitutional standard).

### B.     Exhaustion of Administrative Remedies

Defendants have failed to show that Plaintiff's Due Process claims should be dismissed based on failure to exhaust his administrative remedies. The record before the Court indicates that Plaintiff's continued confinement in the SMU was not a "grievable" issue under the prison's normal grievance procedures. Instead, the proper administrative remedy was the 90-day review process for Tier III inmates. The record shows that Plaintiff exhausted this process.

The evidence presented in connection with the motion to dismiss shows that Plaintiff has failed to exhaust administrative remedies in connection with the conditions of confinement claim alleged in Plaintiff's Motion to Amend. As such, those claims are subject to dismissal as futile.

### 1.     Exhaustion Requirements under the PLRA

Before the Court may address Plaintiff's claims on the merits, it must determine whether Plaintiff exhausted his available administrative remedies in accordance with the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). *Bryant v. Rich*, 530 F.3d 1368, 1372–78 (11th Cir. 2008) (noting that exhaustion is "a precondition to an adjudication on the merits"). "To exhaust administrative remedies in accordance with the PLRA, prisoners must properly take each step within the administrative process." *Id.* (internal quotation marks omitted). This rule applies even where the administrative process is "futile and inadequate." *Alexander v. Hawk*, 159 F.3d 1321, 1325–28 (11th Cir. 1998). That said, administrative remedies must be "available" for the exhaustion requirement to apply. See, e.g., *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1322–26 (11th Cir. 2007).

Because exhaustion is "a matter in abatement," it is properly the subject of dismissal. *Bryant*, 530 F.3d at 1374-75. As with other matters in abatement, courts may consider facts outside of the pleadings when determining whether a prisoner properly exhausted his available

administrative remedies. *Id*. at 1376. Additionally, courts may resolve factual disputes so long as those disputes do not decide the merits, and so long as the parties have a sufficient opportunity to develop a record. Id.

In ruling upon motions to dismiss based upon the affirmative defense of failure to exhaust, courts in this Circuit follow a two-step process established by *Turner v. Burnside*, 541 F.3d 1077 (11th Cir. 2008). First, courts look to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, the court takes the plaintiff's version of the facts as true. *Turner*, 541 F.3d at 1082. "If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." *Id*. If the complaint is not subject to dismissal based on the plaintiff's version of the facts, the court must proceed to the second step, where it makes specific findings of fact in order to resolve the disputed factual issues related to exhaustion. *Id*. At the second step, it is the defendant's burden to prove that the plaintiff failed to exhaust his available administrative remedies. *Id*.

### 2.    Available Administrative Remedies

The grievance policy that became effective on December 10, 2012, is a two-step process that eliminates the informal grievance requirement of the former policy. Doc. 16-2, p. 3. At step one of the new policy, an inmate has ten days to file an "original grievance" with the grievance coordinator. The grievance coordinator then screens the grievance for technical reasons to reject it. If it is not rejected on procedural grounds, then the grievance coordinator conducts an investigation and makes a recommendation to the warden. Following the Warden's decision, an inmate has seven days to file a "Central Office Appeal." Doc. 16-2, p. 7.

Prior to December 10, 2012, GDCP followed a three-step grievance process. The first step started the grievance process when an inmate filed an informal grievance. *Id*. at 4. Informal grievances had to be filed within ten days of the event, and could be filed on forms available to all inmates. Following the response, an inmate then had five days to file a formal grievance at step two of the policy. These were only available through the inmates' counselor, who would prepare a report based on the grievance. *Id*. at 4-5. A formal grievance would be responded to by the warden within thirty days. At step three, the Plaintiff could appeal an adverse decision from the warden to the "Commissioner's office." An inmate had five days to do so following the rejection of a formal grievance. *Id*. at 5.

### 3.    Exhaustion of Due Process Claims

In applying *Turner* to this case, it is clear that the Defendants are not entitled to dismissal at step one. Plaintiff does not deny that he has failed to exhaust the grievance procedure outlined above. Plaintiff argues, however, that the grievance procedure does not apply to him because he is being held in administrative segregation. Plaintiff cites the GDCP grievance procedure, which states that "involuntary assignment to administrative segregation" is not a grievable issue.[2] See Doc. 16-3, p. 7. Georgia defines administrative segregation as "the withdrawal of an inmate from the general inmate population and his (her) detention in a separated area of the institution which is apart from any other area used to accommodate the general inmate population." Ga. Comp. R & Regs. 125-3-1-.03. The SMU meets this definition and previously followed the statutorily authorized procedures for administrative segregation. See *Id*. at (5)(a). Therefore, the ordinary

---

[2] Instead, involuntary assignment to administrative segregation is governed by "GDC SOP IIB09-0001." Doc. 16-3, p. 7. Standard Operation procedure IIB09-0001 does not indicate that a Plaintiff may contest or otherwise appeal assignment to administrative segregation, but it does state that all inmates are entitled to have their status reviewed every thirty days.

grievance procedures are not available to Plaintiff regarding his placement and continued confinement in the SMU.

Plaintiff argues that the administrative remedies available to inmates in the SMU are the ninety (90) day Tier III reviews. Plaintiff further states that Warden Bruce Chatman has "final approval" over inmate cell transfers and has recommended at least nine times that Plaintiff be transferred out of SMU. Thus, Plaintiff is alleging that he was granted the relief he seeks through the administrative remedies available to him. Plaintiff has supplemented the record to show that his ninety (90) day SMU review recommended that he be transferred out of Tier III custody on April 8, 2013; July 31, 2013; July 29, 2014; October 28, 2014; and January 21, 2015.  Because it would have been futile to appeal a beneficial ninety decision, no further administrative process was available or necessary. Thus, at step one of the *Turner* analysis Plaintiff has exhausted the administrative remedies available to him.

Defendants are not entitled to dismissal at *Turner*'s step two. Defendants have provided Plaintiff's grievance history, which includes: (i) Grievance 61526, dated August 2010, contesting plaintiff's confinement in the SMU; (ii) Grievance 80062, dated February 2011, contesting Plaintiff's confinement in the SMU; and (iii) Grievance 18771, dated December 25, 2014, contesting Plaintiff's confinement in SMU Tier III. Also on the record is an affidavit and accompanying documents from the GDCP custodian of record, Darrell Reid, which states that Plaintiff did not appeal grievance 61526, (Doc. 16-2, p. 8); the appeal of grievance 80062 was denied on June 14, 2011, (Doc. 16-2, p. 8; Doc. 16-5, p. 11.); and the appeal of Grievance 18771 was not resolved until March 3, 2015—several weeks after Plaintiff filed the instant action. Doc 16-2, p. 8-9; Doc. 16-14, p. 7.

Of the three grievances that Plaintiff filed regarding his assignment to the SMU, only Grievance 80062 was fully exhausted prior to the filing of this suit. The responses from both the Grievance Coordinator and the Warden indicate that Grievance 80062 was denied because an inmate's housing assignment is a non-grievable matter. Doc. 16-5, p. 2. In response to Grievance 18771, which was finally exhausted after Plaintiff filed this suit, neither the grievance investigator nor the Warden indicated that the claim was non-grievable, instead stating that Plaintiff remained in SMU because he was "still considered . . . a threat to the safe and secure operations of the institution." Doc. 16-14, pp. 6, 7.

The evidence presented by Defendants shows that Plaintiff's assignment and continued confinement in the SMU was in fact a non-grievable matter. The policy currently governing the GDCP's grievance procedures provides that an offender may not file a grievance about any of the following issues:

    a.  Matters that do not affect the offender personally.
    b.  Matters over which the Department has no control, including parole decisions, sentences, probation revocations, court decisions, and any matter established by the laws of the state.
    c.  Disciplinary actions, including any punishment, fees, or assessments. The Disciplinary appeal procedure is located in GDC SOP IIB02-0001 (Inmate Discipline).
    d.  **Involuntary assignment to administrative segregation**. The procedure to appeal such assignment is located in GDC SOP IIB09—0001 (Administrative Segregation).
    e.  Co-Pay charges assessed for health care. The procedure to appeal such charges is located in GDC SOP VH03-0003 (Inmate/Probationer Health Concerns of Complaints).
    f.  Transfers of offenders between institutions.
    g.  An inmate cannot submit a grievance that exceeds the limit of having two active grievances in process locally.
    h.  Changes to housing assignments, program assignments, or work assignments, unless there is an alleged threat to the offender's health or safety.

Doc. 16-3. P. 6-7. Defendants do not address the procedures that are available to inmates in administrative segregation pursuant to GDC SOP IIB09-0001 and do not contest Plaintiff's

description of the review board process as it was or currently is. Defendants contest neither that the Warden ultimately decides who is confined in Tier III SMU, nor that the Warden has recommended that Plaintiff be transferred to Tier II administrative segregation.

Defendants are correct that Plaintiff failed to exhaust his most recent grievance, number 18771, because he filed this action prior to its resolution. Likewise, Defendants are correct that Plaintiff's 2010 and 2011 grievances would be time-barred. Because involuntary placement in the SMU is not a grievable offense, however, Defendants have failed to show that the ordinary grievance procedure was available to Plaintiff.

Instead, it appears from the record that the only administrative procedure available to Plaintiff concerning his continued confinement in SMU was the 90-day review process. Plaintiff contends that these reviews repeatedly recommended that Plaintiff be transferred and were approved by the Warden. Plaintiff had no reason to appeal a beneficial decision. Defendants have not shown that there was any further administrative procedure available for Plaintiff to contest his continued confinement in SMU in spite of the 90-day review committee's recommendations.

#### 4.   Exhaustion of Conditions of Confinement Claims

The evidence submitted by Defendants in support of their Motion to Dismiss shows that Plaintiff has not exhausted administrative remedies in connection with the conditions of confinement claims raised in Plaintiff's Motion to Amend. Claims related to conditions of confinement are grievable under the ordinary grievance policy. Defendants have submitted Plaintiff's entire grievance history during his tenure at GDCP, showing that Plaintiff filed a total of eleven grievances between 2010 and 2014. None of these grievances raises the "totality of conditions" that Plaintiff alleges in his Motion to Amend.

Three of Plaintiff's grievances concerned his continuing confinement in the SMU despite the expungement of his disciplinary report. The first, Grievance 61526, was an informal grievance filed on August 23, 2010, and was not fully exhausted. Doc. 16-4. The second, Grievance 80062, was filed on February 21, 2011, and was fully exhausted. Doc. 16-5. The third, Grievance 18771, was filed on December 25, 2014, was finally exhausted after Plaintiff filed the current lawsuit. These grievances are discussed above in connection with Plaintiff's due process claims.

Plaintiff filed five grievances in August 2011. Four of these—Grievances 93578, 94478, 94882, and 96085—were related to understaffing in the SMU. Only the fourth grievance was fully exhausted. The response to that grievance acknowledged staffing shortages and stated that corrective action had been taken "to ensure adequate coverage of the living units." Doc. 16-9, p. 15. The fifth grievance, number 96440, was filed on August 29, 2011, and alleged that on August 24, 2011, Plaintiff was left in the recreation yard for six hours, "in extreme heat, completely unsupervised, with no access to water or restroom facilities." Doc. 16-10, p. 4. This grievance was also fully exhausted. The appeal response noted that Plaintiff's grievance was substantiated, stating that "the issue was addressed and corrective action has been taken to ensure adequate coverage for each living [unit]." Doc. 16-10, p. 14.

Although the incident on August 24, 2011, is discussed in Plaintiff's Motion to Amend, his exhaustion of this grievance does not satisfy the exhaustion requirement for the conditions of confinement claims in his Amended Complaint. Claims related to this incident by itself are time-barred. The Amended Complaint, which primarily complains of too little outdoor recreation, indicates that this incident was an isolated occurrence, and therefore not subject to the continuing

violation doctrine. As an isolated occurrence, it is also unrelated to the "totality of conditions" claim raised in the Amended Complaint.

Three other grievances in Plaintiff's grievance history are connected to claims in the Amended Complaint. Grievance 115289, filed on March 28, 2012, alleges that Plaintiff did not receive required clothing. This grievance was not exhausted, as Plaintiff did not appeal the denial of his formal grievance. Doc. 16-11. The record indicates that "appropriate administrative action" was taken in response to Plaintiff's informal grievance and that Deputy Warden Bishop requested additional clothing items for SMU inmates. Doc. 16-11, pp. 2, 3. In response to Plaintiff's formal grievance, the Warden responded, "Clothing and personal hygiene items have been issued to the SMU. According to the property officer all items that you requested have been issued to you. The grievance is fully granted at the institutional level." Doc. 16-11, p. 5. Plaintiff did not appeal from the response to his formal grievance.

Grievance 124508, filed on July 3, 2012, alleges that maintenance had failed to repair a broken light in Plaintiff's cell, despite numerous work orders by officers and supervisors. Doc. 16-12, p. 3. In response to the informal grievance, the "maintenance man" (Doc. 16-12, p. 2) acknowledged that he had received the work order on June 26 and promised, "As soon as I get some the past-dated work orders out of the way I will replace his light." Doc. 16-12, p. 5. Plaintiff filed a formal grievance on July 10, 2012, noting that the light was still not repaired after more than ten work orders over a period of three months. Doc. 16-12, p. 7. Plaintiff alleged that for the past three months he had been "forced to live in total darkness, in a cell with completely blacked-out (spray painted) windows."[3] Doc. 16-12, p. 8. In the response to Plaintiff's formal grievance, on July 26, 2012, the "maintenance man" was still promising that he

---

[3] Plaintiff concludes his formal grievance with the rhetorical question, "how many prison employees does it take to change a lightbulb?"

would replace the light "as soon as he gets some of the past dated work orders out of the way." Doc. 16-12, p. 9. Plaintiff did not appeal from his formal grievance, and dropped the matter on August 21, 2012. Doc. 16-12, p. 10. Apparently the maintenance man finally got around to changing the light bulb.

Grievance 137685, filed on November 24, 2012, alleges that GDCP food services refused to provide SMU inmates "with the same quality and quantity of food provided to inmates assigned to general population." Doc. 16-13, p. 4. In his formal grievance, Plaintiff elaborates, contending that he had lost 40 pounds since his assignment to SMU because of small portion sizes. Doc. 16-13, p. 7. He notes that "to their credit, SMU officials have attempted to resolve this issue with Food Service," and held meetings with food service officials on two occasions, "to no avail." *Id*. In response to the formal grievance, food service supervisor Margaret Washington stated that inmates in SMU received the same quality and quantity of food as inmates in general population. Doc. 16-13, p. 9. Plaintiff appealed the denial of his formal grievance and the grievance was denied.

Plaintiff's grievances, and the responses to them, lend some credibility to his allegations about the overall conditions of confinement in the SMU. The responses to his five grievances in August 2011 acknowledge that the SMU was seriously understaffed for a period of time. The response to his March 2012 informal grievance regarding clothing supplies suggests that inmates received inadequate clothing prior to a special request by the Deputy Warden in response to Plaintiff's grievance. The responses to Plaintiff's formal and informal grievances about his light bulb show that the "maintenance man" had such a back-log of work orders that it took him four months to change a light bulb.

Nevertheless, these grievances do not constitute exhaustion of administrative remedies as to the conditions of confinement claims in Plaintiff's Motion to Amend. The specific complaints raised in each grievance are time-barred, as the last of them was filed on November 12, 2012, more than two years before Plaintiff filed this case, on February 9, 2015. None of these grievances raises the totality of conditions as alleged in Plaintiff's Motion to Amend. All of them, with the exception of the food services claim, appear to have been resolved by some action, however belated, on the part of the prison administration. The undisputed grievance history shows that Plaintiff has not filed any grievance related to conditions of confinement within the limitations period, and has never filed a grievance related to the totality of conditions alleged in his Motion to Amend. Accordingly, the Eighth Amendment claims presented in Plaintiff's proposed Amended Complaint would be futile.

### C.  Failure to State a Claim

#### 1.  Applicable Legal Standards

A complaint is subject to dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure if it fails "to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). When considering a motion to dismiss for failure to state a claim, the Court must accept all allegations in the complaint as true, and the Court must construe the facts in the light most favorable to the plaintiff. *Lopez v. Target Corp.*, 676 F.3d 1230, 1232 (11th Cir. 2012). The

Court is not bound to accept as true "a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678( quoting *Twombly*, 550 U.S. at 555). It is well-established that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). Additionally, "'*pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys' and are liberally construed. *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011) (quoting *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998)

In addition to the Complaint, this Recommendation also considers evidence presented in exhibits attached to Plaintiff's responses and separate filings. This liberal construction of Plaintiff's allegations is based on the well-established principle of leniency, which allows *pro se* litigants greater flexibility with the standards for pleadings. *McNeil v. U.S.*, 508 U.S. 106, 113 (1993). A *pro se* complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (internal quotations omitted).

In relation to Plaintiff's due process claims, the Court also considers the allegations raised in Plaintiff's various amended complaints, including his third Amended Complaint. It is a "well-established rule" in the Eleventh Circuit that on motion to dismiss a court must "afford a plaintiff an opportunity to amend his *pro se* complaint before dismissing with prejudice unless an amendment would be futile or the plaintiff expresses a desire not to amend." *Bettencourt v. Owens*, 542 F.App'x. 730, 735 (11th Cir. 2013)(citing *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991)). As explained above, the Eighth Amendment claims in Plaintiff's proposed third Amended Complaint are unexhausted and thus would be futile. The factual allegations related to the conditions of confinement, however, remain relevant to Plaintiff's due process claims,

particularly with regard to the allegation that confinement in the SMU amounted to the deprivation of a liberty interest. Certain allegations, such as the allegation that inadequate nutrition caused Plaintiff to lose as much as 50 pounds, might also be relevant to the question of physical injury or damages as a result of the alleged due process violations.

When read as a whole, the allegations in Plaintiff's complaint and its amendments are sufficient to state a claim that Plaintiff was deprived of a protected liberty interest without due process of law. They are also sufficient to show that each of the individual named defendants participated in the denial of due process.

### 2.      Protected Liberty Interest

To state a procedural due process claim, a prisoner first "must have a liberty interest created by the United States Constitution or by a state." *Walker v. Florida Parole Com'n*, 299 F. App'x 900, 901 (11th Cir. 2008) (citing *Monroe v. Thigpin*, 932 F.2d 1437, 1441 (11th Cir. 1991). The Supreme Court has identified two methods in which a prisoner's liberty interests may be deprived in relation to his confinement in a state prison. See *Sandin v. Connor*, 515 U.S. 472 (1995). The first occurs when his confinement is of such a nature that he is held in excess of his court imposed sentence, and the second occurs when the state deprives him of certain benefits conferred on other prisoners. *Wallace v. Hamrick*, 229 F. App'x 827, 830 (11th Cir. 2007).

For the first kind of liberty interest, "[i]t is plain that the transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Al-Amin, v. Donald*, 165 F. App'x 733, 738 (11th Cir. 2006) (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). For a liberty interest to be triggered by a deprivation of in-prison benefits, the deprivation must "impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison

life." *Wallace*, 229 F. App'x at 830. (quoting *Sandin*, 515 U.S. at 484). "The touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of the regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (quoting *Sandin*, 515 U.S. at 484)

Plaintiff first alleges that inmates housed in general population within Georgia Prisons have many benefits incident to ordinary prison life that Plaintiff is being denied while housed in the Special Management Unit at GCDP. Plaintiff alleges that this differential treatment both rises to the level of being an atypical and significant hardship and is punitive in nature.

In support of his claim, Plaintiff alleges that inmates housed in the SMU are subjected to the following treatment. Plaintiff claims that upon entering the SMU, inmates are stripped of their prison uniforms and forced to wear jumpsuits and flip-flops. Doc. 1, p. 11. They are placed in cells with completely obscured windows for twenty-four hours a day and held in isolation except for two days a week in which they are allowed outside for two and half hours. When SMU inmates are allowed outside, they are still held in isolation in metal cages. The cell measures seven feet by fourteen feet, and the outside metal cages measure nine feet by eighteen feet. Doc. 26-1, p. 20. To increase the "extreme isolation" of the SMU, cells are sound-proofed with metal strips to prevent prisoner-to-prisoner communication, the windows are permanently sealed and occluded by metal boxes, no electrical devices are allowed, and prisoners may not control their own lighting. Doc. 26-1, p. 21.

Inmates are allowed to shower for only fifteen minutes every three days, must submit to humiliating strip searches, must remain handcuffed and shackled at all times during movement, receive sub-standard food and medical care, and are denied access to classes and education

opportunities. Doc. 1, p. 11. Plaintiff further alleges that inmates in the SMU are punitively denied all basic privileges. They are allowed only fifteen minutes of telephone use four times a month, may have only no-contact visitations four times a month for two hours each, may not fully access the commissary, and may not have food or property packages. They are completely denied access to the library and electronic resources and are allowed to view only two legal documents a week. Doc. 26-1, p. 23. Inmates housed in the SMU also suffer delayed and inadequate medical care, delayed dental care, delayed access to clothing and bedding supplies, and are forced to wear second hand clothing previously stained by other inmate's waste. While confined in the isolation for the past six years, according to the Amended Complaint, Plaintiff has been provided no more than six t-shirts, six pairs of socks, and six pairs of underwear, many of which were used.  Doc. 26-1, p. 26.

Plaintiff further alleges that SMU inmates do not have access to adequate and timely cell maintenance. As a result, Plaintiff's cell was totally dark from April 2012 to August 2012 while his light was broken, and his toilet did not flush for a two week period. Moreover, Plaintiff's cell lacks adequate ventilation allowing the build-up of moisture and mold. During rainy weather, Plaintiff's cell remains wet much of the day and night.  Doc. 26-1, p. 28. In 2013 and 2014, a rat infestation resulted in excrement and trash "in every corner," and carcasses were littered throughout the outside recreation area. Doc. 26-1, p. 29-30.

In contrast, Plaintiff states that the general prison population has extensive liberty within the confines of the prison. They enjoy out of cell time for eighteen and a half hours a day during weekdays and twenty hours on the weekends. During these periods, Plaintiff alleges, inmates have very broad access to shows, recreation, gym use, and even sports activity. They are allowed access to the law library, rehabilitative courses, and educational opportunities. General

population prisoners have access to prompt maintenance and replacement of clothing and bedding. They may access the telephone "virtually" without limitation and enjoy contact visitations six hours a day on Saturdays, Sundays, and holidays. Moreover, they may receive monthly property packages, seasonal property packages, enjoy better quality food, and enjoy basic privacy receiving medical care. Doc. 1, p. 13. General population inmates, according to Plaintiff, also have access to timely maintenance and sanitation which prevents the dilapidation of a cell experienced by Plaintiff.

In comparison to the alleged conditions of general population inmates as a baseline from which to measure the ordinary incidents of prison life, the conditions allegedly imposed upon Plaintiff indicate an atypical and significant hardship. In addition to conditions typical of ordinary segregated confinement, Plaintiff alleges that (1) day-to-day human interaction, including cell-to-cell communication, is restricted, (2) the duration of the confinement has lasted years apparently contrary to GDC procedure that graduates inmates into less severe prison environments, and (3) SMU placement disqualifies Plaintiff for parole consideration. See *Wilkinson*, 545 U.S. 209 (finding that conditions of "supermax" facility, taken together, imposed an atypical and significant hardship[4]).

---

[4] In *Wilkinson*, the Supreme Court described the Ohio State Penitentiary Supermax facility, observing that

> In OSP almost every aspect of an inmate's life is controlled and monitored. Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.

> Incarceration at OSP is synonymous with extreme isolation. In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates. All meals are taken alone in the inmate's cell instead of in a common eating area. Opportunities for visitation are rare and in all events are conducted through glass walls. It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.

545 U.S. at 214. The Court held that "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context."

In response, Defendants assert that the conditions as alleged do not rise to the level necessary to constitute atypical or significant hardship. Defendants rely on several Eleventh Circuit Cases to argue that the amount of time Plaintiff has spent in the SMU combined with the level of restriction imposed does not meet the *Sandin* standard. These cases are distinguishable from the factual restrictions Plaintiff has alleged and the fact that Plaintiff asserts he is being held indefinitely. In *Morefield v. Smith*, 404 F. App'x 443 (11th Cir. 2010), for example, the Eleventh Circuit rejected a liberty interest claim where Plaintiff was held in administrative segregation for four years and "the conditions of [] confinement were generally equivalent to general prison population conditions." Similarly, in *Al-Amin*, the Court found that "inmates in administrative segregation 'are treated similarly' to those in general population," and Al-Amin had only been held for three years. *Al-Amin*, 165 F. App'x 733. Plaintiff has alleged a wider gap between the conditions of confinement in general population and in SMU than is described in either *Morefield* or *Al-Amin*. Plaintiff also alleges that he has been held in the SMU for over five years, despite both the review board and warden routinely recommending that he be transferred, and that he is being held there indefinitely.

Where Plaintiff has plausibly alleged a liberty interest created by the state, the question next turns to whether he was afforded the procedures due to him. The Eleventh Circuit has held that an initial administrative hearing in which the inmate is given notice and an opportunity to rebut, combined with periodic reviews of status every thirty (30) days, is sufficient due process when confining an inmate in segregation.  *Morefield*, 404 F. App'x at 446.  Likewise, a special management hearing where Plaintiff was given an explanation and opportunity to express his views combined with an administrative hearing every thirty (30) days, with right to appeal, is

---

*Wilkinson,* 545 U.S. at 224 (citations omitted). The conditions in the SMU, as alleged by Plaintiff, are substantially similar to the conditions in question in *Wilkinson*.

sufficient due process. See *Al-Amin*, 165 F. App'x at 737.  In this case, it is uncontested that Plaintiff was afforded an initial hearing and that he has had periodic reviews of his status since 2013.  Plaintiff alleges, however, that these reviews are pretextual.

Plaintiff alleges that he was originally placed in the SMU based on a disciplinary report expunged from his record and that it has routinely been recommended that he be transferred. Plaintiff contends that his continued confinement indicates that the ninety 90-day review procedure is not a meaningful remedy. Plaintiff states that his original disciplinary report for attempted escape was expunged on appeal in March 2010. He further alleges that since his assignment to the SMU in 2010, he "has been a model prisoner with no disciplinary actions or program phase demotions for negative behavior." Doc. 1, p. 14. Although the 90-day review reports routinely noted that that Plaintiff has not had any disciplinary reports, they fail to specify a specific reason why Plaintiff has not been phased out of the SMU.

The decision to deprive an inmate of a protected liberty interest must be based on "some evidence." *Superintendent, Massachusetts Correctional Instituiton, Walpole v. Hill*, 472 U.S. 445 (1985) (where good time credits are protected liberty interest, a decision to revoke the credits must be supported by some evidence even when they are revoked by a disciplinary board). Therefore, "due process is not satisfied where the periodic reviews are a sham; the reviews must be meaningful and not simply perfunctory." *McClary v. Kelly*, 4 F. Supp. 2d 195 (W.D.N.Y. 1998); see also *Toevs v. Reid*, 685 F.3d 903, 912 (10th Cir. 2012) (citing *Hewitt*, 459 U.S. at 477) ("the review must be meaningful; it cannot be a sham or a pretext").

Plaintiff's allegations are sufficient to establish a plausible claim that the periodic reviews provided were not meaningful and thus did not afford due process.

### 3.      Individual Capacity Claims -- Vicarious Liability

Plaintiff has also alleged sufficient facts to state claims against each of the named Defendants in their individual capacities. Plaintiff's original Complaint alleges due process claims against Warden Chatman, SMU Supervisor McCloud, Deputy Warden of Security Powell, and GDC Field Operations Director Jacobs. In his proposed Amended Complaint, Plaintiff seeks to add due process claims against Deputy Warden of Security Bishop, and against Logan as Chairman of SMU Review Committee and Williams as a member of the SMU review committee. The Amended Complaint also adds further detail about the extent to which the original Defendants were involved in the decision to keep Plaintiff in the SMU.

Defendants state that Plaintiff seeks to hold supervising officials liable under a theory of *respondeat superior*, and that they are entitled to dismissal on those claims. Specifically, Defendants argue:

> In his Complaint, Plaintiff refers generally to "prison officials" and "Defendants." He does not state what any named Defendant has done to deprive him of any constitutional right.  Moreover, as shown above Plaintiff has not alleged facts to show that there was any deprivation of any constitutional right by Defendants. To the extent Plaintiff is attempting to hold any Defendant liable for any others' alleged actions, he does not have a claim under § 1983.

Doc. 16-1, p. 17. "It is well established in this Circuit that supervisory officials are not liable under [Section] 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003) (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)). "Instead, supervisory liability under [Section] 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Id*. (internal citations omitted). Specifically, "[t]o state a claim against a supervisory defendant, the plaintiff must allege: (1) the

supervisor's personal involvement in the violation of his constitutional rights, (2) the existence of a custom or policy that resulted in deliberate indifference to the plaintiff's constitutional rights, (3) facts supporting an inference that the supervisor directed the unlawful action or knowingly failed to prevent it, or (4) a history of widespread abuse that put the supervisor on notice of an alleged deprivation that he then failed to correct." *Barr v. Gee*, 437 F. App'x 865, 875 (11th Cir. 2011) (citing *West v. Tillman*, 496 F. 3d 1321, 1328-1329 (11th Cir. 2007).

Applying the supervisory liability principles of Section 1983 case law is particularly challenging in a case such as this one, where decisions are made within a complex bureaucracy but no particular person is apparently responsible for any particular decision. Despite the opaque nature of the process, Plaintiff makes sufficient factual allegations to state a plausible claim that each of the named Defendants personally participated in the decision to keep Plaintiff in SMU or to maintain a process of "meaningless and pretextual periodic reviews." Doc. 26-1, p. 60.

Plaintiff alleges that the Warden, Chatman, "was at all times mentioned herein after July 1, 2013 the Warden at GDCP. He is and was legally responsible for the operation of GDCP to include the SMU and for the welfare of all the inmates in that prison. Plaintiff alleges that the Warden, along with the SMU Superintendent and the two Deputy Wardens of Security review the recommendations of the classification committee after each 90-day review. Doc. 1, p. 15. The Warden also has the final approval of all inmate housing assignments and inmate transfers to and from the SMU." Doc. 26-1, pp. 2-3. The allegations in the Amended Complaint indicate that the Warden had final say over decisions related to assignment to the SMU.

Plaintiff alleges that Defendant McCloud, in his capacity as Superintendent of the SMU, also served on the committee that reviewed the recommendations of the classification committee. Doc. 1, p. 15. In addition, McCloud specifically determined that Plaintiff was "still considered to

be a threat to the safe and secure operations of the facility," despite the expungement of Plaintiff's disciplinary report and the repeated recommendations of the classification committee. Doc. 26-1, p. 53.

Plaintiff alleges that Defendant Powell "was at all times mentioned herein the co-Deputy Warden of Security in the SMU at GDCP. He is and was legally responsible for the operation of the SMU and for the welfare of all the inmates in that unit. He also serves as the Warden's legal designee in that unit and approves or disapproves all recommendations from the SMU review committee concerning inmate housing assignments and inmate transfers and implements all approved recommendations on the Warden's behalf." Doc. 26-1, p. 4. Plaintiff alleges that Defendant Powell, "arbitrarily continu[ed] Plaintiff in the SMU program despite the fact" that he "repeatedly approved the SMU Review Committee's recommendation to transfer Plaintiff" from the SMU program. Doc. 26-1, p. 59-60.

Plaintiff alleges that Defendant Bishop, in her capacity as co-Deputy Warden of Security in the SMU at GDCP, personally approved the SMU Review Committee recommendations that Plaintiff be removed from SMU. Plaintiff states that Bishop "arbitrarily continu[ed] Plaintiff in the SMU program despite the fact" that she "repeatedly approved the SMU Review Committee's recommendation to transfer Plaintiff" from the SMU program. Doc. 26-1, p. 58.

Plaintiff states that Defendant Jacobs "was at all times mentioned herein prior to June 1, 2015 the Field Operations Director for the Georgia Department of Corrections (GDC). He was legally responsible for the overall operation of the GDC and each institution under its jurisdiction including the SMU at GDCP." Doc. 26-1, p. 5. Plaintiff also alleges that Jacobs "reportedly overruled the Warden's authority to transfer Plaintiff from the SMU: Tier III Program." Doc. 26-1, p. 61.

Plaintiff also alleges that Defendant Logan, in his capacity as the Chairman of the SMU Review Committee, repeatedly recommended that Plaintiff transfer from the SMU Tier III program, while "knowingly engaging in pretextual periodic" reviews of Plaintiff's placement. Doc. 26-1, p. 60.

Plaintiff alleges that Defendant Williams, as a member of the Review Committee with Defendants Bishop and Logan, furthered a custom or policy which resulted in denial of Plaintiff's right to due process through his continued confinement in Tier III despite "meaningless and pretextual periodic reviews." Doc. 26-1, p. 60. Because Plaintiff's allegations against Defendants Bishop, Logan, and Williams are sufficient to indicate that the Defendants personally participated in the alleged denial of due process, the Court cannot find at this stage that his claims would be futile.

Although the precise operation of the decision-making process will require further investigation, the allegations in the Complaint and the Amended Complaint present enough detail to state a plausible claim that each of the named defendants personally participated in the decision to continue Plaintiff's confinement in the SMU or to provide review that was "meaningless and pretextual." Such allegations are sufficient to "unlock the doors of discovery" and permit further factual development of the claims. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

### 4.    Qualified Immunity

Defendants contend that they are entitled to dismissal because they are protected from suit by qualified immunity. "Qualified immunity protects government officials performing discretionary functions from civil trial (and other burdens of litigation, including discovery) and from liability if their conduct violates no 'clearly established statutory or constitutional rights of

which a reasonable person would have known.'" *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146 (11th Cir. 1994) (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800 (1991)). The qualified immunity inquiry involves a three-step process. *Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002). First, the burden is on the defendant to prove that he was acting within the scope of his discretionary authority. *Id*. If the defendant meets this burden, then the Court must determine whether plaintiff suffered a constitutional violation. *Id*. Finally, if the facts prove the violation of a constitutional right, the inquiry is whether the law with respect to that right was clearly established. *Id*.

The clearly established law must provide a defendant with "fair warning" that his or her conduct deprived the plaintiff of a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 739–41 (2002). A plaintiff "can demonstrate that the contours of the right were clearly established in several ways." *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012). First, a plaintiff can show that "a materially similar case has already been decided." *Id*. (internal quotations and citations omitted). Second, a plaintiff can point to a "broader, clearly established principle [that] should control the novel facts [of the] situation." *Id*. (internal quotations and citation omitted). "Finally, the conduct involved in the case may 'so obviously violate[ ] th[e] constitution that prior case law is unnecessary.'" *Id*. (internal citations omitted). Clearly established precedent in this Circuit means decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court of the pertinent state. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

Defendants act within their discretionary authority when their "actions were undertaken pursuant to the performance of their duties and within the scope of their authority." *Rich v. Dollar,* 841 F.2d 1558 (11th Cir. 1988). Determining whether a government employee was acting within discretionary authority focuses on whether that employee (1) was performing a

legitimate job-related function (2) "through means that were within his power to utilize." *Holloman ex. rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (quoting *Hill v. Dekalb Reg'l youth Det. Ctr.*, 40 F.3d 1176, 1185, n. 17 (11th Cir. 1994)). This inquiry looks to the general nature of the defendant's actions to determine if the action would have "fallen within his legitimate job description" but for the alleged constitutional violation. *Id.*

The first inquiry of the qualified immunity analysis is unquestionably met; Defendants were acting within the scope of their discretionary functions as government employees with respect to all actions at issue in this case. It is a jailer's job to administer the jail. The activities forming the basis of Plaintiff's three claims are within the scope of Defendant's legitimate job description, therefore, the inquiry progresses to whether Plaintiff's constitutional rights were violated.

As outlined above, Plaintiff has alleged a protected liberty interest conferring due process rights. Both the protected liberty interest and level of due process rights due to Plaintiff are clearly established federal law. See *Sandin*, 515 U.S. 472; *Superintendent, Massachusetts Correctional Institution, Walpole v. Hill*, 472 U.S. 445 (1985); *Wilkinson*, 545 U.S. 209, 223 (2005); *Wallace*, 229 F. App'x 827.

### 5.    Official Capacity Claims -- State Liability

Defendants argue that to the extent that Plaintiff seeks monetary damages from Defendants in their official capacities, doing so is barred by the Eleventh Amendment.  "Absent waiver by a State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court, a bar that remains in effect when state officials are sued for damages in their official capacity." *Kentucky v. Graham*, 473 U.S. 159, 160 (1985). Georgia has not waived the Eleventh Amendment bar, therefore, Plaintiff cannot seek damages from the

State of Georgia simply by suing Georgia officials in their official capacity. *Id.* Therefore, to the extent that Plaintiff seeks monetary damages from the State of Georgia through Defendants in their official capacities, it is **RECOMMENDED** that Defendants' motion be **GRANTED**.

### 6.      Injunctive Relief

Defendants argue that Plaintiff's request for injunctive relief should be dismissed because it is not "narrowly drawn." Doc. 16-1, pp.27-28; Doc. 45-1, p. 15. Certainly, the PLRA requires that Courts "narrowly tailor" remedies in order to correct the specific violations of the rights of particular plaintiffs. See 18 U.S.C. § 3626(a)(1). Nevertheless, federal courts "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 131 S. Ct. 1910, 1929 (2011). At this stage of the case, it is too early to determine whether or not injunctive relief might be authorized. Given the flawed and opaque decision-making process alleged, it may be possible to fashion an injunctive remedy that would be narrowly tailored to the goal of creating a more meaningful and transparent review process.

### III.   CONCLUSION

In accordance with the analysis above, it is **RECOMMENDED** that the Defendants' Motion to Dismiss (Doc. 16) be **GRANTED IN PART** and **DENIED IN PART**. It is recommended that any claims related to Plaintiff's original assignment to the SMU and confinement prior to August 1, 2013 be dismissed as untimely. Plaintiff may proceed with his due process claims against the Defendants for the period of time after the SMU transitioned to the Tier III Program.

It is further **RECOMMENDED** that Plaintiff's Motion to Amend be **GRANTED**, with regard to Plaintiff's due process claims against Defendants Bishop, Logan, and Williams, and

**DENIED** with regard to Plaintiff's Eighth Amendment claims, including all claims against Defendant Washington. In accordance with this recommendation, it is further **RECOMMENDED** that service be ordered on June Bishop, Rufus Logan, Dwayne Williams, and that the new named Defendants file an Answer or such other response as may be appropriate under Rule 12 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1915, and the Prison Litigation Reform Act, as to Plaintiff's due process claims.

The Order granting Defendant's Motion to Stay (Doc. 18) shall stay in effect until all Defendants have had an opportunity to file an answer, unless otherwise ordered by the District Court.

Pursuant to 28 U.S.C. 636(b)(1), the parties may serve and file written objections to the relevant portions of this **RECOMMENDATION** with the District Judge to whom this case is assigned **WITHIN FOURTEEN (14) DAYS** after being served with a copy thereof.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO RECOMMENDED**, this 22nd day of January, 2016.


s/ Charles H. Weigle_____
Charles H. Weigle
United States Magistrate Judge