# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

_____

| | |
|---|---|
| TIMOTHY GUMM, | ) |
| | ) |
| ROBERT WATKINS, | ) |
| | ) |
| JOHNNY MACK BROWN, on behalf | ) |
| of themselves and others similarly | ) |
| situated, | ) |
| | ) |
|     Plaintiffs, | ) |
| | )    CIVIL ACTION |
|     v. | ) |
| | )    NO. 5:15-CV-41-MTT-CHW |
| TIMOTHY WARD, Assistant | ) |
| Commissioner, Georgia Department | )    **THIRD AMENDED** |
| of Corrections, | )    **COMPLAINT** |
| | ) |
| RICKY MYRICK, Assistant | )    CLASS ACTION |
| Commissioner, Georgia Department | ) |
| of Corrections, | )    JURY TRIAL DEMANDED |
| | ) |
| STEVE UPTON, Director of Field | ) |
| Operations, Georgia Department of | ) |
| Corrections, | ) |
| | ) |
| RICK JACOBS, Former Director of | ) |
| Facilities Operations, Georgia | ) |
| Department of Corrections, | ) |
| | ) |
| RANDY TILLMAN, Former Director | ) |
| of Facilities Operations, Georgia | ) |
| Department of Corrections, | ) |
| | ) |
| ERIC SELLERS, Warden, Georgia | ) |
| Diagnostic & Classification Prison, | ) |
| | ) |

BRUCE CHATMAN, Former Warden,   )
Georgia Diagnostic & Classification   )
Prison,   )
   )
MICHAEL CANNON, Superintendent,   )
Special Management Unit,   )
   )
RODNEY MCCLOUD, Former   )
Superintendent, Special Management   )
Unit,   )
   )
WILLIAM POWELL, Deputy Warden   )
of Security, Special Management Unit,   )
   )
JUNE BISHOP, Former Deputy   )
Warden of Security, Special   )
Management Unit,   )
   )
GEORGE BALL, Unit Manager,   )
Special Management Unit,   )
   )
RUFUS LOGAN, Former Unit   )
Manager, Special Management Unit,   )
   )
THOMAS SUMPTER, Chief of   )
Security, Special Management Unit,   )
   )
DWAIN WILLIAMS, Former Chief of   )
Security, Special Management Unit,   )
   )
MARGARET WASHINGTON,   )
Former Food Service Director, Georgia   )
Diagnostic & Classification Prison,   )
   )
     Defendants.   )
_____   )

**THIRD AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

JURISDICTION AND VENUE ........................................................................4

PARTIES.............................................................................................................4

   A.    Plaintiffs...................................................................................................4

   B.    Defendants ...............................................................................................6

       1.    The Central Office Defendants ....................................................6

       2.    The Georgia Diagnostic Defendants .............................................8

ALLEGATIONS OF FACT ............................................................................12

   A.    Plaintiffs Have Experienced Years of Solitary Confinement in
       the Special Management Unit (SMU) ....................................................12

       1.    Timothy Gumm was held in the SMU for more than seven
           years ............................................................................................12

       2.    Robert Watkins has been held in the SMU for more than
           eight years .................................................................................14

       3.    Johnny Mack Brown has been held in the SMU for more
           than nine years.............................................................................15

   B.    Prisoners in the SMU Experience Solitary Confinement Under
       Conditions of Severe Isolation and Deprivation ......................................16

   C.    Defendants Have Operated the SMU for Ten Years Without
       Establishing a System of Meaningful Review .........................................26

       1.    Defendants' review of Gumm's confinement under the six
           SMU policies...............................................................................26

           a.    The Unwritten Policy: 2007 to September 2012 .................26

b.    The 2012 SMU Policy: September 2012 to August 2013.................................................................................28

c.    The 2013 Tier III Policy: August 2013 to April 2015....................................................................................35

d.    The 2015 Tier III Policy: April 2015 to August 2016...................................................................................40

e.    The 2016 Tier III Policy: August 2016 to November 2017....................................................................................45

f.    The 2017 Tier III Policy: November 2017 to Present...................................................................................52

2.    Defendants' application of their policies to Brown and Watkins...................................................................................52

3.    Defendants' responsibility for prisoners' continued solitary confinement in the SMU ...............................................54

4.    Arbitrariness of prisoners' continued solitary confinement in the SMU ...........................................................56

D.    Plaintiffs' Indefinite Solitary Confinement Deprives Them of Basic Human Needs and Subjects Them to a Risk of Serious Harm ...........................................................................57

E.    Gumm's Seven-Year Term of Solitary Confinement Is Grossly Disproportionate Punishment ...........................................62

F.    Gumm Was Deprived of Sufficient Amounts of Food ............................63

CLASS ACTION ALLEGATIONS ........................................................69

CLAIMS FOR RELIEF ........................................................................72

PRAYER FOR RELIEF ........................................................................81

CERTIFICATE OF SERVICE

iv

EXHIBITS

Exhibit A:   Ga. Dep't of Corr., Special Mgmt. Unit Policy (Sept. 16, 2012)

Exhibit B:   Ga. Dep't of Corr., Policy No. IIB09-0004 (Aug. 1, 2013)

Exhibit C:   Ga. Dep't of Corr., Policy No. 209.09 (Apr. 3, 2015)

Exhibit D:   Ga. Dep't of Corr., Policy Information Bulletin (Aug. 8, 2016)

Exhibit E:   Ga. Dep't of Corr., Policy No. 209.09 (Nov. 8, 2017)

## THIRD AMENDED COMPLAINT

Plaintiffs Timothy Gumm, Robert Watkins, and Johnny Mack Brown respectfully file this amended complaint for declaratory and injunctive relief on behalf of themselves and a class of similarly situated prisoners, and for damages on behalf of Plaintiff Gumm.  In support thereof, Plaintiffs allege the following:

## INTRODUCTION

1.      This is an action to stop prison officials from holding people in an extreme form of solitary confinement for years on end with no meaningful review and no clear way of getting out.

2.      Plaintiffs are Georgia prisoners held in isolation continuously for years despite findings by prison officials that they are fit to return to a normal prison environment.

3.      Plaintiffs are or were held in Georgia's Special Management Unit, or "SMU," a 192-bed facility that subjects prisoners to an extreme and prolonged form of solitary confinement.  The SMU is Georgia's most restrictive prison and the only facility of its kind in Georgia.  It is also the site of an isolation-based behavior modification regimen known as the "Tier III Program."[1]

---

[1] "SMU" refers to the facility where Plaintiffs are or were held, whereas "Tier III Program" refers to the policies governing conditions in the SMU on or after August 1, 2013.  All prisoners in the SMU are in the Tier III Program, and all prisoners in the Tier III Program are housed in the SMU.

1

4.     On paper, the Tier III Program is an "incentive program" used to encourage "appropriate adjustments" so that prisoners "may be returned to a general population housing assignment."  In practice, people are assigned to isolation in the program indefinitely for years on end, regardless of their behavior and despite the serious health consequences of long-term solitary confinement.

5.     Prisoners assigned to the SMU are confined for 23 to 24 hours per day on average, with almost no human contact, in specially designed single-person cells that isolate them and deprive them of sensory stimuli.  Metal shields cover exterior and cell-door windows to prevent prisoners from seeing outside.  Solid metal doors with reinforced edges impede communication between cells.

6.     The SMU's six housing units, called "wings," vary in the restrictions they impose on prisoners, but all are austere.  At best, recreation consists of being placed alone inside an enclosed metal cage only slightly larger than a cell for up to five hours per week.  In the most restrictive wing, recreation is prohibited and prisoners are confined continuously to their cells.  Minor rule infractions can result in a prisoner being summarily returned to the most restrictive wing.

7.     Half of the prisoners in the SMU are required to shower inside of their cells, while the other half receive up to three brief showers per week in small, secured stalls.

2

8.      Visitation is nonexistent or severely restricted.  It occurs in a closed booth behind a glass barricade, with all communication through a speaker-box.

9.      As a result of Defendants' policies and practices, people in the SMU are utterly isolated, many of them for years on end, with little if any meaningful human interaction.

10.     Policies established by Defendants purport to determine who stays in the SMU and who is eligible for release.  Defendants frequently change these policies, but, regardless of the written procedures and standards, prisoners in the SMU are consistently denied meaningful review of their placement and guidance about what they must do to leave the SMU.

11.     Defendants' failure to meaningfully review prisoners' confinement or transfer them from the SMU after they have met all requirements for release violates the due process rights of Plaintiffs and other prisoners.  In addition, Defendants' use of prolonged and indefinite solitary confinement deprives Plaintiffs and other prisoners of basic human needs, creates a substantial risk of serious mental and physical harm, violates basic standards of decency, and constitutes grossly disproportionate punishment.

12.     Plaintiffs bring this action on behalf of themselves and similarly situated prisoners to end Defendants' unlawful practices and vindicate their rights under the Eighth and Fourteenth Amendments to the United States Constitution.

3

13.    In addition, Plaintiff Gumm brings claims on his own behalf against

Defendants for denying him adequate food while he was assigned to the SMU,

resulting in severe weight loss, extreme discomfort, and a substantial risk of

serious medical harm, in violation of his rights under the Eighth Amendment to the

United States Constitution.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action under 28 U.S.C. § 1331,

because it raises claims arising under the United States Constitution and 42 U.S.C.

§ 1983.

15.    This judicial district is an appropriate venue under 28 U.S.C. §

1391(b)(1), because all defendants are Georgia residents and at least one defendant

resides in the Macon Division of the Middle District of Georgia; and under 28

U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to this

action occurred in the Macon Division of the Middle District of Georgia.

## PARTIES

**A.    Plaintiffs**

16.    Plaintiff Timothy Gumm is a 41-year-old man serving a parole-

eligible life sentence.  He was incarcerated by the Georgia Department of

Corrections in the Special Management Unit (SMU) at Georgia Diagnostic &

Classification Prison in Jackson, Georgia, from January 2010 to July 2017.  In July

2017, Gumm was one of 13 SMU prisoners temporarily transferred to an experimental program at Georgia State Prison in Reidsville, Georgia, which allows him to leave his cell and interact with other prisoners for the first time in over seven years.  Under the policy governing the experimental program to which Gumm was assigned, Gumm may be summarily returned to the SMU for any perceived misconduct, including using insubordinate language.  In addition, the Georgia Department of Corrections has not decided whether to continue the experimental program, and may return Gumm to the SMU if the program is terminated.

17.    Plaintiff Robert Watkins is a 29-year-old man who was transferred to the SMU in July 2009 and has been held there nearly continuously since then.  In July 2017, Watkins was transferred with Plaintiff Gumm to an experimental program at Georgia State Prison, but Watkins was summarily returned to the SMU in August 2017 for alleged insubordination toward a correctional officer.  He is currently held in E-Wing, the SMU's most restrictive housing unit.  He has been incarcerated since 2006 under a parole-eligible life sentence.

18.    Plaintiff Johnny Mack Brown is a 61-year-old man who was transferred to the SMU in November 2008 and has been held there since then.  He has been incarcerated since 1997 under a life-without-possibility-of-parole sentence.

5

**B.    Defendants**

19.    There are two categories of defendants in this case.  The first category

consists of officials assigned to the Department's Central Office.  The second

category consists of officials assigned to Georgia Diagnostic & Classification

Prison ("Georgia Diagnostic").

### 1.    The Central Office Defendants

20.    Defendant Timothy Ward is sued in his individual capacity and in his

official capacity as an Assistant Commissioner and the Chief of Staff for the

Department.  As Assistant Commissioner and Chief of Staff, Defendant Ward

exercises final decisionmaking authority over prison transfers and related policies

and practices under authority delegated to him by the Department's Commissioner.

Defendant Ward assumed his role as Assistant Commissioner in June 2011 and

served as the Assistant Commissioner in charge of the Facilities Division from the

time of his appointment until December 2016, when he became Chief of Staff.

Prior to becoming an Assistant Commissioner, Defendant Ward was the

Department's Facilities Director from January 2009 to June 2011.

21.    Defendant Ricky Myrick is sued in his individual capacity and in his

official capacity as the Assistant Commissioner in charge of the Department's

Facilities Division.  As Assistant Commissioner, Defendant Myrick exercises final

decisionmaking authority over prison transfers and related policies and practices

6

under authority delegated to him by the Department's Commissioner.  He assumed his role as Assistant Commissioner in December 2016.

22.    Defendant Steve Upton is sued in his individual capacity and in his official capacity as the Field Operations Director for the Department.  As Field Operations Director, Defendant Upton exercises final decisionmaking authority over prison transfers and related policies and practices under authority delegated to him by the Department's Commissioner and Defendants Ward and Myrick. Defendant Upton assumed his current role in September 2015.  Prior to serving as Field Operations Director, Defendant Upton served as Deputy Director of Facilities Operations and as Georgia Diagnostic's Warden.

23.    Defendant Rick Jacobs is sued in his individual capacity for actions taken during his tenure as Facilities Director for the Department.  The position of Facilities Director was in all relevant respects identical to the current position of Field Operations Director occupied by Defendant Upton.  As Facilities Director, Defendant Jacobs exercised final decisionmaking authority over prison transfers and related policies and practices under authority delegated to him by the Department's Commissioner and Defendant Ward.  Defendant Jacobs served as Facilities Director from January 1, 2014, until September 2015.  Between July 2010 and January 2014, Jacobs served as Field Operations Manager for the Department's North Region, which includes Georgia Diagnostic and its SMU.

24.     Defendant Randy Tillman is sued in his individual capacity for actions taken during his tenure as Facilities Director for the Department.  As Facilities Director, Defendant Tillman exercised final decisionmaking authority over prison transfers and related policies and practices under authority delegated to him by the Department's Commissioner and Defendant Ward.  Defendant Tillman served as Facilities Director from June 2011 until January 2014.

### 2.     The Georgia Diagnostic Defendants

25.     Defendant Eric Sellers is sued in his individual capacity and in his official capacity as Warden of Georgia Diagnostic.  As Warden, Defendant Sellers has final authority over the conditions of confinement in the SMU, and supervisory authority over all officers assigned to the SMU.  Defendant Sellers assumed his position as Warden in July 2016.

26.     Defendant Bruce Chatman is sued in his individual capacity for actions taken during his tenure as Warden of Georgia Diagnostic between July 2013 and July 2016.  As Warden, Defendant Chatman had final authority over the conditions of confinement in the SMU, and supervisory authority over all officers assigned to the SMU.

27.     Defendant Michael Cannon is sued in his individual capacity and in his official capacity as the Superintendent of the SMU.  As Superintendent, Defendant Cannon has final authority over the conditions of confinement in the

SMU, and supervisory authority over all officers assigned to the SMU.  Defendant

Cannon assumed his role as Superintendent on October 1, 2016.

28.     Defendant Rodney McCloud is sued in his individual capacity for

actions taken during his tenure as Superintendent of the SMU at Georgia

Diagnostic.  Defendant McCloud served as Superintendent from April 2014 to

January 2016.  As Superintendent, Defendant McCloud had final authority over the

conditions of confinement in the SMU, and supervisory authority over all officers

assigned to the SMU.  He was the first person to serve in the role of SMU

Superintendent, a position whose duties had previously been performed by

Defendants June Bishop and William Powell, the two Co-Deputy Wardens of

Security for the SMU.  Defendant McCloud currently serves as Deputy Warden of

Security at Telfair State Prison in Helena, Georgia.

29.     Defendant June Bishop is sued in her individual capacity for actions

taken during her tenure as former Co-Deputy Warden of Security for the SMU at

Georgia Diagnostic.  As Deputy Warden of Security, Defendant Bishop had

supervisory authority over all SMU facilities, officers, and prisoners, and had

control over the living conditions in the SMU.  Until April 2014, when Defendant

McCloud assumed his role as SMU Superintendent, Defendant Bishop was, along

with Defendant Powell, the highest-ranking officer assigned to the SMU.  Between

January 2016 and October 2016, Defendant Bishop served as the acting

Superintendent of the SMU.  Defendant Bishop left her SMU assignment in

November 2016 and currently serves as Deputy Warden of Security at Georgia

Diagnostic's main prison.

30.   Defendant William Powell is sued in his individual capacity and in his

official capacity as Deputy Warden of Security for the SMU at Georgia Diagnostic.

As Deputy Warden of Security, Defendant Powell has supervisory authority over

all SMU facilities, officers, and prisoners, and has control over the living

conditions in the SMU.  Prior to April 2014, when Defendant McCloud assumed

his role as SMU Superintendent, Defendant Powell was, along with Defendant

Bishop, the highest-ranking officer assigned to the SMU.  In November 2016,

Defendant Powell became the SMU's sole Deputy Warden of Security.

31.   Defendant George Ball is sued in his official capacity as Unit

Manager for the SMU at Georgia Diagnostic.  As Unit Manager, Defendant Ball

has control over the living conditions in the SMU, and supervisory authority over

all uniformed correctional officers assigned to the SMU.

32.   Defendant Rufus Logan is sued in his individual capacity for actions

taken during his tenure as Unit Manager for the SMU at Georgia Diagnostic.  As

Unit Manager, Defendant Logan had control over the living conditions in the

SMU, and supervisory authority over all uniformed correctional officers assigned

to the SMU.

33.     Defendant Thomas Sumpter is sued in his official capacity as Chief of Security for the SMU at Georgia Diagnostic.  As Chief of Security, Defendant Sumpter has control over the living conditions in the SMU, and supervisory authority over all uniformed correctional officers assigned to the SMU.

34.     Defendant Dwain Williams is sued in his individual capacity for actions taken during his tenure as Chief of Security for the SMU at Georgia Diagnostic.  As Chief of Security, Defendant Williams had control over the living conditions in the SMU, and supervisory authority over all uniformed correctional officers assigned to the SMU.  Defendant Williams assumed his role as Chief of Security in around January 2014 and was reassigned to Georgia Diagnostic's main prison in June 2017.  Defendant Williams previously served for around four years as a lieutenant in the SMU, followed by three years as a lieutenant at Georgia Diagnostic's main prison.

35.     Defendant Margaret Washington is sued in her individual capacity for actions taken during her tenure as Food Service Director for Georgia Diagnostic. As Food Service Director, Defendant Washington was responsible for determining the quality and quantity of food served to prisoners in the SMU.

## ALLEGATIONS OF FACT

**A.** **Plaintiffs Have Experienced Years of Solitary Confinement in the Special Management Unit (SMU).**

> **1.** **Timothy Gumm was held in the SMU for more than seven years.**

36.     Plaintiff Timothy Gumm has been incarcerated since 1995.  Gumm is serving a life sentence and is eligible for parole.  He was denied parole in September 2014 and will be reviewed again in July 2018.

37.     Gumm entered Georgia's prison system as a teenager and had difficulty adjusting during his first few years of incarceration, resulting in numerous disciplinary reports.  However, Gumm's behavior changed as he matured.  Gumm's current offender disciplinary history shows no disciplinary reports.  Gumm's last two disciplinary convictions were in 2008 for talking during a head count, and in 2003 for kicking his cell door.

38.     Gumm has completed numerous programs during his incarceration. In September 1996, Gumm earned his General Educational Development diploma. In 2008, Gumm was recognized by Middle Georgia Technical College with a certificate for completing 320 hours of on-the-job training as an office clerk. Gumm has received certificates for completing the Confronting Self-Concepts class, the Family Violence class, the Prime for Life class, the Kairos religious program, and the Motivation for Change class.

12

39.     Gumm has worked in several job assignments during his imprisonment, principally as an educational aide.  In June 2008, Gumm's supervisor for that position rated him "above average"—the highest possible rating—in every performance category for the previous eight months, including "willingness to follow instructions," "relationship to co-workers," and "level of productivity."  In January 2009, the same supervisor again gave Gumm high ratings.  She wrote on the review form, "Inmate Gumm comes to work each day with a good attitude and eager to help.  His willingness to work and attention to detail is exceptional."

40.     In January 2010, several prisoners were implicated in an escape attempt at Telfair State Prison in Helena, Georgia.  The prisoners, when questioned by investigators, accused Gumm of being involved in the attempt before he allegedly abandoned the effort and returned to his cell.  The alleged escape attempt involved no violence, threats of violence, or physical harm to anyone.

41.     Gumm was issued a disciplinary report charging him with the alleged escape attempt.  He denied the allegations.

42.     On January 27, 2010, Gumm was transferred to the Special Management Unit (SMU) at Georgia Diagnostic & Classification Prison.

43.     Shortly after Gumm entered the SMU, a disciplinary hearing was held concerning the alleged escape attempt.  Gumm was not allowed to cross-examine or otherwise challenge the statements of the prisoner-informants.

44.     Although Gumm was initially found guilty, the disciplinary report was overturned upon review by higher-level prison officials.  The invalid report was expunged from Gumm's prison record.  There were no further disciplinary proceedings or criminal proceedings concerning the matter.  The incident is not reflected in Gumm's official disciplinary history.

45.     Despite expunging the results of the only tribunal that has found Gumm guilty of the attempted escape, Defendants continue to hold Gumm in the SMU and the Tier III Program.

> **2.     Robert Watkins has been held in the SMU for more than eight years.**

46.     Plaintiff Robert Watkins has been incarcerated since 2006, when he was arrested at age 18.  Watkins is serving a life sentence and is eligible for parole. He has spent most of his adult life in the SMU.

47.     In July 2009, Watkins was assigned to Hays State Prison in Trion, Georgia.  On July 26, a correctional officer was assaulted by a prisoner in Watkins's dormitory.  Prison officials suspected Watkins of involvement in the assault, though he was not accused of directly assaulting the officer.  Based solely

on suspicion that he was involved somehow, Watkins was transferred to the SMU the following morning.

48.     At the SMU, a correctional officer completed a form titled, "Administrative Segregation Assignment Memo." In a space on the form for the "reasons" for Watkins's placement in administrative segregation in the SMU, the officer wrote, "RECEIVED Inmate from HAYS SP Participating in disturbance Staff member was assaulted and Inmate [sic]."

49.     A disciplinary report was filed against Watkins for his alleged involvement in the assault at Hays State Prison. The disciplinary report was subsequently dismissed.

50.     Despite the dismissal of the disciplinary report, Defendants continue to hold Watkins in the SMU and the Tier III Program.

### 3.     Johnny Mack Brown has been held in the SMU for more than nine years.

51.     Plaintiff Johnny Mack Brown has been incarcerated since 1997. He is presently under a sentence of life imprisonment without possibility of parole.

52.     In October 2008, Brown allegedly escaped from Hays State Prison in Trion, Georgia. He was recaptured several weeks later and placed in the SMU on November 15, 2008.

53.     After arriving in the SMU, Brown was informed by SMU personnel that he would be released after serving five years in the SMU. Nine years later, he

remains in the SMU under conditions of extreme isolation, despite having received no disciplinary reports during his incarceration there.

**B.   Prisoners in the SMU Experience Solitary Confinement Under Conditions of Severe Isolation and Deprivation.**

54.     The SMU consists of a freestanding detention facility located in a separate compound immediately west of Georgia Diagnostic's main prison.  The SMU facility has its own access-control point, perimeter fence, buildings, assigned staff, and chain of command.

55.     The SMU's housing area consists of 192 cells separated into six wings, designated A-Wing, B-Wing, C-Wing, D-Wing, E-Wing, and F-Wing. Each wing contains 32 cells divided into two "ranges"—top and bottom—of 16 cells each.  Each cell is designed to hold one person.

56.     Viewed from above, the facility looks like this:



57.    Prisoners assigned to the SMU are always housed alone in solitary cells.

58.    Each cell measures approximately seven feet by thirteen feet.

59.    The SMU's 192 solitary confinement cells are specially designed to isolate people by depriving them of sensory stimuli and restricting their movement.

60.    Deprivation of visual stimuli is accomplished by sealing off SMU cells from the outside world.

61.    A metal shield covers the exterior window of each cell, preventing people from seeing outside.

62.    Virtually no natural air or sunlight enters the cells.  The only light that enters comes through a narrow gap between the exterior window and the top edge of the metal shield covering the window.

63.    Cell doors have small, grated windows blocked by a sliding metal cover that remains closed except during rounds by staff or officers.

64.    Each cell door in the SMU is constructed of heavy, solid metal.  The doors are designed so that there is no gap around the edges of the door.

65.    The following is an image of the exterior of SMU cells in A-Wing:



66.     The SMU's six housing wings are associated with different phases of a purported behavior-modification program.  Each phase has certain restrictions concerning property, out-of-cell time, and other conditions.

67.     Under the current policy governing the SMU, known as the "Tier III Program," the SMU's six wings are associated with four program phases.

68.     The most restrictive phase of the Tier III Program is Phase Four. Phase Four prisoners are housed in E-Wing.  They are restricted to their cells 24 hours per day, except that those with family members able and willing to visit them are allowed one no-contact visit per month after the first 30 days of confinement.

69.     The next phase is Phase Three.  Phase Three prisoners are housed in F-Wing (referred to as "lower Phase Three") and then D-Wing (referred to as "upper Phase Three").

70.    The next is Phase Two.  Phase Two prisoners are housed in C-Wing (referred to as "lower Phase Two") and then B-Wing (referred to as "upper Phase Two").

71.    The final phase is Phase One.  Phase One prisoners are normally housed in A-Wing.  Due to the large number of prisoners who have completed the Tier III Program but have been denied transfer to normal prisons, some prisoners who are in Phase One must be housed in wings other than A-Wing.

72.    Prisoners assigned to the SMU begin in Phase Four, where they are confined continuously to their cells 24 hours per day and are prohibited from having personal property.  Depending on their behavior and other factors, prisoners may progress through Phases Three, Two, and One.

73.    While assigned to the SMU, people in more advanced phases may be summarily returned to Phase Four for minor infractions such as banging on a cell door or holding open a tray flap.  Prisoners are frequently required to restart the program from the beginning.  No notice or opportunity to be heard is required before a prisoner's progress is reset.  Some prisoners are routinely forced to restart the program and thus spend lengthy spans of time in more restrictive phases.

74.    A clipboard containing a chart is mounted outside of each cell in the SMU.  A new chart is posted each week.  Correctional officers passing by may, without a prisoner's knowledge, enter comments onto the chart about the

prisoner's perceived attitude or conduct.  These comments become part of the prisoner's institutional file and may be relied upon to justify adverse action against the prisoner long after the comments are recorded, leaving the prisoner without a meaningful opportunity to rebut or respond to them.

75.    People in the SMU, particularly in the more restrictive phases, frequently have difficulty adjusting to prolonged isolation.  Some prisoners scream for hours on end.  Others destroy property, bang on doors constantly, disfigure or cut themselves, or smear feces on the walls of their cells.

76.    Regardless of their assigned phase, people confined in the SMU take all meals alone inside of their cells.  Meals are typically cold.  Although a written policy requires prisoners in the SMU to receive the same types and amounts of food as general population prisoners receive, food portions for SMU prisoners are, in practice, smaller than those served to the general population.  People in the SMU are, depending on their program phase and family support, allowed limited or no access to a commissary to purchase supplemental food.  They are not allowed to receive food packages, clothing packages, or the like.

77.    As a result of Defendants' systematic underfeeding of prisoners in the SMU, Timothy Gumm lost more than 40 pounds and remained at an abnormally low weight during the first several years of his confinement in the SMU.

78.     People confined in the SMU are rarely allowed to leave their cells.  At most, recreation periods are scheduled for twice per week, with up to two and a half hours per period.  The recreation takes place alone in an individual metal cage devoid of recreational equipment.  Recreation is cancelled when it rains, on holidays, and for assorted other reasons, such as security concerns or understaffing. People in Phase Four are denied recreation throughout the phase, which is at least 90 days in duration and may be extended or repeated.

79.     Prisoners assigned to A-, B-, and C-Wings are allowed up to three out-of-cell showers per week, for no more than 15 minutes per shower.  Although prisoners in those wings are allowed to leave their cells for showers, they are restrained and escorted by at least two correctional officers during movements from their cells to the showers and back.  They are then locked inside of a small, secure stall during the brief shower.

80.     Prisoners in D-, E-, and F-Wings have shower fixtures installed in their cells and thus do not leave their cells to shower.  For prisoners who are required to shower in their cells, there is no curtain or wall to contain the water, resulting in cells remaining wet or damp.

81.     Visitation in the SMU is severely restricted.  For people in Phase One—the least restrictive phase—prisoners with family members able and willing to visit them may meet up to four times per month, for up to three hours at a time,

21

inside of a small, cinderblock booth equipped with a thick Lexan panel that completely separates the prisoner from his visitors.  Communication is impossible except through a speaker-microphone device installed in each booth.  The devices frequently malfunction, distorting or failing to amplify speech.

82.     Gumm has not had a single visit from his family during his seven years in the SMU.  Many prisoners likewise have no family to visit them and thus cannot participate in visitation.

83.     People in the advanced phases of the Tier III program are allowed a maximum of four 15-minute telephone calls per month from inside of their cells on a portable telephone.  Those in the most restrictive phase have no telephone access.

84.     Telephone calls are costly for prisoners' families.  Many prisoners, including Gumm, come from families that rarely, if ever, can afford to pay for telephone calls.

85.     People assigned to the SMU are under strict control at all times, particularly when they leave their cells.  Their bodies are strip-searched before exiting, and they are strip-searched again before returning.  They are required to be handcuffed behind their backs, often with leg shackles, and are physically held and escorted by at least two correctional officers during all out-of-cell movements.

86.     People assigned to the SMU are ineligible for any kind of work assignment or detail.  To maintain and clean the SMU, prison officials bring in

prisoners from other prisons in the region, usually Al Burruss Correctional Training Center in Forsyth, Georgia.

87.    Self-improvement programs in the SMU are extremely limited.  For those in advanced phases, the main "program" consists of watching television alone in one's cell.  Prisoners in more restrictive phases often have nothing to distract them from their isolation—they cannot even look out a window.

88.    The SMU has offered no programs of any kind to prisoners during most of the time that it has been operational.  Beginning in 2014 or 2015, the SMU began scheduling GED courses and a course called the "Offender Under Transition" or "OUT" Program.  In 2016, the SMU began scheduling Anger Management classes.  Only a small handful of prisoners can participate in these classes at any given time.

89.    On rare occasions when people are given classroom instruction, it is limited to a one- or two-hour block of time per week in one of two SMU classrooms.  Each of the two classrooms contains four individual cages in which each participating prisoner is locked throughout the class session.

90.    Religious services are not held in the SMU or offered to SMU prisoners.

91.    For people assigned to the most restrictive program phases, books and other property are forbidden.  For a prisoner in one of the advanced phases, the

23

only way to obtain a book is to submit a form requesting that money be transferred from his inmate account to purchase one. Those who have no money to buy books cannot get them.

92.    Assignment to the SMU makes it difficult or impossible for prisoners to obtain parole. Classes that are mandatory for parole eligibility are not offered in the SMU. In addition, the Georgia Board of Pardons and Paroles is required to consider factors such as SMU placement in deciding whether to grant parole. The criteria that cause a prisoner to be assigned to the SMU, as well as the severe restrictions on opportunities for self-improvement within the SMU, preclude any realistic opportunity for parole while prisoners are assigned to the SMU.

93.    By design, the conditions in the SMU are far more restrictive and isolated than those in general population housing units, even for those with the highest security classifications.

94.    General population prisoners are allowed outdoor recreation at least five days per week and typically spend most of each day outside of their cells among other people. They typically walk freely throughout their housing units and the larger prison. They do not have to submit to strip-searches or wear handcuffs and leg restraints when they leave their cells.

95.    General population prisoners are allowed a minimum of six hours of contact visits with their loved ones every Saturday, Sunday, and holiday. During

visitation, they may hug their relatives and share meals together. They are also allowed more frequent and lengthier telephone conversations with family members than are prisoners in the SMU.

96.    General population prisoners have access to job assignments, classes, and vocational programs that prepare them for eventual release and improve their chances of obtaining work release or parole. Many prisoners in the general population participate in gainful employment on a work detail.

97.    General population prisoners can participate in group religious services with other members of their faiths.

98.    General population prisoners are served larger portions of food than prisoners in the SMU. In contrast to the food served in the SMU, food served to those in the general prison population is typically warm and eaten in a communal dining hall. General population prisoners are also allowed care packages once per month and incentive packages several times per year.

99.    General population prisoners receive notice and an opportunity to be heard before having their privileges suspended. In contrast, prisoners in the SMU have extremely limited privileges that may be summarily revoked for any perceived infraction.

100.    Every detail of life in the SMU is planned and controlled by policies designed and approved by Defendants Ward, Myrick, Upton, Jacobs, and/or

Tillman.  Every detail of those policies is implemented by or under the direct supervision of Defendants Sellers, Chatman, McCloud, Cannon, Bishop, Powell, Logan, and/or Williams.  Because the conditions in the SMU are so rigidly controlled at all management levels, each Defendant is actually aware of and responsible for the conditions of confinement in the SMU.

### C. Defendants Have Operated the SMU for Ten Years Without Establishing a System of Meaningful Review.

101.   During the time period relevant to this lawsuit, six policies have, at various times, governed the SMU's living conditions, the process for assigning prisoners to the SMU, and the process for transferring prisoners out of the SMU.

102.   Regardless of policy, prisoners in the SMU have not received and do not receive meaningful review of their confinement.  Moreover, Defendants have misled prisoners in the SMU about the nature of the decisionmaking process for leaving the SMU.  Defendants' lack of transparency has left prisoners uncertain of how they can obtain a transfer from the SMU to a less restrictive facility.

#### 1. Defendants' review of Gumm's confinement under the six SMU policies

##### a. The Unwritten Policy: 2007 to September 2012

103.   The SMU was built to centralize certain prisoners in a single, uniquely restrictive prison facility.

104.   For the first five years of its existence, the SMU had no official, written policy governing its operations, and no system of periodic review for prisoners housed there.  Prisoners generally were not expected to leave the SMU unless lack of space required Defendants to transfer one prisoner elsewhere to make room for a higher priority prisoner entering the facility.  Under that system, the ordinary way for a prisoner to leave the SMU was for the facility to run out of capacity, forcing prison officials to make a transfer decision.

105.   The lack of a written policy during this period reflected an official Department policy and practice, approved by Defendant Ward and other administrators, of assigning prisoners to the SMU on a permanent or semi-permanent basis and holding them there regardless of their behavior.

106.   Gumm spent his first two and a half years in the SMU under this system, with no periodic review of any kind.

107.   Although Gumm does not raise claims for relief with respect to the period during which the SMU lacked a policy, he expects to show that Defendants' original system of holding prisoners in the SMU regardless of their progress and improved behavior continues to exist despite a series of written policies providing for periodic review hearings.

27

### b.   The 2012 SMU Policy: September 2012 to August 2013

108.   On September 16, 2012, the Department established a standard operating procedure governing the SMU ("the 2012 SMU Policy"), authored by then-Commissioner Brian Owens[2] and Defendant Randy Tillman.  (Ex. A.)

109.   The 2012 SMU policy has been the template for every subsequent written policy concerning in the SMU.  Therefore, many of its provisions remain in force under the current SMU policy.

110.   The 2012 SMU Policy identified the SMU's purpose as follows: "The purpose of the SMU is to establish an incentive program based on an increased level of privileges for demonstrated appropriate offender behavior and program compliance.  The goal is for an offender to make the appropriate adjustments so that he may be returned to a general population housing assignment."  (Ex. A at 1.)

111.   The policy established four phases, each offering "progressively more privileges."  (Ex. A at 3.)  Underscoring the stated purpose of preparing SMU prisoners for a "return[] to a general population housing assignment" (Ex. A at 1), the policy provided, "If the offender successfully completes the program, he is reassigned to general population with a close security status."  (Ex. A at 3.)

---

[2] Brian Owens served as the Department's Commissioner from January 2009 to February 2015. He is currently a member of the Georgia Board of Pardons and Paroles.

112.   The 2012 SMU Policy established criteria for assignment to the SMU. The policy listed ten grounds for SMU assignment that were relatively specific and objectively verifiable.  (Ex. A at 3-4.)  For example, the criteria included prisoners who had made an "[e]scape within the previous five years involving violence or serious threat of violence," and prisoners who had made "[m]ultiple escapes or escape attempts within the previous three years from a close security institution." (Ex. A at 3.)

113.   At the time that the 2012 SMU Policy was established, Gumm did not meet any of the enumerated criteria for assignment to the SMU.  He had never committed an escape or attempted escape involving violence or threats of violence. And he had only one alleged escape attempt—not multiple attempts—within the preceding three years, per an invalid disciplinary report that was expunged in 2010.

114.   In accordance with the ostensible goal of preparing SMU prisoners for their return to general population housing assignments, the 2012 SMU Policy required the SMU Unit Manager to "develop short-range, achievable goals and objectives as part of the Offender's Management Plan."  (Ex. A at 9.)  The policy provided that goals "shall be communicated, verbally and in writing, to the offender in a clear, concise, and professional manner."  (*Id.*)  The Unit Manager was required to review each prisoner's performance every 30 days and "develop new goals and objectives" as necessary.  (*Id.*)

29

115.   The 2012 SMU Policy also established an SMU Review Committee to "review the offender's status" every 90 days "and formulate a recommendation to the Warden on whether to promote the offender to the next Phase (or return to general population), to keep him in the current Phase, or to demote him to a lower phase." (Ex. A at 9.)  The policy listed seven factors that the Review Committee was to consider at each 90-day review hearing: (1) length of time in the current phase; (2) continued "facility risk"; (3) number, type, and frequency of disciplinary reports; (4) "[i]nvolvement in self-improvement activities"; (5) behavior "as documented" on a checklist posted outside each offender's cell door; (6) "[p]rogress on his Offender Management Plan"; and (7) "[d]emeanor with staff on the wing and at periodic reviews." (Ex. A at 9-10.)  Prisoners were to be given 48 hours' notice of the hearings, and were permitted to attend, make a verbal or written statement, and present documentary evidence. (Ex. A at 10.)

116.   The Review Committee hearings and recommendations were memorialized on 90-day review forms. (Ex. A at 25.)  The forms had an area for comments, and blocks that the Review Committee marked to record one of four housing recommendations: (1) "Remain in Current Phase"; (2) "Move to the Next Phase"; (3) "Return to lower phase eligibility"; or (4) "Pending reassignment."

117.   Once the Review Committee formulated its recommendation, the recommendation was to be sent to Georgia Diagnostic's Warden for a "final

30

decision."  (*Id.*)  The policy provided that "[i]f the Warden's approval of the recommendation requires transferring the inmate to a different facility, then staff at the SMU facility must process the paperwork required to implement the transfer." (Ex. A at 11.)

118.   In reality, Defendants have ignored the 2012 SMU Policy and every subsequent written policy, operating the SMU as it operated between 2007 and 2012: without fixed standards, guidelines, or procedures.

119.   The 2012 SMU Policy, like every subsequent written policy, was essentially meaningless.  The provision for an "Offender Management Plan" listing individualized "goals and objectives" for each prisoner was and continues to be ignored.  Gumm has never been given an "Offender Management Plan," either verbally or in writing.  He expects to show that no other prisoner in the SMU has been given an "Offender Management Plan" and that Defendants are unable even to explain what such a plan would consist of.

120.   Under the 2012 SMU Policy and every subsequent policy, prisoners in the SMU have little opportunity to achieve any "goals" or "objectives" because they are constantly locked inside isolated cells or cages, and are barred from work details or other opportunities to demonstrate their good behavior under less restrictive conditions.

121.   Like the management-plan provision, the 2012 SMU Policy's system of periodic reviews had no meaningful impact on prisoners in the SMU.  Under that policy and every subsequent policy, review hearings are formalities with respect to the decision to keep a prisoner in the SMU.

122.   Under the 2012 SMU Policy and every subsequent policy, when the Review Committee recommends that a prisoner be transferred from the SMU, the SMU's Deputy Warden of Security or Superintendent almost always approves the recommendation under authority delegated by Georgia Diagnostic's Warden. Under the policy as written, the Warden's approval would be the final step and a transfer automatically would follow.  In practice, the transfer recommendation is usually denied by officials in the Department's Central Office without explanation, without any notice to the prisoner of the reasons for the decision, without any opportunity for the prisoner to be heard in response, and—until recently—without informing the prisoner of who made the decision to keep him in the SMU.

123.   Gumm had three reviews under the 2012 SMU Policy.  The reviews occurred on December 10, 2012; April 8, 2013; and July 31, 2013.

124.   On December 10, 2012, the Review Committee held a hearing and wrote on the review form, "Remain in current, recommend transfer no DR's."  The Review Committee checked the box labeled "Remain in Current Phase."

125.   On April 8, 2013, the Review Committee held a hearing and wrote on the review form, "Recommend transfer no DR's in six months, review in 90 days. Issued appeal form."  The Review Committee also checked the "Pending reassignment" box, indicating the Review Committee's finding that Gumm had completed the SMU program and should be transferred to a general population housing assignment.  Defendant June Bishop, exercising authority delegated by Georgia Diagnostic's Warden, approved the Review Committee's recommendation on April 17, 2013.

126.   Despite completing all of the 2012 Policy's requirements for a transfer to general population, Gumm remained confined in the SMU.

127.   On July 31, 2013, the Review Committee held a hearing and wrote on the review form, "Recommends you be considered for transfer from the SMU program, as you have been DR free for more than 6 months.  Review in 90 days and issued appeal form."  The Review Committee also checked the "Pending reassignment" box, indicating once again that Gumm had completed the SMU program and should be transferred to the general population.  Defendant June Bishop, exercising authority delegated by Georgia Diagnostic's Warden, again approved the Review Committee's recommendation on an unknown date.

128.   Despite once again completing all of the 2012 Policy's requirements for a transfer to general population, Gumm remained confined in the SMU.

129.   Under the plain terms of the 2012 SMU Policy, Gumm should have been transferred from the SMU to a general population housing assignment with a "close security" status following Defendant Bishop's "final decision" approving his transfer.

130.   Contrary to the text of the 2012 SMU Policy, the decision to release a prisoner from the SMU was not made by Georgia Diagnostic's Warden or the Warden's designee.  Instead, officials in the Department's Central Office made the ultimate decision.  The Central Office officials had no standards, guidelines, or criteria on which to base their decision about whether to transfer prisoners from the SMU.

131.   Gumm and other prisoners in the SMU were not formally advised of the existence of a Central Office review process.  Aside from rumors that prison administrators "at Tift"[3] were holding up their transfers, prisoners had no notice of the existence of another step in the transfer process beyond the Warden, no explanation for the Central Office decision, and no opportunity to be heard by Central Office decisionmakers.

---

[3] Since 2009, the Georgia Department of Corrections headquarters has been located at the Tift College campus in Forsyth, Georgia.

34

### c.       The 2013 Tier III Policy: August 2013 to April 2015

132.    On August 1, 2013, the Department established the "Tier Segregation System" to govern administrative and disciplinary segregation in close-security prisons.  Like the 2012 SMU Policy, the policies governing the Tier Segregation System were authored by then-Commissioner Brian Owens and Defendant Tillman.  (Ex. B.)

133.    The Tier Segregation System established three forms, or "Tiers," of segregated confinement.  Tier I was used for prisoners needing short-term segregation of 30 days or less for the purpose of protection, punishment, or transient housing pending classification or investigation.  Tier II was a disciplinary behavior-modification program, lasting for an indefinite period of at least nine months.  Tier II was implemented at "Level V" or "close security" prisons, including Hays State Prison, Georgia State Prison, Macon State Prison, Telfair State Prison, Smith State Prison, Ware State Prison, Hancock State Prison, and Valdosta State Prison.  Tier III was the most restrictive of the three forms of segregation, and was implemented only at Georgia Diagnostic's SMU.

134.    Statewide, the Department reserves thousands of cells for prisoners assigned to the Tier Segregation System.  The most restrictive of those are the 192 SMU cells for Tier III prisoners.

35

135.   The 2013 Tier III Policy was identical to the 2012 SMU Policy in most respects.  It provided that the "goal [of the SMU] is for an offender to make the appropriate adjustments so that he may be returned to a general population housing assignment."  (Ex. B at 1.)  The policy provided, "If the offender successfully completes the program, he is reassigned to general population with a Close Security status."  (Ex. B at 3.)

136.   The 2013 Tier III Policy retained the 2012 SMU Policy's 11 eligibility criteria for assignment to the SMU.  However, a twelfth, subjective, catch-all provision was added that allowed a prisoner to be "eligible for placement in the Tier III Program" if he "is noted as a threat to the safe and secure operation of the Facility."  (Ex. B at 4.)

137.   The review procedures were similar to those provided in the 2012 SMU Policy, with a two-step process for being released from the SMU.  The first step required a Review Committee to "review the offender's status and formulate a recommendation to the Warden."  (Ex. B at 10.)  The second step required the Warden to make a "final decision" approving the transfer.  (Ex. B at 12.)  The policy provided that "[i]f the Warden's approval of the recommendation requires transferring the offender to a different facility, then staff at the Tier III Program facility must process the paperwork required to implement the transfer."  (Ex. B at 12.)

36

138.   Unlike the 2012 SMU Policy, which provided only for transfers from the SMU to general population, the 2013 Tier III Policy allowed the Review Committee to recommend one of two types of transfer from the SMU.  The first was a recommendation that a prisoner be transferred to general population.  (Ex. B at 10.)  The second was a recommendation that a prisoner be "[t]ransferred to a Level 5 (Tier II Program)."  (*Id.*)

139.   The Tier II Program holds prisoners in administrative segregation under conditions similar to those in the SMU.  For Tier II prisoners, near-continuous confinement to a cell is the norm.  They must progress through three phases, which, in theory, takes between nine and twenty-four months, before they are eligible to return to general population.  However, prisoners are routinely made to restart the program for minor infractions, allowing correctional officers who dislike a certain prisoner to prevent him from completing the program.  Moreover, some prisoners are kept in a phase called "Phase 3-Plus" upon completion of the Tier II Program.  Prisoners in Phase 3-Plus are held in segregation indefinitely.  Thus, the Tier II Program has many of the same problems as the Tier III Program.

140.   On August 1, 2013, Defendant William Powell completed an "Assignment Memo" officially placing Gumm in the Tier III Program, meaning Gumm would remain in the SMU.  Gumm had been held continuously in the SMU for over three and a half years by that point.  The form contained no information

about the reasons for Gumm's assignment other than the following handwritten

notation: "Attempted Escape."

141.   Under the terms of the 2013 Tier III Policy, Gumm did not meet the

escape-related eligibility criteria because he had no escapes involving violence or

threats of violence, and had no attempted escapes within the preceding three years.

The only category under which he could have been assigned to the Tier III

Program was the new catch-all provision that did not exist in the 2012 SMU

Policy.  The catch-all provision applied to prisoners "noted as a threat to the safe

and secure operation of the Facility."  (Ex. B at 4.)

142.   Gumm was not given notice of his assignment to the Tier III Program

or an opportunity to be heard in response to that assignment.

143.   After being formally "assigned" to the Tier III Program, Gumm

received four reviews under the 2013 Tier III Policy.  The reviews occurred on

January 7, 2014; July 29, 2014; October 28, 2014; and January 21, 2015.

144.   On January 7, 2014, a Review Committee composed of Defendant

Dwain Williams, Defendant Rufus Logan, and counselor Monique Gholston, held

a hearing and recommended that Gumm "remain in current phase."  Gumm was

later informed that the Review Committee had automatically declined to

recommend him for transfer from the SMU because he had chosen not to attend the

review hearing.  Gumm's reason for not attending was that he had come to believe that the hearings were irrelevant to whether he would be released from the SMU.

145.    On July 29, 2014, a Review Committee composed of Defendant Logan, counselor Monique Gholston, and an unknown officer held a hearing and wrote on the review form, "Recommend transfer from SMU Program.  Review in 90 days.  Appeal form issued."  Although Gumm had twice been recommended for a transfer to general population under the 2012 SMU Policy, the Review Committee checked a box labeled, "Transfer to a Level (5) Administrative Segregation Tier II Program."  Defendant William Powell, exercising authority delegated by Georgia Diagnostic's Warden, approved the Review Committee's recommendation on August 4, 2014.

146.    Despite completing all of the 2013 Policy's requirements for a transfer, Gumm remained confined in the SMU.

147.    On October 28, 2014, a Review Committee composed of Defendant Williams, Defendant Logan, and counselor Monique Gholston held a hearing and wrote on the review form, "Recommend transfer from SMU Program.  Review in 90 days.  Appeal form issued."  The Review Committee again checked the box labeled, "Transfer to a Level (5) Administrative Segregation Tier II Program." Defendant William Powell, exercising authority delegated by Georgia Diagnostic's Warden, approved the Review Committee's recommendation on October 29, 2014.

39

148.   Despite once again completing all of the 2013 Policy's requirements for a transfer, Gumm remained confined in the SMU.

149.   On January 21, 2015, a Review Committee composed of Defendant Williams, Defendant Logan, and counselor Monique Gholston held a hearing and wrote on the review form, "Recommend transfer from SMU Program and review in 90 days.  Appeal form issued."  The Review Committee again checked the box labeled, "Transfer to a Level (5) Administrative Segregation Tier II Program." Defendant William Powell, exercising authority delegated by Georgia Diagnostic's Warden, approved the Review Committee's recommendation on January 27, 2015.

150.   Despite once again completing all of the 2013 Policy's requirements for a transfer, Gumm remained confined in the SMU.

### d.      The 2015 Tier III Policy: April 2015 to August 2016

151.   On April 3, 2015, the Georgia Department of Corrections issued a revised Tier III Policy authored by Defendant Rick Jacobs and then-Commissioner Homer Bryson.  (Ex. C.)  The 2015 Tier III Policy was identical to the 2013 Tier III Policy in all material respects.

152.   Gumm received five reviews under the 2015 Tier III Policy.  The reviews occurred on May 4, 2015; August 4, 2015; November 3, 2015; February 10, 2016; and May 18, 2016.

153.   On May 4, 2015, a Review Committee composed of Defendant Williams, Defendant Logan, and counselor Monique Gholston held a hearing and wrote on the review form, "Recommend transfer from SMU Program and review in 90 days.  Appeal form issued."  The Review Committee checked the box labeled, "Transfer to a Level (5) Administrative Segregation Tier II Program." Defendant William Powell, exercising authority delegated by Georgia Diagnostic's Warden, approved the Review Committee's recommendation on May 14, 2015.

154.   Despite completing all of the 2015 Policy's requirements for a transfer, Gumm remained confined in the SMU.

155.   Gumm appealed the May 4 recommendation using a "Review/Classification Appeal Form."  On the form, Gumm wrote:

> State prison regulation provides that inmates who successfully complete the SMU: Tier III Program are reassigned to the general prison population, not to a Tier II Program.  GDC SOP II B09-0004.  I also object to the staff's failure to implement the previous nine (9) warden-approved recommendations of the SMU Review Committee for my transfer from the Tier III Program in accordance with GDC SOP II B09-0004(VI)(F)(2)(a).

In a space designated for a response from Georgia Diagnostic's Warden, Defendant Rodney McCloud, the SMU Superintendent, checked a box indicating that he concurred with the Review Committee's recommendation of transfer from the SMU, and wrote, "Inmates that progress through the Tier III program will be recommended for release to the Tier III 90 day executive review committee.

41

During the review with the executive committee you were denied release."  There

was no further description of the "executive committee," and no reason was given

for its decision.

156.   On August 4, 2015, a Review Committee composed of Defendant

Williams, Defendant Logan, and counselor Nash held a hearing and wrote on the

review form, "Transfer to a level (5) administrative segregation Tier II Program."

The Review Committee checked the box labeled, "Transfer to a Level (5)

Administrative Segregation Tier II Program."  Defendant William Powell,

exercising authority delegated by Georgia Diagnostic's Warden, approved the

Review Committee's recommendation on August 4, 2015.

157.   Despite once again completing all of the 2015 Policy's requirements

for a transfer, Gumm remained confined in the SMU.

158.   On November 3, 2015, a Review Committee composed of Defendant

Williams, Defendant Logan, and counselor James Goody held a hearing and wrote

on the review form, "Recommends you be considered for transfer from SMU

program, as you have been DR free for more than 6 months.  Review in 90 days

and issued appeal form."  The Review Committee checked the box labeled,

"Transfer to a Level (5) Administrative Segregation Tier II Program."  In an area

on the form designated "Offender's rebuttal," the form quotes Gumm as saying,

"Please give me a chance to transfer!"  Defendant William Powell, exercising

authority delegated by Georgia Diagnostic's Warden, approved the Review

Committee's recommendation on November 3, 2015.

159.   Despite once again completing all of the 2015 Policy's requirements

for a transfer, Gumm remained confined in the SMU.

160.   Gumm appealed the November 3 recommendation using a

"Review/Classification Appeal Form."  He wrote:

> State prison regulation provides that inmates who
> successfully complete the SMU: Tier III Program are
> reassigned to the general prison population, not to a Tier
> II Program.  GDC SOP II B09-0004.  I also object to the
> Tier III Program staff's failure to implement all previous
> approved recommendations for my transfer from the Tier
> III Program in compliance with GDC SOP II B09-0004.

In a space designated for a response from Georgia Diagnostic's Warden,

Defendant Rodney McCloud, the SMU Superintendent, wrote:

> The  SMU  Classification  Committee  will  make
> recommendations for release to the Warden.  The Warden
> will review and [sic] the decision of the Classification
> Committee and approve or deny the Classification
> Committees [sic] decision.  The recommendation will be
> forwarded to the Director of Field Operations for final
> approval.  Your release is denied.  Placement into a Tier II
> Program will be reviewed on a case by case basis upon
> approval for release.

161.   On February 10, 2016, a Review Committee composed of Defendant

Williams, Defendant Powell, and counselor Karen Forts held a hearing and wrote

on the review form, "Recommends you be considered from the SMU program as

43

you have been DR free for more than 6 months.  Review in 90 days and appeal

form issued."  The Review Committee checked the box labeled, "Transfer to a

Level (5) Administrative Segregation Tier II Program."  In an area on the form

designated "Offender's rebuttal," the form quotes Gumm as saying, "When am I

transferring?"  Defendant June Bishop, exercising authority delegated by Georgia

Diagnostic's Warden, approved the Review Committee's recommendation on

February 10, 2016.

162.   Despite once again completing all of the 2015 Policy's requirements

for a transfer, Gumm remained confined in the SMU.

163.   Gumm appealed the February 10 recommendation using a

"Review/Classification Appeal Form."  On the form, Gumm wrote:

> I have successfully completed the Tier III Program.
> Pursuant to GDC SOP II B09-004, I am entitled to
> reassignment to the general prison population.   I
> strenuously object to any decision contrary to what I am
> entitled under the official GDC policy.

In a space designated for a response from Georgia Diagnostic's Warden,

Defendant Bruce Chatman did not record a comment.  He checked a block

indicating that he concurred with the Review Committee's recommendation of

transfer from the SMU.

164.   On May 18, 2016, a Review Committee composed of Defendant

Williams, Lieutenant Andrew Russo, and counselor James Goody held a hearing

44

and wrote on the review form, "Recommends transfer for you have been DR free for more than 6 months.  Appeal form issued.  Review again in 90 days."  The Review Committee checked the box labeled, "Transfer to a Level (5) Administrative Segregation Tier II Program."  Defendant June Bishop, exercising authority delegated by Georgia Diagnostic's Warden, approved the Review Committee's recommendation on May 26, 2016.

165.   Despite once again completing all of the 2015 Policy's requirements for a transfer, Gumm remained confined in the SMU.

166.   Gumm appealed the May 18 recommendation using a "Review/Classification Appeal Form."  On the form, Gumm wrote:

> I have successfully completed the Tier III Program.
> Pursuant to GDC SOP II B09-004, I am entitled to
> reassignment to the general prison population.    I
> strenuously object to any decision contrary to what I am
> entitled under the official GDC policy.

In a space designated for a response from Georgia Diagnostic's Warden, Defendant Bruce Chatman did not record a comment.  Defendant Chatman checked a block indicating that he concurred with the Review Committee's recommendation of transfer from the SMU.

### e.    The 2016 Tier III Policy: August 2016 to November 2017

167.   On August 8, 2016, the Georgia Department of Corrections issued a "Policy Information Bulletin" revising the Tier III Policy ("the 2016 Tier III

Policy").  (Ex. D.)  The 2016 Tier III Policy left intact most of the 2015 Tier III

Policy, but made several changes with respect to the Review Committee's 90-day

reviews.

168.   The 2016 Tier III Policy revised the 90-Day Review forms to

eliminate the Review Committee's ability to recommend that a prisoner be

transferred to a general population housing assignment.  Instead, the Review

Committee could only recommend transfer "to an Administrative Segregation-Tier

II Program."  (Ex. D at 1, 6.)

169.   The 2016 Tier III Policy further provided, "If the recommendation of

the Tier III Program Review Committee is that offender be released by being

transferred to an Administrative Segregation-Tier II Program, [then a] 90 Day

Review-Hearing Form and [a] Review-Classification Appeal Form must be

forwarded to the Director of Field Operations who shall make the final decision."

(Ex. D at 2.)  If the Director of Field Operations "approves of the recommendation

to release the offender by transfer to a Tier II facility, then staff at the Tier III

Program facility must submit the request to Offender Administration to initiate the

transfer."  (*Id.*)

170.   Under the 2016 Tier III Policy, the 90-Day Review forms were

revised to require approval by the SMU Superintendent, the Warden of Georgia

Diagnostic, and the Director of Field Operations.  The Review-Classification

Appeal forms were similarly revised to provide for approval by both the SMU

Superintendent and the Director of Field Operations.  The policy thus required a

prisoner to obtain a decision in his favor at four separate levels of review before he

could be transferred.  An unfavorable decision by the Review Committee, the

Superintendent, the Warden, or the Director of Field Operations, would ensure that

the prisoner remained in indefinite solitary confinement in the SMU.

171.   To date, Gumm has received four reviews under the 2016 Tier III

Policy.  The reviews occurred on August 19, 2016; December 8, 2016; March 9,

2017; and June 6, 2017.

172.   On August 19, 2016, a Review Committee composed of Defendant

Williams, Defendant Powell, and counselor James Goody held a hearing and wrote

on the review form, "Recommends that you release transfer to Admin. Seg.-Tier II

Program.  Review again in 90 days and issued appeal form."  The Review

Committee checked a box labeled, "Release-Transfer to Administrative

Segregation-Tier II Program."  In an area on the form designated "Offender's

rebuttal," the form quotes Gumm as saying, "Please stop lieing to us about leaving

here!"  Defendant June Bishop approved the Review Committee's

recommendation on August 23, 2016, and Defendant Eric Sellers approved the

recommendation on August 25, 2016.

173.   Gumm appealed the August 19 recommendation using a "Review/Classification Appeal Form."  On the form, Gumm wrote:

> I have successfully completed the Tier III Program. Pursuant to GDC SOP II B09-004, I am entitled to reassignment to the general prison population.  I strenuously object to my continued confinement in the Tier III Program in violation of official Tier III Program policy and in total disregard for the Review Committee's recommendations.

In a space designated for a response from the SMU Superintendent, Defendant June Bishop checked a block indicating that she concurred with the Review Committee's recommendation of transfer from the SMU.  However, in a space designated for comments by the Director of Field Operations, Defendant Steve Upton recorded the following comment: "Inmate is a threat to the operation of safe and secure facilities as being an escape risk."  There was no further explanation. Gumm remained in the SMU.

174.   On December 8, 2016, a Review Committee composed of Defendant Williams, Defendant Powell, and counselor Karen Forts held a hearing and wrote on the review form, "Recommends release transfer to Administrative Segregation-Tier II Program.  Appeal form issued.  Review in 90 days."  The Review Committee checked a box labeled, "Release-Transfer to Administrative Segregation-Tier II Program."  In an area on the form designated "Offender's rebuttal," the form quotes Gumm as saying, "What's up with the Ipads?"

48

Defendants Cannon and Sellers approved the recommendation on December 9, 2016.  Defendant Upton subsequently disapproved that recommendation.  On the form, his only written remark was, "Remain."  Gumm remained in the SMU.

175.    On March 9, 2017, a Review Committee composed of Defendant Williams, Lieutenant Lawrence Purvis, and counselor Karen Forts held a hearing and recommended that Gumm be transferred from the SMU.  Defendant Cannon approved the recommendation on March 18, 2017, and Defendant Sellers approved the recommendation on March 20, 2017.  Defendant Upton subsequently disapproved that recommendation.  On the form, his only written remark was, "Remain [sic] current phase."  Gumm remained in the SMU.

176.  Gumm appealed the March 9 recommendation using a "Review/Classification Appeal Form."  On the form, Gumm wrote:

> I have successfully completed the Tier III Program. Pursuant to GDC SOP II B09-004, I am entitled to reassignment to the general prison population. Accordingly, I strongly object to my release-transfer to any Administrative Segregation Tier II Program and my continued confinement in the Tier III Program without legitimate penological justification.

In a space designated for a response from the SMU Superintendent, Defendant Michael Cannon checked a box indicating that he concurred with the Review Committee's recommendation of transfer from the SMU.  Gumm remained in the SMU.

177.   On June 6, 2017, a Review Committee composed of Defendant George Ball, Defendant Powell, and counselor Karen Forts held a hearing and wrote on the review form, "Recommends consideration release/transfer to Tier Program.  Review in 90 days.  Appeal form issued."  The Review Committee checked a box labeled, "Release-Transfer to Administrative Segregation-Tier II Program."  In an area on the form designated "Offender's rebuttal," the form quotes Gumm as saying, "Why haven't I transferred?"  Defendant Cannon approved the recommendation on June 8, 2017, and Defendant Sellers approved the recommendation on June 9, 2017.  On information and belief, Defendant Upton subsequently disapproved that recommendation.  Gumm remained in the SMU.

178.   In June 2017, the Georgia Department of Corrections established an experimental program at Georgia State Prison permitting prisoners to leave their cells for up to six hours per day with a group of three or four other prisoners. Gumm and eight other prisoners were selected as the first to be transferred to the experimental program.

179.   On June 29, 2017, a Review Committee composed of Defendant George Ball, Defendant Powell, and counselor Goody completed 90-day review forms for Gumm and eight other prisoners.  On Gumm's review form, the committee wrote, "Recommends Release from GDCP/SMU (Tier III) and transfer to Tier II program."  No review hearing was held.  The Review Committee

checked a box labeled, "Release-Transfer to Administrative Segregation-Tier II Program." In an area on the form designated "Offender's rebuttal," the form quotes Gumm as saying the same thing he said at his June 6, 2017, review hearing: "Why haven't I transferred?" Defendants Cannon and Sellers approved the recommendation on June 29, 2017. Defendant Upton approved the recommendation on July 5, 2017.

180.   Gumm and the eight other prisoners were transferred to Georgia State Prison on July 24, 2017. One week later, four additional prisoners were transferred to the program.

181.   Upon Gumm's and the other prisoners' arrival, Georgia State Prison Warden Marty Allen warned Gumm and each other prisoner individually that any mistake would result in immediate return to the SMU and that anyone returned to the SMU would never again leave that facility. Allen stated that there were no written policies or criteria governing the experimental program.

182.   Defendant Ricky Myrick, the Assistant Commissioner in charge of facilities statewide, testified at his deposition that the experimental program at Georgia State Prison is temporary and may be terminated by the end of 2017, though there is a possibility that it will be extended. Myrick confirmed that prisoners may be removed from the experimental program and returned to the SMU without any opportunity to be heard.

51

### f.   The 2017 Tier III Policy: November 2017 to Present

183.   On November 8, 2017, the Georgia Department of Corrections issued a revised Tier III Policy ("the 2017 Tier III Policy"). (Ex. E.) The 2017 Tier III Policy is substantially similar to the 2016 policy, with three principal changes. First, the 2017 Tier III Policy provides that if the Director of Field Operations disapproves a recommendation that a prisoner be transferred from the SMU, the Assistant Commissioner of Facilities may override that decision. (Ex. E at 12.) Second, the 2017 Tier III Policy provides that prisoners' five hours of out-of-cell recreation occurs five days per week instead of two days. (Ex. E at 8.) Third, the 2017 Tier III Policy provides that prisoners may request reading materials through "the institution's library." (Ex. E at 9.)

184.   On information and belief, the changes set forth in the 2017 Tier III Policy have not been implemented as of December 14, 2017.

185.   The 2017 Tier III Policy has not yet been applied to Plaintiff Gumm due to his current assignment to an experimental program at Georgia State Prison.

### 2.   Defendants' application of their policies to Brown and Watkins

186.   Plaintiffs Robert Watkins and Johnny Mack Brown have been and will continue to be subjected to Defendants' unlawful policies absent declaratory and injunctive relief.

52

187.   Johnny Mack Brown has been held in the SMU for more than nine years despite having received approximately 16 recommendations for transfer from the SMU.  The recommendations for transfer have been denied without explanation by the Central Office.

188.   Robert Watkins has been held in the SMU for more than eight years despite at least two recommendations for transfer from the SMU.  The recommendations for transfer have been denied without explanation by the Central Office.

189.   Watkins was eventually selected to participate in the same experimental program as Plaintiff Gumm.  On July 31, 2017, Watkins was transferred to Georgia State Prison.  Less than three weeks later, Watkins was removed from the experimental program for allegedly being insubordinate toward a correctional officer.  A disciplinary report for insubordination was prepared but was subsequently dismissed.  Nonetheless, Watkins was summarily returned to the SMU without a hearing on August 25, 2017.

190.   On a form titled, "Special Management Unit: Tier III Program Assignment Request Form," Georgia State Prison Warden Marty Allen checked two boxes indicating the "reasons" for Watkins's return to the SMU.  One box stated that Watkins was "a threat to the safe and secure operation of the facility's offender management system."  The other box stated that Watkins was "considered

to be a person of notoriety."  In a box for the "Specific Reason" Watkins was being

returned to the SMU, Allen wrote that Watkins had "continued to be insubordinate

to the staff at [Georgia State Prison]."  Apart from "insubordination," no other

reason was given for Watkins's return to the SMU.

191.   Alleged "insubordination" is one of the most common disciplinary

infractions with which Georgia prisoners are charged.  Countless prisoners in the

general prison population have committed this infraction and more serious

infractions, without being sent to the SMU.

### 3.   Defendants' responsibility for prisoners' continued solitary confinement in the SMU

192.   Despite completing all requirements for transfer under the 2012 SMU

Policy, 2013 Tier III Policy, and 2015 Tier III Policy, Gumm remained in the SMU

for more than seven years, and Defendants Brown and Watkins have remained in

the SMU even longer, due to the action or inaction of Defendants Ward, Myrick,

Upton, Jacobs, Tillman, Sellers, Chatman, Cannon, McCloud, Bishop, Powell,

Ball, Logan, Sumpter, and/or Williams.

193.   Defendants Ward, Myrick, Upton, Jacobs, and Tillman, during their

respective tenures in the Department's Central Office, had the authority to change

both the conditions of confinement in the SMU and the procedures and standards

used in deciding whether to transfer a prisoner from the SMU.

194.   Defendants Ward, Myrick, Upton, Jacobs, and Tillman knew or should have known that the procedures involved in reviewing prisoners for transfer from the SMU failed to provide notice of the reasons for the Central Office decision or an opportunity for prisoners to address decisionmakers.

195.   Defendants Ward, Myrick, Upton, Jacobs, and Tillman knew that they followed no standards or criteria in deciding whether to accept or reject a 90-day Review Committee's recommendation that a prisoner be transferred from the SMU.

196.   Defendants Sellers, Chatman, Cannon, McCloud, Powell, and Bishop, in their respective roles as administrators responsible for the SMU, failed to ensure that the Review Committee provided a complete and accurate assessment of a prisoner's conduct, attitude, and behavior, at each 90-day review, so that Central Office officials could meaningfully review recommendations for transfer. Similarly, Defendants Powell, Ball, Logan, Sumpter, and Williams, in sitting on the Review Committee, failed to provide a complete and accurate account of their reasons for recommending transfers from the SMU.  Instead, the Review Committee members simply wrote some variation of the same thing each time— "Recommend transfer from SMU Program and review in 90 days.  Appeal form issued."—accompanied by a couple of random words spoken by the prisoner, such as, "What's up with the Ipads?" at Gumm's December 2016 review.

55

### 4. Arbitrariness of prisoners' continued solitary confinement in the SMU

197.   Even when experienced officers and administrators conclude that a prisoner's behavior no longer requires the SMU's strict security measures, and recommend the prisoner for transfer to a standard prison, an unexplained and unreviewable decision by a Central Office official keeps the prisoner confined under conditions where he is forced to remain compliant.  Under those conditions, the prisoner is unable meaningfully to demonstrate that his good conduct is the product of his own volition.  Rather, Central Office personnel are likely to attribute the prisoner's good conduct to his near-total lack of freedom, using the prisoner's obedience to justify continued confinement under the same restrictive conditions.

198.   Many prisoners have left the SMU only because they completed their prison sentences and were released from the prison system altogether.  In the 2015 calendar year, 13 of the 16 prisoners released from the SMU had reached the end of their sentences and could no longer be held in any Georgia prison.  Another 13 prisoners were released from the SMU to free society in 2016, comprising nearly half of the prisoners who left the SMU that year.  During the first six months of 2017, only five prisoners were released from the SMU; four of the five had completed their prison sentences and were released directly to society.  Despite knowing that these prisoners will return to free society with little or no correctional

control, Defendants refuse to give them an opportunity to conform their conduct to an ordinary prison environment while they are in prison.

199.   Defendants could easily modify the conditions and policies that apply to the SMU so that prisoners have a meaningful opportunity to show their fitness for less restrictive conditions.  For example, the SMU's physical layout would accommodate prisoner common areas in each wing, where prisoners could be allowed out of their cells unrestrained subject to their continued good behavior. Prisoners could also perform work details within the SMU's secured areas. Though security concerns may justify withholding those opportunities from certain prisoners, there is little justification for withholding them from prisoners who have been recommended for transfer from the SMU repeatedly over the course of several years, and who have consistently demonstrated good behavior while housed in the SMU.

### D.     Plaintiffs' Indefinite Solitary Confinement Deprives Them of Basic Human Needs and Subjects Them to a Risk of Serious Harm.

200.   Confinement in a cell for an average of 22 hours or more per day without meaningful human contact is deemed "solitary confinement" by correctional and medical experts in the United States and internationally.

201.   The use of solitary confinement and sensory deprivation in the SMU causes a substantial risk of serious harm and deprives people assigned to the SMU of basic human needs.

202.   Solitary confinement has historically been a torture technique whose detrimental effects on physical and mental health are obvious to a reasonable person.

203.   Indefinite solitary confinement violates contemporary standards of decency and defies a consensus among correctional experts, who condemn the practice.  The Association of State Correctional Administrators, of which Department Commissioner Gregory Dozier is a member, recently acknowledged that "[p]rolonged isolation of individuals in jails and prisons is a grave problem in the United States."  Press Release, Ass'n of State Corr. Adm'rs, *New Report on Prisoners in Administrative Segregation Prepared by the Association of State Correctional Administrators and the Arthur Liman Public Interest Program at Yale Law School* (Sept. 2, 2015).  As a result, "[c]orrectional leaders across the country are committed to reducing the number of people in restrictive housing and altering what it means to be there."  *Id.*

204.   Plaintiffs expect to show that many states have restricted their use of solitary confinement in the past decade.  Colorado now requires prisoners in its restrictive Management Control Unit to have at least four hours outside of their

cells each day.  Washington and Pennsylvania have begun to replace solitary

confinement with educational programs.  Other states that have restricted their use

of solitary confinement include Alaska, Arizona, California, Connecticut, Indiana,

Maine, Massachusetts, Michigan, Mississippi, Nebraska, New Mexico, New York,

Ohio, Oklahoma, Virginia, West Virginia, and Wisconsin.  The United States

government has taken similar action to curb solitary confinement of federal

prisoners.

205.   The United Nations Special Rapporteur on Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment has concluded that solitary

confinement can constitute torture in violation of the International Covenant on

Civil and Political Rights and the Convention Against Torture.  The Special

Rapporteur recommended absolute prohibitions on both indefinite solitary

confinement and the use of solitary confinement for more than 15 days at a time.

206.   Under Rules 43.1 and 44 of the United Nations Standard Minimum

Rules for the Treatment of Prisoners, prisoners cannot be held for more than 22

hours per day without meaningful human contact indefinitely or for more than 15

days at a time.

207.   The American Bar Association (ABA) recommends that "[c]onditions

of extreme isolation should not be allowed regardless of the reasons for a

prisoner's separation from the general population." *Standards for Criminal*

*Justice: Treatment of Prisoners* § 23-3.8(b) (3d ed. 2011).  According to the ABA, "Conditions of extreme isolation generally include a combination of sensory deprivation, lack of contact with other persons, enforced idleness, minimal out-of-cell time, and lack of outdoor recreation."

208.   Plaintiffs expect to show that social isolation brought on by conditions in the SMU causes or exacerbates hypertension, stroke, diabetes, and cardiac diseases.  It also reduces life expectancy.

209.   Plaintiffs expect to show that symptoms associated with solitary confinement for ten days or longer include insomnia, dizziness, heart palpitations, deteriorated vision, weight loss, severe digestive problems, back and joint pain, and aggravation of preexisting medical problems.  These symptoms are common among prisoners held in solitary confinement, even among previously healthy prisoners.

210.   Plaintiffs expect to show that solitary confinement causes severe discomfort that is processed by the nervous system as pain.  Plaintiffs expect to show that all other deprivations that are processed as pain—such as food and sleep deprivation—are associated with basic human needs that are necessary for survival.  The fact that isolation registers in the nervous system as pain shows that social interaction is a basic human need that is denied to people housed in the SMU.

211.   Plaintiffs expect to show that the lack of natural sunlight in the SMU causes prisoners to lose the normal diurnal rhythm that orients a person's biological processes.  As a result, prisoners in the SMU experience significant sleep deprivation, resulting in physiological and psychological deterioration.

212.   Plaintiffs expect to show that numerous psychological consequences result from solitary confinement.  People exhibit a measurable loss in brain activity within a few days of being placed in solitary confinement.  The brain waves affected are those associated with cognition and emotional control.  Studies have found that the impaired brain functioning caused by prolonged isolation continues long after a person returns to a normal social setting.

213.   Plaintiffs expect to show that many of the conditions associated with life in the SMU—including lack of physical activity, lack of meaningful human interaction, and lack of visual stimulation—are sufficient to dramatically change a person's brain functioning when confinement continues for longer than a few days.

214.   Plaintiffs expect to show that solitary confinement of ten days or longer results in anxiety, hypersensitivity to stimuli, difficulties in concentration, memory loss, decreased impulse control, and other psychological problems.

215.   Plaintiffs expect to show that these psychological consequences manifest themselves in concrete ways that harm prisoners as well as society.  For example, people who have been held in solitary confinement have a markedly

higher rate of recidivism upon their release from prison.  In addition, people held in solitary confinement have a markedly higher rate of suicide.

216.   Plaintiffs expect to show that the harmful consequences of solitary confinement can be permanent.

217.   Plaintiffs expect to show that Defendants are actually aware of the consequences of long-term solitary confinement through their exposure to reliable information produced by the Department or provided to them by outside experts and agencies.  Plaintiffs further expect to show that Defendants work in or have visited the SMU and are thus familiar with the conditions there.

### E.  Gumm's Seven-Year Term of Solitary Confinement Is Grossly Disproportionate Punishment.

218.   Gumm was placed in the SMU as punishment for an alleged escape attempt.  Had he not been accused of attempting to escape, he would have remained in the general prison population at Telfair State Prison.

219.   Under Department Policy 209.01, governing the punishments imposed on prisoners for disciplinary infractions, the maximum amount of isolation imposed for any offense—including homicide—is "30 days."  Ga. Dep't of Corr., Policy 209.01, Attach. 5 at 1 (Apr. 30, 2015).  Attempted escape is not one of the most serious offenses.  It is listed as a "high severity offense" punishable by "[i]solation [of] one to fourteen days."  *Id.* at 2; *see also id.*, Attach. 4 at 3.

220.   With over seven years of isolation in the SMU, Gumm served the maximum disciplinary sanction listed for attempted escape—14 days of isolation— nearly 200 times over.

221.   Numerous Georgia prisoners have been convicted of escaping or attempting to escape from correctional facilities.  Most of those prisoners are housed in the general prison population, and many are held in minimum or medium security prisons.

222.   Gumm expects to show that most prisoners found guilty of actual or attempted escapes from prison are not placed in the SMU and, to the extent that they are placed in isolation, serve only a small fraction of the time that Gumm has served.

223.   Gumm's prolonged confinement in isolation is grossly disproportionate to the alleged offense that resulted in his placement in the SMU: a nonviolent escape attempt that was voluntarily abandoned.

**F.   Gumm Was Deprived of Sufficient Amounts of Food.**

224.   Prisoners in the SMU receive three meals per day Monday through Thursday, and two meals per day on Friday, Saturday, and Sunday.

225.   The SMU lacks a kitchen or dedicated food-service staff.  Meals for SMU prisoners are prepared at Georgia Diagnostic's main prison.  The food items for each meal are loaded onto a vehicle at the main prison and driven to the SMU.

226.   In the SMU, inmate orderlies from outside prisons prepare meal trays to be distributed to prisoners.  The orderlies place food on the trays from bulk containers containing various meal items.

227.   Inmate orderlies are supposed to be supervised by professional food-service staff in preparing the trays.  However, the orderlies frequently prepare the trays without supervision.  As a result, prisoners in the SMU often receive trays with smaller portions of food than are given to general population prisoners.

228.   Inmate orderlies and others fail to take precautions to ensure that food is sanitary and safe to eat.  Gloves and hairnets are rarely worn.  Food trays are not washed properly and frequently contain traces of old food residue, creating a risk of food poisoning.

229.   Due to the delays involved in serving food to SMU prisoners, meals are almost always served cold.

230.   Gumm expects to show that SMU prisoners are served food items that are inedible or have less nutritional content than food served to general population prisoners.  Food items frequently are undercooked or lack ingredients necessary for their full nutritional content.  Prisoners in the SMU often receive rotten fruits and vegetables, expired milk, and other items deemed unsuitable for prisoners at Georgia Diagnostic's main prison.

231.   Gumm expects to show that between 2010 and 2014, food-service staff members at Georgia Diagnostic's main prison, with the knowledge of Defendant Margaret Washington, the Food Service Director, routinely substituted normal food items with less nutritious items for prisoners in the SMU.

232.   Gumm is a six-foot-tall, 41-year-old male.  At the time of Gumm's assignment to the SMU in January 2010, Gumm weighed 204 pounds.  His normal weight is around 180 to 190 pounds.

233.   Soon after arriving in the SMU, Gumm noted that his meals contained significantly less food than he received as a general population prisoner.  Gumm complained to the SMU's highest-ranking officers, Defendants Bishop and Powell, about the systematic food deprivation.  Gumm expects to show that many other prisoners in the SMU complained of food deprivation such that any officer assigned to the SMU would have known that underfeeding of prisoners was a pervasive and ongoing problem.

234.   Gumm expects to show that Defendants Bishop and Powell met with Defendant Washington twice in 2012 about food deprivation and sanitation.  The problems with food service continued.  Gumm expects to show that numerous formal grievances and incident reports were submitted concerning food service, and many prisoners received disciplinary reports in connection with their complaints about the food.  In addition, many prisoners continued to complain

informally to correctional officers and administrators in the SMU, including

Defendants Powell, Bishop, Logan, and Williams.

235.   For more than three years, Gumm experienced muscle degeneration,

constant bone and joint pain, and extreme hunger pains throughout the day and

night.

236.   During a routine medical examination on November 13, 2012, Gumm

learned that he had lost around 40 pounds since arriving in the SMU in January

2010.

237.   Gumm complained to the examining physician about his constant

bone and joint pain and requested a vitamin deficiency test.  The physician

responded that vitamin deficiency tests were unavailable.  The physician

prescribed fish oil pills for Gumm's joint pain.

238.   Gumm filed informal and formal grievances about the food

deprivation and his weight loss soon after the November 13 examination.  His

grievances requested that Defendants end the systematic food deprivation in the

SMU.  Gumm expects to show that Defendants Bishop, Powell, and Washington

were aware of the grievance.

239.   In response to Gumm's formal grievance, Defendant Washington

wrote, "SMU and the general population are provided the same quality and

quantity of menu items and portion sizes of food required by the daily worksheet."

240.   In April 2013, Gumm was temporarily transferred to Valdosta State Prison for a court hearing.  During the process of entering Valdosta State Prison, Gumm learned that his weight remained abnormally low, around 160 pounds.  The weight loss was confirmed when he returned to the SMU four days later.  An SMU nurse advised Gumm to submit a formal medical request concerning his extreme weight loss.

241.   After over a month of delay, Gumm finally saw a physician.  The physician questioned Gumm about whether he could purchase commissary items to compensate for the SMU's lack of food.  The physician prescribed no dietary supplements.

242.   Medical testing revealed no medical conditions that would have caused Gumm's weight loss.

243.   Between May 2013 and December 2013, Gumm received money from his family to purchase additional food items.  After consuming the additional food, Gumm noticed his health improving and his weight returning to normal.

244.   Plaintiff Gumm expects to show that administrators for Georgia Diagnostic and the SMU, including Defendants Washington, Chatman, McCloud, Bishop, Powell, Logan, and Williams, were aware of the longstanding problems with food service and food deprivation among SMU prisoners.

67

245.   Numerous prisoners in the SMU lodged formal and informal complaints with Defendants about the lack of food.  Defendants' awareness of these problems is reflected in a sign that remains posted in the SMU's Medical Unit, warning prisoners, "DO NOT ASK FOR EXTRA FOOD OR VITAMIN [sic]."  Affixed to the sign is a handwritten note that states, "READ THIS," with an arrow pointing to the sign's text.

246.   Numerous officers and administrators made comments reflecting widespread awareness that prisoners in the SMU were underfed.  For example, correctional officers assigned to the SMU often made jokes about the lack of food when they spoke to prisoners.  Several SMU prisoners lost significant amounts of weight, sometimes as much as 70 to 100 pounds.  Defendant McCloud specifically stated on one occasion that he noticed some of the prisoners in the SMU were losing weight.

247.   In addition, Plaintiff Gumm expects to show that Defendants ensure that SMU prisoners receive the proper types and amounts of food on days when the SMU receives prominent visitors from outside the prison system, reflecting Defendants' knowledge that the amount and quality of food ordinarily served to SMU prisoners is inadequate.

## CLASS ACTION ALLEGATIONS

248.   Plaintiffs bring this class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated prisoners.  Plaintiffs seek to certify a class defined as follows: All prisoners who are or will be assigned to the Special Management Unit (SMU) at Georgia Diagnostic & Classification Prison.

249.   Plaintiffs meet the requirements of Rule 23(a) for the following reasons:

(a)   The class is so numerous that joinder of all members is impracticable.  The class consists of up to 192 current SMU prisoners and an unknown number of prisoners who will be assigned to the SMU in the future.  The class is ascertainable because the placement of a prisoner in the SMU is immediately apparent from Defendants' records and the fact of the prisoner's confinement in the SMU. Plaintiffs expect to show that approximately 150 to 192 prisoners are assigned to the SMU at a given time.

(b)   There are questions of law and fact common to the class concerning whether prisoners have a liberty interest in avoiding confinement in the SMU; whether Defendants

69

afford prisoners process commensurate with the liberty interest infringed by confinement in the SMU; and whether confinement in the SMU constitutes cruel and unusual punishment.

(c)     The policies challenged in this action apply with equal force to Plaintiffs and all members of the class so that Plaintiffs' claims are typical of those of the class. Plaintiffs are subject to the same unconstitutional conditions and procedures as other prisoners assigned to the SMU.

(d)     Plaintiffs and their counsel will adequately protect the interests of the class.  Plaintiffs possess no interests adverse to those of other class members.  Plaintiffs are represented by attorneys with the Southern Center for Human Rights, a nonprofit organization with experience in prisoners' rights litigation, and Kilpatrick, Townsend & Stockton, a large private law firm with extensive experience in complex class action litigation.

250.   Plaintiffs meet the requirements of Rule 23(b)(2) in that Defendants have acted or failed to act on grounds that apply generally to the class, so that final

injunctive or declaratory relief is appropriate respecting the class as a whole.  In

particular, Plaintiffs seek to represent the class in challenging, under the Eighth

and Fourteenth Amendments, unconstitutional review procedures and conditions of

confinement in the SMU.  Those procedures and conditions apply to all SMU

prisoners, and any prospective relief granted to Plaintiffs with respect to those

matters will necessarily benefit each class member.

## CLAIMS FOR RELIEF

### COUNT I:

### VIOLATIONS OF THE FOURTEENTH AMENDMENT
### DUE PROCESS CLAUSE
### (Procedural Due Process)

### (By all Plaintiffs against Defendants Ward, Myrick, Upton, Jacobs, Tillman, Sellers, Chatman, Cannon, McCloud, Powell, Bishop, Ball, Logan, Sumpter, and Williams)

251.   Plaintiffs incorporate paragraphs 1-13 and 16-250 as if fully set out herein.

252.   Prolonged solitary confinement in the Special Management Unit (SMU) constitutes an atypical and significant hardship relative to the ordinary incidents of life in Georgia prisons.

253.   The punishment inflicted by prolonged solitary confinement in the SMU far exceeds the expected bounds of imprisonment, and thus gives rise to a protected liberty interest under the Due Process Clause.

254.   Defendants have failed to provide meaningful review to Plaintiffs and other prisoners assigned to the SMU.  In particular, Defendants Ward, Myrick, Upton, Jacobs, and Tillman established and maintained a system that failed to give prisoners notice or a meaningful opportunity to be heard before their transfers to other facilities were denied.  Defendants Sellers, Chatman, Cannon, McCloud, Powell, Bishop, Ball, Logan, Sumpter, and Williams exacerbated the lack of

meaningful review by failing to completely and accurately document each prisoner's positive attributes and behavior, or by failing to ensure that their subordinates did so.

255.   Defendants Ward, Myrick, Upton, Jacobs, and Tillman have failed to establish procedures that adequately avoid the risk of erroneously placing or retaining prisoners in the SMU.  The private liberty interest at stake is particularly weighty in light of the widely recognized harms caused by prolonged solitary confinement.  Procedures that Defendants are required to implement include a heightened evidentiary requirement, hearings at which the prisoner may attend and address the tribunal in person, and a presumption against continued solitary confinement after a prisoner has remained in solitary confinement for a certain amount of time.

256.   Defendants Ward, Myrick, Upton, Jacobs, Tillman, and Davis have failed to establish a system by which SMU prisoners can demonstrate their ability to maintain good behavior under ordinary prison conditions.  The failure to provide additional out-of-cell time, reasonable work assignments, and other opportunities for SMU prisoners to demonstrate good behavior unduly interferes with their right to receive meaningful review of their readiness for a general population housing assignment.

73

257.    Defendants Sellers, Chatman, Cannon, McCloud, Powell, Bishop, Logan, Ball, and Williams knew or should have known that the SMU's procedures are and were grossly inadequate and violate the due process rights of prisoners. These Defendants nonetheless failed to adjust prisoners' conditions of confinement to avoid depriving them of their protected liberty interests without due process of law.

258.    For the reasons above, Defendants violated the Due Process Clause.

259.    Plaintiffs seek declaratory and injunctive relief on behalf of themselves and a class of similarly situated persons to prevent further violations of their rights by Defendants Ward, Myrick, Upton, Jacobs, Tillman, Sellers, Chatman, Cannon, McCloud, Powell, Bishop, Ball, Logan, Sumpter, and Williams.

260.    Plaintiff Timothy Gumm seeks compensatory, nominal, and punitive damages for previous violations of his rights by Defendants Ward, Myrick, Upton, Jacobs, Tillman, Sellers, Chatman, Cannon, McCloud, Powell, Bishop, Logan, and Williams.

## COUNT II:

### VIOLATIONS OF THE FOURTEENTH AMENDMENT
### DUE PROCESS CLAUSE

### (Substantive Due Process)

### (By Plaintiff Gumm against Defendants Ward, Myrick, Upton, Jacobs, and Tillman)

261.   Plaintiff Timothy Gumm incorporates paragraphs 1-13 and 16-250 as if fully set out herein.

262.   Defendants Ward, Myrick, Upton, Jacobs, and Tillman have established a system that keeps prisoners in the Special Management Unit (SMU) arbitrarily and capriciously.  These Defendants' failure to consider prisoners for less restrictive housing assignments—even when prisoners will soon be released from prison altogether—fails to rationally further a legitimate penological interest.

263.   Defendants Ward, Myrick, Upton, Jacobs, and Tillman have established a system by which an SMU prisoner is expected to demonstrate his fitness for a general population housing assignment while he is housed in conditions where he cannot even leave his cell without being strip-searched, handcuffed, and escorted by two or more officers.  These Defendants' repeated decisions to deny transfer to Timothy Gumm and similarly situated prisoners, without providing an opportunity for the prisoners to demonstrate their good behavior under less restrictive conditions of confinement, fails to rationally further a legitimate penological interest.

75

264.   Defendants Ward, Myrick, Upton, Jacobs, and Tillman routinely transfer prisoners from the SMU to administrative segregation or the "Tier II Program," where prisoners continue to live under extremely restrictive conditions indefinitely, often in solitary confinement.  Defendants' policy of continuing to segregate prisoners as a matter of course, and in violation of Defendants' own longstanding written policy mandating a transfer to general population when a prisoner completes the SMU program, fails to rationally further a legitimate penological interest.

265.   Plaintiff Timothy Gumm seeks declaratory relief and injunctive relief to prevent further violations of his rights; and compensatory, nominal, and punitive damages for previous violations of his rights by Defendants Ward, Myrick, Upton, Jacobs, and Tillman.

## COUNT III:

### VIOLATIONS OF THE EIGHTH AMENDMENT
### CRUEL AND UNUSUAL PUNISHMENTS CLAUSE

### (Solitary Confinement)

**(By all Plaintiffs against Defendants Ward, Myrick, Upton,
Jacobs, Tillman, Sellers, Chatman, Cannon, McCloud,
Powell, Bishop, Ball, Logan, Sumpter, and Williams)**

266.    Plaintiffs incorporate paragraphs 1-13 and 16-250 as if fully set out herein.

267.    Defendants Ward, Myrick, Upton, Jacobs, and Tillman have final authority over each prisoner's duration of confinement in the Special Management Unit (SMU), and the authority to prescribe the conditions of prisoners' confinement, including the duration and degree of isolation imposed on prisoners. Defendants Sellers, Chatman, Cannon, McCloud, Powell, Bishop, Ball, Logan, Sumpter, and Williams have direct control over the conditions of confinement in the SMU, including the duration and degree of isolation imposed on prisoners.

268.    Prolonged or indefinite solitary confinement is considered torture by many authorities and violates contemporary standards of decency in the United States and many other countries.

269.    Prolonged or indefinite solitary confinement deprives prisoners of basic human needs, including exercise, social interaction, and sensory stimulation. These deprivations are processed by the nervous system as pain.

270.   Prolonged or indefinite solitary confinement creates a substantial risk of serious harm to prisoners.  The potential harms include mental illness, brain dysfunction, suicide, self-mutilation, hypertension, and heart problems.  The effects continue long after a person is released from confinement, and may be irreversible.

271.   By causing Plaintiffs and other prisoners to remain in the SMU indefinitely, and failing to take action to alleviate the conditions there, Defendants violate contemporary standards of decency, deprive prisoners of basic human needs, and display deliberate indifference to the serious risk of harm caused by prolonged or indefinite solitary confinement, violating the Eighth Amendment prohibition against cruel and unusual punishment.

272.   Plaintiffs seek declaratory and injunctive relief on behalf of themselves and a class of similarly situated persons to prevent further violations of their rights by Defendants Ward, Myrick, Upton, Jacobs, Tillman, Sellers, Chatman, Cannon, McCloud, Powell, Bishop, Ball, Logan, Sumpter, and Williams.

273.   Plaintiff Timothy Gumm seeks compensatory, nominal, and punitive damages for previous violations of his rights by Defendants Ward, Myrick, Upton, Jacobs, Tillman, Sellers, Chatman, Cannon, McCloud, Powell, Bishop, Logan, and Williams.

## COUNT IV:

### VIOLATIONS OF THE EIGHTH AMENDMENT
### CRUEL AND UNUSUAL PUNISHMENTS CLAUSE

### (Grossly Disproportionate Punishment)

### (By Plaintiff Gumm against Defendants Ward, Myrick, Upton, Jacobs, and Tillman)

274.   Plaintiff Timothy Gumm incorporates paragraphs 1-13 and 16-250 as if fully set out herein.

275.   Gumm was held in isolation for more than seven years based on rumors by other prisoners that he was involved in a nonviolent and voluntarily abandoned attempt to escape from prison.

276.   Had Gumm been convicted of attempted escape at a disciplinary hearing, his maximum punishment would have been 14 days of isolation.

277.   Defendants Ward, Myrick, Upton, Jacobs, and Tillman have violated Gumm's right to freedom from cruel and unusual punishment by holding him in isolation for a grossly disproportionate amount of time.

278.   Plaintiff Timothy Gumm seeks declaratory relief and injunctive relief to prevent further violations of his rights; and compensatory, nominal, and punitive damages for previous violations of his rights by Defendants Ward, Myrick, Upton, Jacobs, and Tillman.

## COUNT V:

### VIOLATIONS OF THE EIGHTH AMENDMENT
### CRUEL AND UNUSUAL PUNISHMENTS CLAUSE

### (Food Deprivation)

### (By Plaintiff Gumm against Defendants Washington, Chatman, McCloud, Powell, Bishop, Logan, and Williams)

279.   Plaintiff Timothy Gumm incorporates paragraphs 1-13 and 16-250 as if fully set out herein.

280.   Food is a basic human need.  Prison officials must provide prisoners with food of sufficient quality and quantity to maintain normal health.

281.   Defendants Washington, Chatman, McCloud, Powell, Bishop, Logan, and Williams knew that Timothy Gumm and other SMU prisoners did not receive adequate amounts of food between 2010 and 2014 because Gumm and other prisoners routinely complained that they were underfed and losing weight, and because numerous prisoners including Gumm were obviously losing body weight. These Defendants violated Gumm's Eighth Amendment right to freedom from cruel and unusual punishment by depriving Gumm of a basic human need and by failing to take reasonable steps to respond after learning of a substantial risk that Gumm was being deprived of sufficient amounts of food.

282.   Plaintiff Timothy Gumm seeks compensatory, nominal, and punitive damages for previous violations of his rights by Defendants Washington, Chatman, McCloud, Powell, Bishop, Logan, and Williams.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully ask that this Court:

(1)    Assume jurisdiction over this action;

(2)    Certify this case as a class action under Rule 23 of the Federal Rules of Civil Procedure;

(3)    Declare that Defendants violated the Eighth and Fourteenth Amendment rights of Plaintiffs and other class members;

(4)    Enter permanent injunctive relief against those Defendants sued in their official capacities, requiring Defendants to:

   (a)    Establish, for the benefit of Plaintiffs and the class members, procedural safeguards commensurate with prisoners' strong interest in avoiding the harmful consequences of prolonged isolation, with specific measures to be determined after further proceedings in this case;

   (b)    Establish, for the benefit of Plaintiffs and the class members, conditions of confinement that reasonably mitigate the substantial risk of serious harm caused by prolonged isolation; and

   (c)    Transfer Plaintiffs to general population housing assignments;

(5)    Award Timothy Gumm nominal, compensatory, and/or punitive damages against those Defendants sued in their individual capacities;

(6)    Award Plaintiffs reasonable attorney's fees, expenses, and costs of litigation under 42 U.S.C. § 1988 and other applicable law; and

(7)    Award such other and further relief as this Court deems just and proper.

81

Respectfully submitted,

/s/ Ryan Primerano

C. Allen Garrett Jr.                  Sarah Geraghty
Ga. Bar No. 286335                    Ga. Bar No. 291393
James F. Bogan III                    Aaron Littman
Ga. Bar No. 065220                    Ga. Bar No. 843053
Chris W. Haaf                         Ryan Primerano
N.C. Bar No. 46077                    Ga. Bar No. 404962
Tamara Serwer Caldas                  SOUTHERN CENTER
Ga. Bar. No. 617053                   FOR HUMAN RIGHTS
KILPATRICK TOWNSEND                   83 Poplar Street, N.W.
& STOCKTON LLP                        Atlanta, Georgia 30303
1100 Peachtree Street, NE             (404) 688-1202
Suite 2800                            (404) 688-9440 (fax)
Atlanta, Georgia 30309                sgeraghty@schr.org
(404) 815-6376
(404) 541-3498 (fax)
agarrett@kilpatricktownsend.com

*Counsel for Plaintiffs*

May 14, 2018

## CERTIFICATE OF SERVICE

I certify that on May 14, 2018, I electronically filed the foregoing using the

CM/ECF system, which will send notification of filing to all counsel of record.

/s/ Ryan Primerano