**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

|                          |     |                                    |
|--------------------------|-----|------------------------------------|
| TIMOTHY GUMM,            | )   |                                    |
| ROBERT WATKINS,          | )   |                                    |
|                          | )   |                                    |
| Plaintiffs,              | )   |                                    |
|                          | )   |                                    |
| v.                       | )   | CIVIL ACTION NO. 5:15-CV-41 (MTT)  |
|                          | )   |                                    |
| BENJAMIN FORD *et al.*,  | )   |                                    |
|                          | )   |                                    |
| Defendants.              | )   |                                    |
|                          | )   |                                    |

## FINAL ORDER AND PERMANENT INJUNCTION

The parties reached and the Court preliminarily approved, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, a class action Settlement Agreement resolving the claims for injunctive and declaratory relief in this case. *See* Doc. 210. After granting preliminary certification of the settlement class, appointing the Plaintiffs' counsel as class counsel, granting preliminary approval of the Settlement Agreement, and approving a process for giving notice to the class, the Court received objections and comments from class members and held a final fairness hearing on April 30, 2019. For the reasons below and those set forth in the Court's preliminary approval order, the Court now grants final certification of the settlement class and final approval of the Settlement Agreement and, at the joint request of the parties, adopts the Settlement Agreement by incorporation as the Order of the Court.

## I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Timothy Gumm brought this action under 42 U.S.C. § 1983 challenging conditions and practices at the Special Management Unit ("SMU") at Georgia Diagnostic

& Classification Prison ("GDCP").  Doc. 1.  The Court appointed attorney Sarah

Geraghty of the Southern Center for Human Rights to represent Plaintiff Gumm.  Doc.

70.  After the parties engaged in several months of discovery, Plaintiff Gumm filed an

amended complaint in March 2017 (Doc. 73), asserting claims for declaratory and

injunctive relief on behalf of a putative class of all prisoners who are or will be held in

the SMU.  The class claims were brought under the Fourteenth Amendment's Due

Process Clause and Eighth Amendment's Cruel and Unusual Punishments Clause.

The complaint alleged that confinement in the SMU created a substantial risk of serious

harm to prisoners and that prisoners were held in the SMU for years without meaningful

procedural safeguards.  The complaint sought classwide injunctive relief to remedy

unconstitutional review procedures and conditions of confinement in the SMU.  In May

2018, Gumm filed a further amended complaint, naming SMU prisoners Robert Watkins

and Johnny Mack Brown as additional plaintiffs and class representatives.  Doc. 140.

Plaintiff Watkins is presently assigned to the SMU.  Plaintiff Brown was subsequently

transferred to the GDCP STEP Unit and has been voluntarily dismissed from this action.

Docs. 202; 209.

The parties engaged in a lengthy discovery process, as well as settlement

discussions over the course of approximately 18 months.  The negotiations were

conducted at arm's length by parties and attorneys familiar with the evidence.  In

December 2018, the parties reached an agreement to certify a settlement class and

settle the injunctive and declaratory relief claims raised in this case.  Doc. 207-1.  This

agreement provides SMU prisoners four hours per day of out-of-cell time, improved

conditions, guidelines for prisoners with mental illness, more robust procedural

safeguards, and limits on who may be assigned to the SMU and the duration that they may be held there.

## II. DISCUSSION

In weighing final approval of a class settlement, the Court's role is to determine whether the settlement, taken as a whole, is "fair, adequate and reasonable and . . . not the product of collusion between the parties." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (internal quotation marks and citations omitted). The factors the Court must consider are set forth in Federal Rule of Civil Procedure 23(e)(2). All but one of these factors—opposition to the settlement—were addressed in the Court's preliminary approval order; that analysis will not be repeated here. *See* Doc. 210 at 5-14. However, the Court will expand on its previous discussion of six issues relevant to the propriety of approval: (1) the Settlement Agreement's compliance with the requirements of the Prison Litigation Reform Act; (2) the adequacy of notice to class members; (3) the objections and comments submitted by class members; (4) the views of class counsel; (5) the proposed attorneys' fee award, *see* Rule 23(e)(2)(C)(iii), and agreements required to be identified under Rule 23(e)(3), *see* Rule 23(e)(2)(C)(iv); and finally, (6) the views of the Court.

The Court also concludes that the settlement class preliminarily certified should be finally certified for settlement purposes under Federal Rule of Civil Procedure 23(b)(2), for the reasons set forth in the Court's preliminary approval order. *See* Doc. 210 at 3-5. This class is defined as "all persons who are or in the future will be assigned to the facility currently known as the Special Management Unit at Georgia Diagnostic & Classification Prison, or who are or in the future will be assigned to the

Tier III Program."

### A. Compliance of the Settlement Agreement with the PLRA's Need-Narrowness-Intrusiveness Requirements

The Prison Litigation Reform Act ("PLRA") generally mandates that prospective relief orders in prison conditions cases "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs" and requires that courts entering them "find[] that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A); *see also* 18 U.S.C. § 3626(c)(1) (applying these requirements to consent decrees). Together, these requirements are commonly referred to as the "need-narrowness-intrusiveness" requirements.

In *Cason v. Seckinger*, the Eleventh Circuit addressed the sort of findings courts are required to make with respect to the need-narrowness-intrusiveness requirements where the parties dispute whether these requirements are met. 231 F.3d 777 (11th Cir. 2000). *Cason* involved a contested motion by defendant prison officials to terminate a consent order under 18 U.S.C. § 3626(b), which provides a right to terminate prospective relief in certain circumstances if the need-narrowness-intrusiveness requirements are not satisfied. *Cason*, 231 F.3d at 781; *see* 18 U.S.C. § 3626(b)(3) (providing that prospective relief "shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation"). The *Cason* panel read § 3626(b)(3) as

4

generally "requiring particularized findings, on a provision-by-provision basis, that each requirement imposed by the consent decrees satisfies the need-narrowness-intrusiveness criteria." 231 F.3d at 785. Where the parties disagree on whether those criteria are satisfied, "[i]t is not enough to simply state in conclusory fashion that the requirements of the consent decrees satisfy those criteria. Particularized findings, analysis, and explanations should be made as to the application of each criteria to each requirement imposed by the consent decrees."[1] *Id.*

*Cason* went on to recognize, however, that the provision-by-provision, particularized-finding requirement does not apply where the parties have agreed that the PLRA's need-narrowness-intrusiveness requirements are satisfied. *See Cason*, 231 F.3d at 785 n.8. Specifically, a district court may rely on the parties' "concessions" and "stipulations" concerning those criteria, just as it would any other undisputed facts. *Id.* Thus, when defendants expressly concede that the PLRA's need-narrowness-intrusiveness requirements are met, the Court need not enter the particularized findings that are otherwise required. *See id.* ("Of course, we do not mean to suggest that the district court must conduct an evidentiary hearing about or enter particularized findings concerning any facts or factors about which there is not dispute. The parties are free to make any concessions or enter into any stipulations they deem appropriate."). Here, the Defendants have not only consented to entry of the Settlement Agreement as an order but have also expressly stipulated that the Settlement

---

[1] The Eleventh Circuit later held that *Cason*'s particularized-finding requirement applies not just to termination but also to entry of prospective relief under 18 U.S.C. § 3626(a). *See United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1228 (11th Cir. 2015) (involving contested motion for preliminary injunction sought by United States in case challenging Florida's failure to provide kosher meals to prisoners).

Agreement satisfies the various requirements of the PLRA, including the need-narrowness-intrusiveness requirements.[2]  Docs. 207 at 15-16; 207-1 at 6. Therefore, particularized findings are not required.  *See Dunn v. Dunn*, 318 F.R.D. 652, 682 (M.D. Ala. 2016); *Laube v. Campbell*, 333 F. Supp. 2d 1234, 1239 (M.D. Ala. 2004); *see also Martinez v. Maketa*, 2011 WL 2222129, at *1 (D. Colo. June 7, 2011) (entering a prospective relief order after observing that "Plaintiffs and Defendant jointly stipulate that the Court should make the findings required for prospective relief under 18 U.S.C. § 3626(a)(1)(A)"); *cf. Thomas v. Bryant*, 614 F.3d 1288, 1323 & n.33 (11th Cir. 2010) (holding defendant prison officials could waive challenge to district court's failure to make particularized findings by failing to raise issue in district court or on appeal).

The Court has nevertheless conducted an independent review of the record in this case and assessed the core terms of the Settlement Agreement in light of that record.  The Court independently finds that the provisions of the Settlement Agreement satisfy the PLRA's requirements for the following additional reasons.

### 1.    Settlement Terms

The Plaintiffs challenged the conditions of confinement in the SMU and the procedures that kept them there.  Doc. 140 ¶¶ 1-13, 36-223.  The Plaintiffs alleged that the SMU's conditions constituted solitary confinement, which was defined as 22 or more

---

[2] *See* Doc. 207-1 at 6 ("The Parties agree that the prospective relief set forth in this Agreement satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A) in that the relief is narrowly drawn, extends no further than necessary to correct the alleged violations of those federal rights as asserted by the Plaintiffs in the Third Amended Complaint, and is the least intrusive means necessary to correct the violations of federal rights. The relief set forth in this Agreement will not have an adverse impact on public safety or the operation of the criminal justice system, not will it require or permit government officials to exceed their authority under state or local law, or otherwise violate state or local law."); *see also* Doc. 207 at 15-16 ("expressly stipulat[ing]" that the Settlement Agreement satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A) and (a)(1)(B), and does not constitute a "prisoner release order" within the meaning of § 3626(a)(3)).

hours per day in a cell without meaningful human contact. *Id.* ¶ 200. The Plaintiffs further alleged that their solitary confinement presented a substantial risk of serious psychological harm to the Plaintiffs and class members, in violation of the Eighth Amendment (*id.* ¶¶ 201-16), and that procedures for placing prisoners in the SMU were arbitrary in violation of the Fourteenth Amendment Due Process Clause (*id.* ¶¶ 101-99). The Defendants stipulate that the Settlement Agreement is "the least intrusive means necessary to correct the violations of federal rights" alleged by the Plaintiffs. Doc. 201-1 ¶ 7.[3] In addition, there is evidence in the record supporting the Plaintiffs' allegations. *See, e.g.*, Docs. 142; 154-4 to 154-29; 161-4 to 161-8; 167 to 167-8; 168 to 168-3.

As discussed in greater detail below, the Court finds that the prospective relief provided in the Settlement Agreement is necessary to prevent violations of prisoners' constitutional rights in this case, is narrowly tailored and extends no further than necessary to correct those violations, and constitutes the least intrusive means of ensuring compliance with minimal constitutional requirements. As an initial matter, *Cason*'s requirement of "particularized" and "provision-by-provision" findings, 231 F.3d at 785, allows for some flexibility in light of the circumstances of each case. Where the parties dispute whether relief is appropriate under § 3626, a district court ordinarily

---

[3] *See Morales Feliciano v. Calderon Serra*, 300 F. Supp. 2d 321, 334 (D.P.R. 2004) ("The very fact that the defendants chose to join the plaintiffs in selecting this remedy would seem to mean—and must be taken to mean—that they understood it to be precisely tailored to the needs of the occasion, that it is narrowly drawn and least intrusive—in fact not intrusive at all."), *aff'd*, 378 F.3d 42, 54-56 (1st Cir. 2004), *cert. denied*, 543 U.S. 1054 (2005); *Little v. Shelby Cty.*, 2003 WL 23846734, at *2 (W.D. Tenn. Mar. 25, 2003) ("Clearly, the least intrusive means in this case is that advocated by the parties themselves and determined by the parties . . . as being in the interest of both inmate and public safety."). Furthermore, the Defendants amended their standard operating procedures, which now mirror many of the provisions of the settlement agreement. As a number of courts have recognized, this too weighs strongly in favor of a finding that the PLRA's need-narrowness-intrusiveness is satisfied. *See Thomas v. Bryant*, 614 F.3d 1288, 1325 (11th Cir. 2010) (citing use of the defendants' existing policies in formulating relief as evidence of non-intrusiveness).

holds an evidentiary hearing, creates a record, and makes factual findings. *See Loyd v. Alabama Dep't of Corr.*, 176 F.3d 1336, 1342 (11th Cir. 1999). In this case, however, the parties have chosen to resolve the case without further proceedings. Although the stage at which this litigation was resolved limits the record available for the Court to consider in making need-narrowness-intrusiveness findings, the Eleventh Circuit has recognized that a district court applying § 3626(a) should "discuss those factors and enter findings that are as specific to the case as the circumstances permit." *Johnson v. Breeden*, 280 F.3d 1308, 1326 (11th Cir. 2002). Therefore, the Court concludes that it need not hold an evidentiary hearing or require the parties to expend time and resources on presenting evidence. *See generally Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910) ("Compromises of disputed claims are favored by the courts."); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement."). The Court will instead make findings "as specific to the case as the circumstances permit," recognizing that "there may not be much to say" about certain matters in light of the limited record available to the Court. *See Johnson*, 280 F.3d at 1326.

Making the findings required by § 3626 "requires a degree of judgment." *See Brown v. Plata*, 563 U.S. 493, 538 (2011). And even under the limitations imposed by the PLRA, "[c]ourts have substantial flexibility when making these judgments." *Id.* To determine whether a remedial provision is "narrowly drawn" and "extends no further than necessary," 18 U.S.C. § 3626(a)(1)(A), courts assess the "fit between the remedy's ends and the means chosen to accomplish those ends." *Brown*, 563 U.S. at 531 (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989))

(internal alterations and quotation marks omitted).  The necessity and narrow-tailoring requirements forbid orders that "unnecessarily reach out" to fix problems other than those that violate federal law.  *Id.*  Rather, the "scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation."  *Id.*  Similarly, the requirement that the relief ordered be "the least intrusive means necessary," 18 U.S.C. § 3626(a)(1)(A), aims to ensure that the relief ordered "does not excessively impede upon the [prison system's] internal administration," *see Thomas v. Bryant*, 614 F.3d 1288, 1325 (11th Cir. 2010).  The least intrusive orders will tend to be those that track a prison system's "current policy" and leave discretion to prison officials in implementing the ordered relief.  *Id.*

In determining the permissible scope of relief, a court must consider what relief would be sufficient "to adequately protect future class members" from harm.  *Plata*, 563 U.S. at 532.  A remedial order narrowly tailored to preventing future violations of certain class members' federal rights is not overbroad even though its "collateral effects" may improve conditions for prisoners generally.  *Id.* at 531 (holding order requiring release of prisoners to ensure timely medical care for class members was not overbroad, even though the order would benefit prisoners outside of the plaintiff class by, among other things, reducing prison violence and prompting parole reform).

### a.    Out-of-Cell Time

Paragraphs 11 to 18 of the Settlement Agreement provide that class members will ordinarily receive a minimum of four hours out-of-cell time per day, Monday through Friday, subject to specified limitations and conditions.  The Settlement Agreement does not require that class members be permitted to leave their cells on weekends.  Out-of-

cell time may be cancelled if required by "unanticipated security or safety considerations." Doc. 207-1 ¶ 12. It also may be cancelled for up to 14 days, on an individualized basis, as punishment for certain disciplinary offenses. Doc. 207-1 ¶ 16. When it occurs, the out-of-cell time contemplated by the Settlement Agreement occurs under regimented and secure conditions. One hour of out-of-cell time occurs in "the outdoor recreation cages." Doc. 207-1 ¶ 12. The record shows that those cages are single-person enclosures that appear to be secure and austere. *See* Doc. 159-1 at 15-16 (photographs of the outdoor cages). Three hours of out-of-cell time will occur "using restraint tables." Doc. 207-1 ¶ 12. Restraint tables ensure the "safety of staff and inmates" by limiting a prisoner's "ability to stand and move around." Doc. 171-2 ¶ 10. Prisoners may voluntarily decline out-of-cell time. Doc. 207-1 ¶ 17. Prisoners denied out-of-cell time as punishment will be visited by a mental health counselor on non-holiday weekdays. Doc. 207-1 ¶ 16. The Settlement Agreement also provides ancillary provisions requiring the Defendants to document out-of-cell time, address failures to provide out-of-cell time, and provide sufficient staff to comply with the Settlement Agreement's provisions. Doc. 207-1 ¶¶ 13-14, 17-18.

The Court finds that the out-of-cell time provisions are narrowly tailored and extend no further than necessary to prevent an unconstitutional "risk of psychological harm" to the class members. *See Thomas v. Bryant*, 614 F.3d 1288, 1315 (11th Cir. 2010) (recognizing risk of psychological harm can violate Eighth Amendment). The Settlement Agreement provides for 20 hours per week of total out-of-cell time. Moreover, the out-of-cell time provided under the Settlement Agreement occurs under highly secure conditions and is subject to cancellation by prison officials in cases of

emergency or unforeseen circumstances.  Prison officials also are permitted to punish prisoners with up to 14 days of deprivation of out-of-cell time under certain conditions, which is consistent with evidence in the record suggesting that solitary confinement in excess of 15 days is considered harmful.  Doc. 159-1 ¶ 108.  The provision for daily mental health counselor contacts with class members on yard restriction is necessary and narrowly tailored to ensuring that mentally vulnerable class members are identified.

The ancillary provisions concerning out-of-cell time also are narrowly tailored and necessary to prevent violations of the Plaintiffs' rights.  The provision for staffing is necessary to ensure that the Settlement Agreement is implemented, and there is evidence that understaffing has limited out-of-cell time in the recent past.  *See* Doc. 239 at 3 (acknowledging class members' complaints that understaffing diminishes out-of-cell time).  Provisions for documenting out-of-cell time are necessary and narrowly tailored to ensuring that the Settlement Agreement is implemented.  Finally, given that prison officials expressly consented to these provisions, the Court cannot find that there is a less intrusive means of protecting the class members' federal rights.

In short, the out-of-cell provisions protect the class members' rights while ensuring that the Defendants' ability to run a safe and secure facility is not compromised.  Accordingly, the Court finds that the out-of-cell time provisions are necessary, are narrowly drawn, and intrude no further than necessary.

### b.    Activities, Programs, and Privileges

Paragraphs 19 to 27 of the Settlement Agreement provide that class members will have access to certain activities and privileges.  The Settlement Agreement provides that class members will have operable computer tablets called "GOAL

devices." Doc. 207-1 ¶ 20. These devices have multiple functions, the most important of which for present purposes are educational materials, games, books, and similar activities. Docs. 171-2 ¶ 10; 171-2 at 6-10 (informational materials concerning GOAL devices). The Settlement Agreement further provides that class members may request materials from the GDCP library and will have access to mobile book carts on a weekly basis. Doc. 207-1 ¶ 19. Within six months of the December 21, 2018, date that the parties entered the Settlement Agreement, the Defendants are to provide class members "the opportunity to participate in at least 120 minutes per week of out-of-cell programming or classes." Doc. 207-1 ¶ 22. Prisoners also will have access to "approved" religious materials, and religious services "at the discretion of the [SMU] Superintendent." Doc. 207-1 ¶ 27. Class members will have the privileges listed in Georgia Department of Corrections Standard Operating Procedure No. 209.09 (Doc. 207-1 ¶ 26), which allows class members certain personal property, visitation, telephone calls, access to commissary goods, showers three times per week, and assorted other conditions.[4]

The Court finds that each of these provisions is a necessary correlate of the out-of-cell time provisions. Evidence in the record suggests that "enforced idleness and inactivity" contributes to the psychological harm associated with solitary confinement. Doc. 159-1 ¶ 92. The Court finds that the provisions for GOAL devices, books, programming, religious services, and related conditions are necessary and narrowly tailored to preventing the serious psychological harm allegedly caused by solitary

---

[4] *See* Ga. Dep't of Corr., Policy No. 209.09 Attach. 6 (Mar. 14, 2019), *available at* https://www.powerdms.com/public/GADOC/documents/512955 (last visited Apr. 24, 2019).

confinement and extend no further than necessary to prevent violations of the class members' federal rights. The Court cannot find that there is a less intrusive alternative to the parties' proposal, given that prison officials have consented to these specific provisions. Ancillary provisions concerning GOAL devices, books, and programming are likewise necessary and narrowly tailored to ensuring that the principal provisions are implemented.

Accordingly, the provisions concerning activities, programs, and privileges are necessary, are narrowly drawn, and intrude no further than necessary.

### c.    In-Cell Conditions of Confinement

Paragraphs 28 to 43 of the Settlement Agreement address general living conditions, including food, cell furnishings, and sanitation. Class members are required to have the same type and amount of food as prisoners in the general population, and substitute meals if provided to the general population or medically indicated. Doc. 207-1 ¶¶ 28-29. The SMU must maintain the highest possible standards of cleanliness, sanitation, and safety. Doc. 207-1 ¶ 31. Cells must be single-occupancy and must be equipped like general population cells. Doc. 207-1 ¶¶ 32-33. Class members must be provided medication, clothing, and property as provided in the privilege chart attached to Georgia Department of Corrections Standard Operating Procedure 209.09, "unless there is imminent danger that an inmate will destroy an item or induce self-injury." Doc. 207-1 ¶ 34. Class members must also be provided hygiene items, laundry and barbering services, opportunities to clean their cells on the same basis as prisoners in general population, and the opportunity to shower and shave three times per week. Doc. 207-1 ¶¶ 35-38. Class members will have the services of a counselor. Doc. 207-1

¶ 39.  Sliding covers over cell windows will remain open "unless articulable security or safety considerations dictate otherwise."  Doc. 207-1 ¶ 40.  Class members may not be held in cells lacking exterior windows unless they damage the windows in their standard cells, must have operable electric lights in their cells, and cannot be placed in cells that are constantly lit unless requested by a class member or "necessary for the safety and security of an inmate."  Doc. 207-1 ¶¶ 41-43.

The Court finds that these provisions, which principally concern the conditions in which class members live while confined to their cells, address general living conditions consistent with constitutional principles.  Although the Settlement Agreement provides for out-of-cell time and activities, the class members will continue to spend many hours of their time in their cells.  It is thus necessary that class members be provided minimally adequate living conditions—including food, sanitation, hygiene items, clothing, and other basic needs—during the time that they are held in those cells.  *See Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1573 (11th Cir. 1985).  The Court finds that these provisions are narrowly tailored, extend no further than necessary, and are the least intrusive means available to correct violations of class members' federal rights.  Most of these provisions are taken verbatim or nearly verbatim from the current policies of the Georgia Department of Corrections,[5] which is strong evidence that the provisions are appropriately narrow and nonintrusive.  *See Thomas v. Bryant*, 614 F.3d 1288, 1325 (11th Cir. 2010) (holding injunction satisfied § 3626(a) where "the district court borrowed language from the DOC's current policy").

---

[5] *See, e.g.*, Ga. Dep't of Corr., Policy No. 209.09, *Special Mgmt. Unit—Tier III Program* (Mar. 14, 2019), *available at* https://www.powerdms.com/public/GADOC/documents/105973 (last visited Apr. 24, 2019).

Accordingly, the Court finds that the provisions concerning in-cell conditions of confinement are necessary, are narrowly drawn, and intrude no further than necessary.

### d.  Assignment, Periodic Review, and Duration of Confinement

Paragraphs 44 to 56 establish a general 24-month limit on confinement in the SMU, procedures for assignment to the SMU, and procedures for review while held in the SMU.  A multi-level procedure governs assignment.  Doc. 207-1 ¶ 48.  Upon assignment to the SMU, class members will be provided "a detailed Offender Management Plan setting out individualized goals for the inmate and explaining the steps that the inmate must take to qualify for a transfer."  Doc. 207-1 ¶ 53.  Class members will be reviewed every 60 or 90 days under a multi-level procedure to determine whether they will progress through the program phases or transfer to a different facility.  Doc. 207-1 ¶ 54.  Assignment and periodic review hearings will be accompanied by out-of-cell mental health evaluations "to determine whether the inmate is, by reason of mental illness or disability, precluded from being placed in or remaining in the Tier III program."  Doc. 207-1 ¶ 49.  In addition, officers and staff members assigned to the SMU will be trained in recognizing and responding to signs of mental illness and suicidal ideation.  Doc. 207-1 ¶ 52.  Class members will not be returned to the lowest two program phases—Phase 1 (E-Wing) and Phase 2 (F-Wing)—unless they engage in conduct "that would satisfy one of the criteria for assignment to the SMU."  Doc. 207-1 ¶ 55.  Class members will not be held in the SMU for more than 24 months unless they volunteer to remain there or meet one of six enumerated categories.  Doc. 207-1 ¶ 44.  Prisoners held beyond 24 months will be reviewed quarterly by a panel composed of the Director of Field Operations, the Statewide Mental Health Director, the

Statewide Medical Director, and a member of the Office of Legal Services. Doc. 207-1 ¶ 45. When they are transferred from the SMU, class members "will be placed in either a Segregation Transition Education Program (STEP) or Specialized Mental Health Treatment Unit (SMHTU)." Doc. 207-1 ¶ 56.[6] Beginning when a class member is within 12 months of being released from prison, the committee reviewing the class member will consider placing him in the STEP program, the reasons for denying placement in the STEP program will be documented, and an Assistant Commissioner will review that decision. Doc. 207-1 ¶ 46.

The Court finds that the limitations on assignment to and duration of confinement in the SMU, and the procedures for reviewing class members held in the SMU, are narrowly drawn, extend no further than necessary to correct the violations alleged by the Plaintiffs, and are the least intrusive means necessary to correct those violations. Taken as a whole, the Settlement Agreement's provisions concerning assignment and review, and limitations on holding prisoners in the SMU and in certain wings, are necessary and narrowly tailored to correcting the alleged due process violations. The review procedures provided in the Settlement Agreement largely incorporate the procedures required under the Defendants' own policies; the Settlement Agreement will simply ensure that those procedures are followed in practice. *See Thomas*, 614 F.3d at 1325. Modifications to the assignment criteria, special review for class members

---

[6] *See* Ga. Dep't of Corr., Policy No. 209.55, *Special Mgmt. Unit—Tier III Segregated Transition Education Program (Tier III STEP)* (Apr. 25, 2019) (providing for at least four hours per day of out-of-cell time, group activities, and the same privileges as general population), *available at* https://www.powerdms.com/public/GADOC/documents/536189 (last visited Apr. 26, 2019); Ga. Dep't of Corr., Policy No. 508.23, *Specialized Mental Health Treatment Units* (Apr. 27, 2018) (providing for at least 20 hours per week of out-of-cell time and therapeutic activities), *available at* https://www.powerdms.com/public/GADOC/documents/196628 (last visited Apr. 26, 2019)

approaching their release dates, limitations on how long certain class members may be held in the SMU, and limitations on when class members may be required to return to the SMU's most restrictive phases, are narrowly addressed to remedying alleged abuses in assigning prisoners to the SMU for questionable reasons and keeping them there indefinitely.  *See* Docs. 140 ¶¶ 188-91; 159-1 ¶¶ 39-45.  For class members held in the SMU beyond 24 months, quarterly review of their continued detention by a panel of senior prison officials is necessary to ensure that persons held in the SMU long-term are held there for appropriate reasons while still giving prison officials the discretion and flexibility to make decisions about whom to release.  Finally, the provisions for periodic mental health evaluations of class members, treatment for class members who are decompensating, and training for officers in responding to signs of mental illness are necessary so that that class members with serious mental health concerns are identified, assessed, and treated.  *See* Doc. 159-1 ¶¶ 46-89.  The Settlement Agreement provides that class members who mentally decompensate in the SMU will be transferred to an appropriate treatment facility, as determined by prison officials. These agreed-upon provisions reflect the parties' mutual goal of ensuring that prisoners with a mental health designation of Level III or above are not housed in the SMU.  Doc. 207-1 ¶ 49.

Together, these provisions put in place a structure to provide that class members are appropriately considered for advancement through and transfer from the SMU.  The Settlement Agreement specifies certain criteria but leaves the application of the criteria to individual class members in the hands of prison administrators.  These provisions address the concerns about prolonged and indefinite confinement in isolation raised by

the Plaintiffs but are narrowly drawn and do not unnecessarily constrain the Defendants' decisionmaking authority.

Accordingly, the Court finds that the provisions concerning assignment, periodic review, and duration of confinement to the SMU are necessary, are narrowly drawn, and intrude no further than necessary.

### e. Provisions for Monitoring and Implementation

Paragraphs 57 to 80 of the Settlement Agreement provide for monitoring and implementation of the Settlement Agreement's substantive terms. The principal terms in that regard provide for monitoring meetings between the parties approximately every nine months (Doc. 207-1 ¶ 57), limited access to records (Doc. 207-1 ¶¶ 58-60), annual on-site visits to the SMU by class counsel (Doc. 207-1 ¶ 61), notice and training for officers and staff members (Doc. 207-1 ¶ 62), and confidential meetings and communications between class counsel and the class members (Doc. 207-1 ¶¶ 63-64). The Court finds that these provisions are narrowly drawn, extend no further than necessary to correct the violations alleged by the Plaintiffs, and are the least intrusive means necessary to correct those violations. Many of the obligations imposed by the Settlement Agreement with respect to records and communications by class members with class counsel are comparable to obligations already imposed on the Defendants and the Georgia Department of Corrections by law (when responding to a public records request). *See, e.g.*, O.C.G.A. § 50-18-71(a) (providing that public records are generally available for public inspection and copying); Ga. Comp. R. & Regs. § 125-3-4.07(a) (providing for confidential attorney-client visits in state prisons). Regarding the provisions for meetings, site visits, and training of officers and staff, the Settlement

Agreement's provisions are plainly narrowly tailored and no more intrusive than necessary to ensure that the Defendants' subordinates are aware of their obligations and that class counsel can perform their role in monitoring compliance on behalf of their clients. The Court notes that the Settlement Agreement also includes a meeting and conferral requirement, so as to ensure that the Defendants are given the opportunity to resolve potential concerns without court intervention if possible. Doc. 207-1 ¶ 65. Some process for verifying compliance is of course necessary and is commonplace in institutional reform orders of this sort; a process designed to ensure that the Defendants are made aware of any alleged issues of non-compliance before the Plaintiffs resort to adversarial contempt proceedings is reasonable and nonintrusive.

Accordingly, the Court finds that the provisions concerning monitoring and implementation are necessary, are narrowly drawn, and intrude no further than necessary.

## 2. Impact of the Settlement Agreement on Public Safety

Neither the parties nor the Court has identified "any adverse impact on public safety or the operation of a criminal justice system caused by the relief" provided in the Settlement Agreement. 18 U.S.C. § 3626(a)(1)(A). The terms of this agreement will allow the Defendants to continue to place prisoners in a secure setting when necessary.

In sum, the parties stipulate, and the Court concludes, that the Settlement Agreement meets the requirements of 18 U.S.C. § 3626(a)(1)(A).[7]

---

[7] The parties have also expressly stipulated, and the Court finds based upon that stipulation and upon its own independent review, that the terms of the Settlement Agreement do not "require[] or permit[] a government official to exceed his or her authority under State or local law" within the meaning of 18 U.S.C. § 3626(a)(1)(B) and do not constitute a "prisoner release order" within the meaning of 18 U.S.C. § 3626(a)(3). The parties have also expressly stipulated, and the Court finds based upon that stipulation and upon its own independent review, that the PLRA's termination provision, 18 U.S.C. § 3626(b)(1)(A)

### B. Notice to Class Members

The Court must ensure that notice has been provided to class members in compliance with Federal Rule of Civil Procedure 23(e)(1). Per the Court's preliminary approval order, the parties were required to provide notice and a copy of the Settlement Agreement directly to every current class member—that is, every person currently assigned to the Tier III Program and confined in the SMU. *See* Doc. 210 at 15. Such individual delivery clearly constitutes adequate notice under Rule 23(e)(1). *See, e.g.*, *Dunn*, 318 F.R.D. at 668 (concluding that notice was adequate when prisoners confined in cells rather than dormitories were individually "hand-delivered" notice forms). The Defendants have filed forms with the Court indicating whether each class member acknowledged or refused to acknowledge receipt of the settlement documents. *See* Doc. 217. The parties agree that the class notice process was carried out as set forth in the Court's preliminary approval order. The Court concludes that notice to the class members satisfies the requirements of Federal Rule of Civil Procedure 23(c)(2) and 23(e)(1).

### C. Objections to the Settlement Agreement

In determining whether a class settlement should be approved, "the reaction of the class is an important factor." *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005). The Court received objections or comments from 14 individual class members. Docs. 218 to 235. The parties submitted pre-hearing briefs summarizing and responding to these filings. Docs. 237; 239. As the parties point out,

---

(providing that prospective relief "shall be terminable upon the motion of any part or intervener . . . 2 years after the date the court granted or approved the prospective relief . . ."), is subject to waiver and has been waived by the Defendants. *See Dunn v. Dunn*, 318 F.R.D. 652, 682 (M.D. Ala. 2016); *Depriest v. Walnut Grove Corr. Auth.*, 2015 WL 3795020, at *6 (S.D. Miss. June 10, 2015).

the class members almost entirely address concerns with the Defendants' alleged failures so far to implement some of the Settlement Agreement's terms—particularly those regarding out-of-cell time (and the staffing required to facilitate it), certain conditions of confinement, and procedures for placement and retention in the SMU. Thus, most of the objections do not take issue with the Settlement Agreement; they raise compliance issues.

For example, many class members complain that due to short staffing, inmates are denied the out-of-cell time required by the Settlement Agreement: specifically, Gitters (Doc. 220 at 2), Wilcox (Doc. 221 at 1-2), Shepard (Doc. 223 at 2-3), Zavala (Doc. 224 at 1-2 (alleging that "certain inmates are being placed on 5-man escorts . . . and then deprived out-of-cell time with the excuse that there is not enough staff")), Jackson (Doc. 226 at 1), Carter (Doc. 231 at 1)), Young (Doc. 232 at 5), and Scott (Doc. 234 at 1). These concerns are heightened on E-Wing, which objectors allege has lower priority for recreation than other dormitories. Similarly, some class members complain there is no programming or library access for class members in E-Wing as required by the Settlement Agreement. Docs. 224 at 2; 231 at 1; 234 at 1; 207-1 ¶¶ 19-22.[8] None of the noncompliance objections provide a basis for rejecting the settlement. Rather, the Court will address any failure to comply if necessary. To the extent that the objectors raise a concern that GDCP lacks sufficient resources to implement the terms of the Settlement Agreement, the Court addressed that concern at the hearing. The

---

[8] This is not exhaustive of the noncompliance objections, and class counsel's pre-hearing brief addresses those additional objections. *See generally* Doc. 237.

Defendants agree that they must provide the resources necessary to implement the Settlement Agreement.  Doc. 252 at 15-16.

Some objectors argue the Settlement Agreement could have done more for class members.  For instance, Waseem Daker and Jeffrey Bourassa[9] both argue the agreement is inadequate unless it provides for access to the law library.  Docs. 218 at 26; 227 at 8.  Class counsel responded by noting that the objection does "not fall within the scope of the substance of this lawsuit," and both class counsel and the Defendants' counsel agreed there is nothing in the Settlement Agreement which would preclude a Tier III inmate from "pursuing a remedy based upon insufficient or inadequate access to legal materials[.]"  Doc. 252 at 17-18.  The Court agrees.  Daker and Bourassa also objected to Paragraph 44 of the Settlement Agreement, which allows the Defendants to keep class members in the SMU for longer than 24 months if they meet certain narrow criteria.  Daker and Bourassa argue the exceptions to the 24-month cap on confinement in the SMU allow the Defendants excessive discretion in keeping class members in the SMU.  Docs. 218 at 14-15; 227 at 14-15.  However, the Settlement Agreement also provides a panel for quarterly placement review for class members kept in the SMU for longer than 24 months.  Doc. 207-1 ¶ 45.  Class counsel argue that "the provisions in question were the subject of extended and difficult negotiation by class counsel with the

---

[9] The Defendants contend Daker is not a class member, because he is a Tier II inmate.  Doc. 239 at 5-6. Actually, virtually everybody is a potential future class member because of the possibility, however slight, that they could be assigned to Tier III during the next three years.  Bourassa, for example, is currently in federal custody, and although, as a practical matter, he may never return to the Georgia Diagnostic & Classification Prison, and may not be assigned to Tier III even if he is, he is still a potential future class member.  However, Daker's arguments concerning conditions of confinement on Tier II are beyond the scope of this Settlement Agreement and this case, and the Settlement Agreement will not resolve any claims Daker may have regarding Tier II.  Accordingly, his objections relating to Tier II are not relevant, but even considering them, nothing in Daker's Tier II-related objections at all impacts the Court's finding that the Settlement Agreement provides fair, adequate, and reasonable relief for the class members.

Defendants; they represent a cabining of the Defendants' authority to place inmates in the SMU and a significant limiting of their ability to retain them there for longer than two years[.]" Doc. 237 at 12. The Court agrees and notes further that a 24-month cap with limited exceptions is a substantial improvement and confers a considerable benefit to the class. The Court finds that the provisions limiting the circumstances in which a class member may be held in the SMU for longer than 24 months are a fair, adequate, and reasonable outcome for the class members.

Bourassa also objects to Paragraph 40, which requires the "sliding covers attached to cell-door windows [to] remain open at all times, unless articulable security or safety considerations dictate otherwise." Doc. 207-1 at 13. Bourassa argues that closed covers "further[] no legitimate penological interest." Doc. 227 at 11. Again, on this point the Settlement Agreement represents a negotiated compromise after "a protracted back and forth" between the parties. Doc. 252 at 19. It represents a considered balance between the class's interests and the Defendants' interest in security, and the Settlement Agreement itself prohibits closed covers in the absence of an articulable security interest.

Similarly, Shepard objects to the use of "restraint tables" during indoor out-of-cell recreation time. Doc. 223 at 2. During the three hours per weekday of indoor out-of-cell recreation time secured by the Settlement Agreement, the Defendants allow class members who wish to leave their cells to sit at tables to which they are handcuffed for security. Doc. 252 at 25. The Defendants purchased these tables during settlement negotiations to allow Tier III inmates to have out-of-cell recreation in a secure setting in the common area. *Id.* Although Shepard objects that the tables "mak[e] it impossible to

read a book, write a letter, or even scratch an itch" and inhibit inmate self-defense, the Court, after reviewing photographs of these tables, disagrees.  Doc. 223 at 2; *see* Docs. 255-1; 255-1; 255-3.  Shepard overstates significantly the degree of restraint.  The Court finds that the tables are a reasonable solution to provide inmates with increased out-of-cell recreation, thereby reducing the harms associated with prolonged isolation, while maintaining prison security.  *Id.*

Tavares Harris raises concerns that Paragraph 14 of the Settlement Agreement, which imposes heightened notice requirements on the Defendants when the out-of-cell time secured by Paragraph 12 is cancelled or shortened for three or more consecutive days, is too lenient, and he argues that the period to trigger heightened notice obligations should be shortened to two or more consecutive days.  Doc. 229 at 1.  However, Paragraph 12 still requires a minimum of four hours of out-of-cell time per day, Monday through Friday, and the Court finds those requirements, along with the Settlement Agreement's other provisions for ensuring compliance, are a favorable outcome for the class members.  Harris also alleged the Defendants denied that Paragraph 14 applied to the E-Wing dormitory, Doc. 229 at 2, but the Defendants' counsel has acknowledged that Paragraph 14 does apply to E-Wing.  Doc. 252 at 24.  Accordingly, the application of Paragraph 14 to E-Wing is an issue not of the terms of the Settlement Agreement, but of compliance.

Harris also raises concerns about Paragraph 16, which provides that prison staff may use denial of out-of-cell time as a punishment only when an inmate has committed a disciplinary offense of "Great" or higher severity level; that inmates placed on such a restriction must be visited daily, excluding weekends and holidays, by a mental health

counselor; and that the visit must be documented in the inmate's mental health file. Harris argues that the Defendants have violated that provision and that the Settlement Agreement should require greater accountability for any such denials. However, the Court finds that the Settlement Agreement's restrictions on the Defendants' use of denial of out-of-cell time as a punishment, the counselor requirement, and the existing provisions for monitoring and compliance represent a fair, adequate, and reasonable outcome for the class members.

Other objections challenging the terms of the Settlement Agreement similarly discuss how the Settlement Agreement could theoretically have been drafted to provide even more benefits to class members; however, none of the objections in any way undermines the Court's conclusion that class counsel, through hard-fought negotiation, procured a Settlement Agreement which "provides adequate substantive relief for the class members and treats class members equitably." Doc. 210 at 7.

Accordingly, after careful consideration of all objections, the Court finds none provides any basis for not approving the Settlement Agreement.

### D.     Judgment of Class Counsel on the Adequacy of the Settlement

In considering a proposed class settlement, the Court "may rely upon the judgment of experienced counsel for the parties. . . . Absent fraud, collusion, or the like, the district court 'should be hesitant to substitute its own judgment for that of counsel.'" *Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). Here, class counsel have extensive experience litigating and settling conditions of confinement cases and

strongly endorse the Settlement Agreement as appropriate. This factor therefore weighs in favor of approval.

### E. Attorneys' Fees and Costs and Other Agreements

In compliance with the Court's preliminary approval order (Doc. 210 at 12-13), the parties have conferred regarding attorneys' fees and costs. They reached a negotiated agreement that attorneys' fees and costs should be paid by the Defendants to class counsel in the amount of $425,000. The Plaintiffs thereafter filed an uncontested fee petition seeking an award of such fees in compliance with Federal Rule of Civil Procedure 23(h). Doc. 241. The parties have moved the Court for leave to notify class members of the proposed fee award and give them an opportunity to object to it.[10] Doc. 242. The Court granted the motion, ordered that notice be given to the class members regarding the Plaintiffs' motion for attorneys' fees, and provided a reasonable opportunity for class members to object. Doc. 251. Because the fee award was negotiated only following the parties' entry into the Settlement Agreement and because the parties agree that the Settlement Agreement stands regardless of whether or not the Court grants the fee petition, the Court finds that nothing in the Plaintiffs' request for attorneys' fees undermines the fairness or adequacy of the Settlement Agreement. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii). The fee petition will be resolved pursuant to a separate order.

---

[10] Class members were notified that the parties would attempt to negotiate attorneys' fees following preliminary approval of the Settlement Agreement and were made aware that the Settlement Agreement provides for the ongoing payment of fees to class counsel for post-settlement work. *See* Docs. 207-2 at 2 ("The *Settlement Agreement* . . . also states that the Defendants will pay the attorneys' fees of the lawyers for the class, in an amount to be negotiated."); 207-1 ¶¶ 71-74 (setting forth in detail the process for negotiation regarding a retrospective attorneys' fee award, and providing for prospective payment of attorneys' fees for the monitoring of—and, if necessary, the enforcement of compliance with—the Settlement Agreement).

The Court further notes that the parties have filed a notice of agreements required to be identified under Federal Rule of Civil Procedure 23(e)(3), in compliance with Rule 23(e)(2)(C)(iv). Doc. 243. Therein, the parties inform the Court that an agreement has been reached regarding modest incentive awards for the named plaintiffs, and that a separate and unrelated settlement has been reached with Plaintiff Gumm disposing of his alleged damages claims. The parties note that the amounts of these awards were negotiated after the parties reached the class Settlement Agreement and did not affect the terms of that agreement. *See* Doc. 243 at 1-2. The Court therefore concludes that these monetary agreements do not undermine the fairness, adequacy, or reasonableness of the injunctive-relief class Settlement Agreement.

F.     **The Court's Assessment**

"Finally, with the above considerations in mind, the court should itself [finally] assess whether the settlement agreement is fair, adequate, and reasonable." *Gaddis v. Campbell*, 301 F. Supp. 2d 1310, 1316 (M.D. Ala. 2004) (citation and internal quotation marks omitted). Based on a review of the Settlement Agreement and of the entire record in this case, and based on the analysis of the Rule 23(e) factors set forth in the Court's preliminary approval order and in this Order, the Court concludes that the Settlement Agreement is fair, adequate, and reasonable, should be approved, and should be adopted as an Order of the Court. The Court finds that this settlement, reached after extensive discovery and arms-length negotiations by the parties, represents an appropriate and desirable resolution of this case; it substantially affords to class members the relief the Plaintiffs sought regarding conditions and placement and retention in the SMU, without the cost and uncertainty of further litigation. Because the

Defendants were involved in crafting and agreed to the provisions of the Settlement Agreement, the Court expects that they will successfully implement those terms, to the benefit of the class members.

## III. ORDER AND PERMANENT INJUNCTION

For the foregoing reasons, the Court will grant final approval of the settlement and incorporate it as an Order of the Court.[11]  In accordance with foregoing opinion and findings, it is the ORDER and DECREE of the Court as follows:

(1)     A settlement class is certified, consisting of "all persons who are or in the future will be assigned to the facility currently known as the Special Management Unit at Georgia Diagnostic & Classification Prison, or who are or in the future will be assigned to the Tier III Program," under Federal Rules of Civil Procedure 23(a) and (b)(2);

(2)     The objections to the proposed settlement filed by class members in response to the notice to the class are overruled;

(3)     The parties' request to adopt the Settlement Agreement is granted;

(4)     The terms of the Settlement Agreement, which is attached as an appendix to this Order, are incorporated as the Order of this Court;

(5)     In accordance with the terms of the Settlement Agreement, the Court retains jurisdiction to enforce the agreement during its term;

(6)     The Defendants in their official capacities, their officers, agents, servants, and employees, and those persons in active concert or participation with them who

---

[11] Note that although the Settlement Agreement has been attached to this opinion as an appendix, it is incorporated as the Order of the Court.  The parties expressly stipulate and the Court finds that this Order complies with Federal Rule of Civil Procedure 65(d)(1).  *See Williams v. City of Dothan, Ala.*, 818 F.2d 775, 761 (11th Cir. 1987).

receive actual notice of this injunction by personal service or otherwise, are each enjoined from failing to comply with the terms of the Settlement Agreement; and

(7)     The Settlement Agreement shall expire, in accordance with its terms, three years from the date of entry of this Order.

In order to provide class members with notice of the final disposition of this lawsuit, it is further ORDERED that, within 14 days from the date of this Order, the Defendants shall cause to be provided to class members notice of the final disposition of this lawsuit by delivering to each class member this Order and Permanent Injunction and the Court's Judgment.

**SO ORDERED**, this the 7th day of May, 2019.


S/Marc. T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT