**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **RICARDO DAUGHTRY, _et al._,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:15-CV-41 (MTT)** |
| | ) | |
| **SHAWN EMMONS, TYRONE OLIVER,** | ) | |
| **AHMED HOLT, STAN** | ) | |
| **SHEPARD, JOE WILLIAMS, DENNIS** | ) | |
| **TURNER, and FLEMISTER WILEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>CONTEMPT ORDER</u>**

The inmates imprisoned in the Georgia Department of Corrections' ("GDC")

Special Management Unit ("SMU") are, by definition, the worst inmates in Georgia's

prison system.  They are there because they require intense and close supervision.  As

a group, they have done nothing to earn sympathy.  They are, however, entitled to

certain minimal conditions of confinement.  After this lawsuit was filed in 2015, the GDC

agreed that the SMU failed to meet that standard.  Accordingly, the GDC settled the

lawsuit and contractually agreed to reform the SMU.  On May 7, 2019, the Court

accepted that settlement and entered an injunction requiring the GDC to institute the

agreed-upon reforms.  During the initial three-year term of the injunction, the defendants

violated every requirement of the Court's injunction.  Facing sanctions for their

contumacious conduct, the defendants asked the Court to extend the term for 18

months to give them a second chance.  The Court agreed.  Not much changed.  The

defendants continued to ignore and violate the Court's injunction.  As the end of the

injunction's term neared, it became clear to the Court that the defendants, in effect, were running a four-corner offense and had no desire or intention to comply with the Court's injunction; they would stall until the injunction expired.  The Court can no longer tolerate the defendants' misconduct and, for the reasons discussed below, holds the defendants in contempt.

When the injunction was entered, the defendants were Tyrone Oliver, interim GDC Commissioner; Ricky Myrick, GDC Assistant Commissioner of the Facilities Division; Robert Toole, GDC Director of Field Operations; Benjamin Ford, Warden of the Georgia Diagnostic and Classification State Prison ("GDCP"); Michael Cannon, Superintendent of the SMU; and Joseph Polite, Deputy Warden of the SMU.  Doc. 256-1 at 5.  Because some defendants have left their positions, their successors have been substituted for them.[1]  Currently, the defendants are Commissioner Tyrone Oliver, Assistant Commissioner of the Facilities Division Ahmed Holt, Director of Field Operations Michael Stanton ("Stan") Shepard, GDCP Warden Shawn Emmons, SMU Warden Joe Williams, and SMU Deputy Wardens of Security Dennis Turner and Flemister Wiley.  Doc. 435.  All defendants have been sued only in their official capacities as GDC officials.

The parties have stipulated that the current defendants are the proper defendants.  Docs. 421 ¶¶ 1-9; 429 at 6:5-8:10.  The parties agree that these defendants in their official capacities are the parties responsible for implementing

---

[1] Since the Court adopted the settlement agreement and entered the injunction, the Superintendent of the SMU referenced in the original injunction is now the SMU Warden.  Doc. 429 at 6:5-8:10.

requirements imposed by the settlement agreement and ensuring compliance with the Court's injunction.

## I. BACKGROUND

### A. Filing of Complaint, Class Certification, and Initial Enforcement

#### 1. *Class Allegations*

On February 12, 2015, Timothy Gumm, then an SMU inmate, filed this 42 U.S.C. § 1983 action to challenge alleged unconstitutional conditions and practices in the SMU's Tier III Program.[2]  Doc. 1.  On October 27, 2016, the Court appointed the Southern Center for Human Rights to represent Gumm.  Docs. 69; 70.  After considerable discovery, Gumm sought injunctive relief on behalf of a putative class of all inmates held in the SMU.  Docs. 73; 97; 140.  The third and final amended complaint alleged that confinement in the SMU created a substantial risk of serious harm to which the defendants were deliberately indifferent, and that all inmates were held in the SMU for years without meaningful procedural safeguards, in violation of the Eighth Amendment's Cruel and Unusual Punishment Clause and the Fourteenth Amendment's Due Process Clause.  *See*, *e.g.*, Doc. 140 ¶¶ 1 ("This is an action to stop prison officials from holding people in an extreme form of solitary confinement for years on end with no meaningful review and no clear way of getting out."), 11, 271.

---

[2] "'SMU' refers to the facility where the plaintiffs are or were held, whereas 'Tier III Program' refers to the policies governing conditions in the SMU on or after August 1, 2013."  Doc. 140 ¶ 3 n.1.  The Standard Operating Procedures ("SOP") governing the "Special Management Unit – Tier III Program" is Policy No. 209.09.  Doc. 432-76 ("SOP 209.09").  The Court uses the term SMU to refer to both the facility and the policies governing conditions of confinement for inmates assigned to the Tier III program except where necessary to distinguish between them.  *See* Doc. 142 ¶ 28 n.2 ("The 'Tier III Program' apparently applies only to SMU prisoners at this facility, and it applies to all of them.").

2. *Settlement Agreement and Injunction*

The parties reached an agreement in December 2018 to certify a class and settle the class claims.  Docs. 207; 207-1.  In that agreement, the defendants agreed that:

> the prospective relief set forth in this Agreement satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A) in that the relief is narrowly drawn, extends no further than necessary to correct the alleged violations of those federal rights as asserted by Plaintiffs in the Third Amended Complaint, and is the least intrusive means necessary to correct the violations of federal rights. The relief set forth in this Agreement will not have an adverse impact on public safety or the operation of the criminal justice system, nor will it require or permit government officials to exceed their authority under state or local law, or otherwise violate state or local law.

Doc. 207-1 ¶ 7.

The Court issued its Final Order and Permanent Injunction on May 7, 2019, which certified the settlement class,[3] granted final approval of the settlement agreement, and adopted the settlement agreement as the Order of the Court.  Docs. 256; 256-1.  In its review of the settlement agreement, the Court confirmed that the prospective relief required by the settlement agreement was necessary to prevent violations of the inmates' constitutional rights, was narrowly tailored and extended no further than necessary to correct those violations, and was the least intrusive means of ensuring compliance with minimal constitutional requirements.  Doc. 256 at 7.

Initially, the term of the settlement agreement was to end May 7, 2022—three years from the date it went into effect.  Doc. 256-1 ¶ 80.  For reasons that will be discussed, the term of the settlement agreement and injunction were extended several times, most recently to April 19, 2024.  Doc. 471 at 1.

---

[3] The class includes: "All persons who are or in the future will be assigned to the facility currently known as the Special Management Unit at Georgia Diagnostic & Classification Prison, or who are or in the future will be assigned to the Tier III Program."  Doc. 256-1 ¶ 67.

### 3. SMU Tier III Program

The SMU is Georgia's most restrictive prison.  According to the GDC, the SMU houses inmates who have "commit[ted] violent, disruptive, predatory, or riotous actions," and who require "greater management of [their] interaction[s] with other persons [to] ensure the safety, security, or orderly operation of [GDC] facilities."  Docs. 171-2 ¶ 6; 432-76 (SOP 209.09) at 2.  Inmates spend every moment locked inside a small space (a cell, cage, shower stall, or visitation booth), handcuffed to a table, or in cuffs and leg irons as they are moved from space to space.  *See* Docs. 142 ¶¶ 14, 23, 29-30, 37-38, at 131; 338 ¶ 10; 432-76 (SOP 209.09) at 48.  "The conditions, practices, and procedures to which prisoners housed there are subjected constitute what is commonly referred to in correctional practice and the scientific literature as 'solitary confinement.'" Doc. 142 ¶ 28.

The SMU is "its own individual, standalone facility."[4]  Docs. 340 at 68:13-18; 344 at 46:12-17.  The SMU houses up to 192 inmates in six wings, designated A through F; each wing consists of 32 single-man cells.[5]  Docs. 338 ¶¶ 14-15; 421 ¶¶ 10-11; 432-76 (SOP 209.09) at 13.  Inmates are assigned to E-Wing first, and then progress to F-Wing, D-Wing, and on to C-Wing and B-Wing.  Doc. 432-76 (SOP 209.09) at 4.

In theory, the Tier III Program is an incentive-based behavior modification program in which inmates spend a minimum of 13 months and a maximum of 24

---

[4] *See Special Management Unit*, GA. DEP'T CORR., https://gdc.georgia.gov/locations/special-management-unit (last visited Apr. 17, 2024); *see also* Doc. 140 ¶ 54 ("The SMU consists of a freestanding detention facility located in a separate compound immediately west of Georgia Diagnostic's main prison.  The SMU facility has its own access-control point, perimeter fence, buildings, assigned staff, and chain of command.").

[5] Although A-Wing is not now part of the Tier III Program, two A-Wing "observation" cells are used by the SMU and have come to play a substantial role in these proceedings.  *See* Docs. 338 ¶ 15; 421 ¶ 11.

months.  Docs. 256-1 ¶ 9; 432-76 (SOP 209.09) at 2, 4.  The goal, at least on paper, "is for the inmate to make the appropriate adjustments so he … may be returned to a general population" setting.  Docs. 256-1 ¶ 9; 432-76 (SOP 209.09) at 2.  Inmates have the opportunity to advance through five "phases," each of which allows progressively more privileges based on demonstrated appropriate behavior.  Docs. 256-1 ¶ 9; 432-76 (SOP 209.09) at 2-4.  "Offenders, if successful at each phase, shall spend sixty (60) days in E-Wing, sixty (60) days in F-Wing, ninety (90) days in D-Wing, ninety (90) days in C-Wing, and ninety (90) days in B-Wing."  Doc. 432-76 (SOP 209.09) at 4.  The privileges for each phase are outlined in the Tier III program privileges chart.  *Id*. at 48.  Privileges, however, are based on phase—not wing.  *Id.* at 4, 48.  As conceived, the Tier III Program seemingly contemplated that all inmates in a phase would be housed in one wing.  *See id*. at 48.  However, because inmates are often kept in the SMU for longer than 24 months, their phase and wing assignments may differ.

### 4.  Conditions in the SMU Before the Settlement Agreement

 Craig Haney, Ph.D., J.D.,[6] is widely recognized as one of the foremost authorities on solitary confinement.  Doc. 142 ¶ 3.  He evaluated the SMU in late 2017.  *Id*. ¶ 14.  That evaluation involved the review of voluminous records and site visits, which included interviews of inmates and staff.  *Id.* ¶¶ 13-17.  His findings drove the terms of the parties' settlement agreement, and a summary of those findings is appropriate.

 Dr. Haney found that the SMU "is one of the harshest and most draconian [solitary confinement] facilities [he had] seen in operation anywhere in the country."  *Id.* ¶ 19.  Some of the inmates "were among the most psychologically traumatized" solitary

---

[6] His curriculum vitae is found in Doc. 142 at 73-113.

confinement inmates he had ever seen.  *Id.* ¶ 21.  He concluded that four exacerbating features of the SMU were the cause of the unusually high level of trauma he saw.  *Id.* ¶ 22.

> a. The conditions of confinement at the SMU were "unusually severe and more isolating and 'closed in.'"  *Id*. ¶ 23.

Inmates at the lowest level of the SMU were allowed almost no personal property, were allowed no phone calls or visitation, and were not allowed access to out-of-cell exercise or recreation.  *Id*. ¶ 28.  Dr. Haney had never heard of or seen a facility that imposed such conditions on solitary confinement inmates.  *Id.* ¶¶ 28, 58 ("[T]he atmosphere inside E Wing was bedlam-like, as chaotic and out-of-control as any such unit I have seen in decades of conducting such evaluations.  When I entered this housing unit I was met with a cacophony of prisoner screams and cries for help.  The noise was deafening ….").  Even when SMU inmates were allowed some privileges, they were still locked in their small cells for all or most of any given day.  *Id*. ¶¶ 28-30.  Some SMU inmates were allowed five hours of outdoor exercise per week, although that was frequently cancelled.  *Id*. ¶¶ 23, 30.  The outdoor exercise facility consisted of a concrete-floored cage approximately the same size as the inmates' cells.  *Id*. ¶ 30.  Some inmates received three 15-minute out-of-cell showers per week.  *Id.* ¶ 31.  Others had a shower spigot in their cell.  *Id*.  Further, and unlike typical solitary confinement facilities, cell doors in the SMU were made of solid metal rather than steel bars, and the small window on the cell door was covered by an outer metal shield.  *Id*. ¶ 32.  The cells had small rear windows, but metal shields were placed on some of those windows as well.  *Id*. ¶ 33.  In effect, as Dr. Haney put it, SMU inmates are "hermetically sealed" in their cells.  *Id*.

b. The consequences of the conditions of confinement were "compounded by the uncertainty and the sense of helplessness" that accompanied those conditions. *Id*. ¶ 24.

Dr. Haney found that, in "theory," SMU inmates were provided incentives to encourage them to engage in behavior that would be rewarded with increased privileges, with an ultimate goal of earning a transfer to a "mainline prison setting." *Id*. ¶¶ 28 n.2, 39. In practice, Dr. Haney found that the incentive program had completely broken down. *Id*. ¶¶ 39-40. Inmates reported they received no guidance about what they needed to do to earn their release from the SMU. *Id*. ¶ 40.

c. The consequences of the severe conditions of confinement at the SMU were exacerbated by the prolonged duration of confinement. *Id*. ¶ 25.

Dr. Haney found that many inmates could not progress through the system because of a lack of bed space in less restrictive wings. *Id*. ¶ 39 n.6. Consequently, inmates were being held in the SMU far longer than "recommended professional, human rights, and correctional limits." *Id*. ¶¶ 41-43. In the two years preceding his review, 60 percent of releases were because inmates had served their prison sentences. *Id*. ¶ 44. Seventy-three percent of inmates who were transferred from the SMU to other prisons were placed not in "general population," as the GDC calls it, but rather were placed in "Tier II long-term administrative segregation," the GDC's term for solitary confinement. *Id*. ¶ 45. In short, solitary confinement had become a final stop rather than an interim rehabilitative stop.

d. "[A] shockingly high number of mentally ill prisoners are housed in the SMU." *Id*. ¶ 26.

Finally, Dr. Haney found that 70 of the SMU's 180 inmates were designated as mentally ill. *Id*. ¶ 47. In Dr. Haney's opinion, it is "dangerous" to house mentally ill

inmates in a solitary confinement setting.  *Id.*  There is no justification, he concluded, for incarcerating such a high number of mentally ill inmates in the harsh conditions of the SMU.  *Id.*

   5.  *Settlement Agreement Provisions*

The settlement agreement requires remediation of the conditions described by Dr. Haney.  In general, the settlement agreement sets certain minimal requirements for out-of-cell time, programming, nutrition, sanitation, and access to reading materials and other resources to mitigate the traumatic effect of solitary confinement.  The settlement agreement also specifies the duration of confinement in the SMU and sets criteria for assignment and periodic review.  Doc. 256-1 ¶¶ 44-46.  Finally, the settlement agreement requires the defendants to staff the SMU properly, allows monitoring to ensure compliance, and requires periodic reporting.  *Id.* ¶¶ 57-60, 62.  These oversight provisions include onsite visits, monitoring meetings, meet and confer obligations, and other required communications between counsel.  *Id.* ¶¶ 57-61.  Key provisions are summarized in more detail below.

**Conditions of Confinement.**  The defendants agreed to and were ordered to provide inmates with certain minimum conditions of confinement.  Docs. 256; 256-1 ¶¶ 11-43.

- ***Out-of-Cell Time*** (¶¶ 12, 16): Inmates shall receive at least four hours of out-of-cell time a day, Monday through Friday, including up to three hours in a common area using restraint tables and at least one hour in outdoor recreation cages. Out-of-cell time can be withheld only in the event of unanticipated security or safety considerations.  Inmates shall not be denied out-of-cell time as punishment unless the inmate has committed a "great" or higher severity level disciplinary offense during out-of-cell time; the denial of out-of-cell time shall not exceed 14 consecutive days.

- **_Programming_** (¶¶ 22-23): Inmates shall receive weekly the opportunity to participate in at least 120 minutes of out-of-cell programming or classes and shall receive notice of programming opportunities.

- **_GOAL Devices_** (¶ 20): Inmates shall be given operable computer tablets called a "GOAL" device.[7]  These tablets are "[d]esigned to work in conjunction with [a] JPay inmate kiosk."  Doc. 171-2 at 6.  Inmates shall be allowed to recharge the devices daily and access the kiosk at least twice per week.[8]

- **_Privileges_** (¶¶ 19, 26): Inmates shall have access to mobile book carts on a weekly basis and receive the opportunity to request materials from the GDCP library.  Inmates shall receive, at a minimum, the privileges required by SOP 209.09 (Doc. 432-76 at 48), which allows class members certain personal property, visitation, telephone calls, access to commissary goods, showers three times per week, and other conditions.

- **_Cell Conditions and Sanitation_** (¶¶ 31, 33, 36): Inmates shall receive the highest possible standards of cleanliness, sanitation, and safety.  Inmates shall be provided the opportunity to clean their cells on the same basis as inmates in the general population.  Cells must be equipped and furnished in a manner consistent with cells in the general population.

- **_Hygiene and Clothing_** (¶¶ 34-35, 37-38): Inmates shall be provided prescribed medication, clothing, and basic personal items as set out in the privileges chart attached to SOP 209.09, unless there is imminent danger that an inmate will destroy an item or induce self-injury.  Inmates shall be provided toiletries and personal hygiene items—including toilet paper, soap, toothbrushes, toothpaste, and similar items—on the same basis as inmates in the general population.  Each inmate must be provided the opportunity to shower and shave three times per week.  Inmates must be provided the same laundry and barbering services and be issued and exchanged clothing on the same basis as inmates in general population.  Exceptions are permitted only when found necessary by the warden or designee; any exception is recorded in the unit log and justified in writing.

- **_Food and Nutrition_** (¶¶ 28-30): Inmates are entitled to (1) food of the same quality and quantity as that provided to the general population, and (2) removal of any signs discouraging inmates from discussing their nutritional needs with medical staff.

---

[7] GOAL stands for Georgia Offender Alternative Learning.  Doc. 171-2 ¶ 10 n. 4.  The "devices have multiple functions, the most important of which for present purposes are educational materials, games, books, and similar activities."  Doc. 256 at 12 (citing Doc. 171-2 ¶ 10, at 6-10 (informational materials concerning GOAL devices)).

[8] _See_ Doc. 256 at 12-13 ("The Court finds that the provisions for GOAL devices, books, programming, … and related conditions are necessary and narrowly tailored to preventing the serious psychological harm allegedly caused by solitary confinement.").

The removal of Orwellian signage barring nutritional-needs discussion with medical providers might seem relatively trivial. *See* Doc. 142 at 138. But the Court pauses to note the issue because it is emblematic of the defendants' broad refusal to comply with the Court's injunction, even when the fix is easy. Years after the entry of the Court's injunction, the signs had not been removed. *See*, *e.g.*, Docs. 308-1 at 25; 308-5 ¶ 34.

- ***Staffing and Training*** (¶¶ 18, 62): The defendants shall ensure that a sufficient number of administrators, correctional officers, counselors, mental health professionals, and other staff members are available to carry out the terms of the settlement agreement. All GDC employees who are involved in the daily operation of the Tier III Program will be trained on the SOP and any provisions contained in the settlement agreement that apply to the daily management of inmates housed in the Tier III Program.

**Assignment, Periodic Review, and Duration of Confinement**. The settlement agreement addresses Dr. Haney's finding that the harsh conditions of the SMU were exacerbated by the lack of meaningful review of SMU assignments and the inability of inmates to earn release from the SMU. *See* Doc. 256-1 ¶¶ 44-56.

- ***Out-of-Cell Mental Health Evaluations*** (¶ 49): Before assignment to the SMU, and in conjunction with every 60-day or 90-day review hearing, inmates shall receive an out-of-cell mental health evaluation performed by a licensed mental health provider.

- ***Assignment*** (¶ 48): It is necessary to state in full, rather than summarize, the injunction mandates regarding assignment to the SMU:

  Prior to assignment to the SMU or Tier III Program, a formal hearing will be convened to advise the person that he is being assigned to the SMU/Tier III. The inmate must be given an opportunity to be present at this hearing, and must be afforded the following rights in connection with SMU/Tier III assignment or proposed assignment:

  a) At least 48 hours prior to the hearing, the inmate must be served with a notice informing the inmate that he is being considered for the SMU/Tier III Program.

b) The inmate has the right to attend the hearing.  He may forfeit this right if he is disruptive, and this disruption shall be documented.  Should he decline to attend, his waiver of the right to attend shall be documented.

c) The inmate has the right to make a verbal statement, to present documents, and to submit a written statement.

d) The inmate will be informed that he may submit written objections to a recommendation that he be moved to the SMU/Tier III Program.  He may do so using an appeal form to be submitted to the Director of Field Operations within 14 calendar days from receipt of the notice of assignment to the SMU.  If the Director of Field Operations approves the recommendation, then the inmate's written objections shall be forwarded to the Assistant Commissioner of Facilities who shall make the final decision about SMU placement.

e) Except in emergency situations, transfer of the inmate to the SMU must not be made until after the time for the inmate to submit objections expires.

The defendants take the position that subsection (e) permits them to cancel all pre-assignment process if they deem a transfer to be an "emergency."  *See, e.g.*, Docs. 340 at 86:5-13; 344 at 72:10-19; 384 at 32:5-33:11; 460 at 6.  That construction is flawed.  Subsection (e) applies to the two-week objection period, not the mandate to hold a pre-assignment hearing.  If paragraph 48 granted an exception to all pre-assignment process, that exception would appear in its main body, not in a subpart that references only the two-week objection period.  (For example, "Except in emergency situations, prior to assignment to the SMU ….").  In any event, as will be discussed, the defendants are in violation of paragraph 48 even under their interpretation of subsection (e).  *See* Doc. 460 at 6 ("[T]he information shows that the requirement was not met in some instances. There are inmates for whom a 48 hour hearing was either not received

or not timely received, or for whom, if they did, the documentation does not exist to

demonstrate as much.").

- **_Offender Management Plan_** (¶ 53): Upon assignment to the Tier III Program, each inmate shall be provided a detailed Offender management plan setting out individualized goals and explaining the steps that the inmate must take to qualify for a transfer from the SMU/Tier III Program.

- **_Duration of Confinement_** (¶¶ 44, 56): Inmates shall not be held in the SMU for more than 24 months unless they voluntarily request to remain or one of the following six exceptions applies: "(1) the inmate committed a murder while incarcerated; (2) the inmate escaped outside the secure fencing of a GDC facility; (3) the inmate caused serious bodily injury to another inmate or a GDC employee, contractor, or volunteer; (4) the inmate took another inmate or GDC employee, contractor, or volunteer hostage; (5) the inmate's crime was so egregious that the person was placed in the Tier III Program immediately upon being placed in GDC custody; or (6) the inmate, due to his unique position of influence and authority over others, poses such an exceptional, credible, and articulable risk to the safe operation of the prison system or to the public that no facility other than the Tier III Program facility is sufficient to contain the risk." Inmates transferred from the SMU will be placed in either a Segregation Transition Education Program ("STEP") or Specialized Mental Health Treatment Unit ("SMHTU").

- **_Periodic Review_** (¶ 54): The SMU's periodic review procedures will involve a multi-level process beginning with review by a classification committee and ending with review by an assistant commissioner, as required by SOP 209.09. As part of the review process, inmates shall receive the classification committee's recommendation at least 48 hours before the review hearing, shall have the right to attend the hearing, and shall have the right to object to the recommendation and appeal the decision.

    **_60- and 90-Day Review_** (¶ 49): Each inmate shall be reviewed by a classification committee every 60 or 90 days and receive an out-of-cell mental health evaluation by a licensed mental health provider.[9] The committee shall determine whether the inmate should move to the next phase, remain in the current phase, be reassigned to a previous phase, or be released from the SMU.

    **_24-Month Review_** (¶ 45): If an inmate is held in the SMU longer than 24 months, a panel of prison officials must determine on a quarterly basis whether prolonged confinement is warranted. The panel shall provide, in

---

[9] "All offenders in Phase 1 and 2 (or if housed in E and F Wings regardless of phase)" are reviewed once every 60 days. Doc. 432-76 (SOP 209.09) at 18. "All offenders in D, C, and B Wings" are reviewed once every 90 days. _Id._

writing, specific and detailed reasons for placing the inmate in the SMU/Tier III and retaining them there.  The criteria governing the panel's determination shall include: (a) length of time in current phase; (b) perceived risk of release from the SMU; (c) number, type, and frequency of disciplinary reports; (d) involvement in self-improvement activities; (e) behavior while in the SMU; (f) the inmate's 60- or 90-day mental health evaluation; (g) progress on the inmate's Offender management plan; and (h) the total duration of the inmate's confinement in the SMU.  The Commissioner or Assistant Commissioner shall personally approve any decision to retain an inmate in the SMU Tier III Program beyond 24 months.

**Mental Health.**  As noted, Dr. Haney found that "a shockingly high number of mentally ill prisoners are housed in the SMU."  Doc. 142 ¶¶ 26, 57, 123.  Thus, the defendants agreed to and were ordered to monitor and appropriately address the mental health status of SMU inmates.

- ***Out-of-Cell Mental Health Evaluation*** (¶ 49): Before assignment to the SMU and as part of every 60- or 90-day review hearing, inmates shall receive an out-of-cell mental health evaluation by a licensed mental health provider.  The purpose of this evaluation is to determine whether the inmate's mental condition requires his removal from the SMU.

- ***Training for Staff*** (¶ 52): All SMU officers and staff shall be trained to recognize and respond to signs and symptoms of mental illness, including suicidal ideation and acts.

- ***Mental Health Designations*** (¶ 49): Inmates with a mental health designation of Level III or above shall not be housed in the Tier III Program.

- ***Transfer for Treatment*** (¶ 50): If an inmate is found to be decompensating or precluded from continued placement in the Tier III Program due to mental illness or disability, the inmate must be transferred to an appropriate treatment facility on an expedited basis.

**Recordkeeping.**  The defendants agreed to and were ordered to document their compliance with the settlement agreement and provide that documentation to the plaintiffs.  *See*, *e.g*., Doc. 256-1 ¶¶ 13, 17, 22, 59-60.  These provisions include:

- ***Documentation of Out-of-Cell Time*** (¶¶ 13-14, 16-17): Out-of-cell time and/or refusal to participate in out-of-cell time shall be documented contemporaneously

on an inmate's door sheet and made a part of his institutional file.[10]  If the
defendants "have reason to believe that out-of-cell time has been or will be
cancelled or shortened … for three or more consecutive days, for either an
individual dormitory or the entire SMU, the SMU [Warden] will promptly notify the
Regional Director in writing and will explain the circumstances resulting in the
cancellation, the steps taken to resolve the issue, … and an estimated timeline
for resuming compliance with Paragraph 12" of the settlement agreement.  "A
mental health counselor will [also] visit any inmate on yard restriction daily,
excluding weekends and holidays, and the occurrence and substance of such
visit will be documented in the inmate's mental health file."

- ***Documentation of Classes and Programs*** (¶¶ 22-24): Programming time
  and/or refusal to participate in out-of-cell programming shall be
  contemporaneously documented on an inmate's door sheet.  The defendants
  shall provide inmates with notice of programming opportunities and schedules,
  as well as written acknowledgement of programs, classes, and similar activities
  completed while in the Tier III Program.

- ***Documentation of Mental Health Evaluations*** (¶ 51): "For every [mental health]
  evaluation, the licensed mental health provider shall document his/her
  observations, findings, and recommendations [regarding] the inmate evaluated,"
  and "log the date of the evaluation."  This would include, for instance, evaluations
  performed in conjunction with 60- and 90-day reviews.

- ***Documentation for Monitoring*** (¶¶ 57, 60): The parties shall conduct regular,
  in-person meetings to discuss compliance with the settlement agreement.  At
  least fourteen days in advance of each monitoring meeting, the defendants must
  provide specific documents to plaintiffs' counsel, including: portions of the
  institutional, medical, and mental health files for up to 20 inmates, SCRIBE[11]

---

[10] Door sheets are also referred to as "program checklists."  Doc. 432-76 at 36, 54; *see* Doc. 308-5 ¶ 23
("The Tier III program policy provides for 'Program Checklists' that are supposed to '[c]ontain a record of
all activities such as out of cell time, bathing, recreation time, medical visits, program participation, and
religious visits.'  Program Checklists include spaces to document meals, recreation, table time,
programming, kiosk, haircut and shaves, showers, mail, visitation, supervisor, counselor, medical, mental
health rounds, and administrative review.  Each checklist covers a one-week period.") (alteration in
original).

[11] SCRIBE is a computer-based note-taking program containing specific information for each inmate.
Doc. 429 at 195:6-19; *see* SOP 401.06 at 1, GA. DEP'T CORR. (May 27, 2020),
https://gdc.georgia.gov/organization/about-gdc/agency-activity/policies-and-procedures/executive-
division-policies/401 ("A specific CAPTIVA based software system module with restricted access that is
used to record and maintain the offender/detainee clothing record; staff clothing record; a facility's
inventory of offender/detainee clothing, bedding and supplies; and a facility's inventory of security
supplies and equipment.").

"The Court may take judicial notice of government publications and website materials."  *Coastal Wellness
Centers, Inc. v. Progressive Am. Ins. Co.*, 309 F. Supp. 3d 1216, 1220 n.4 (S.D. Fla. 2018); *see also
R.S.B. Ventures, Inc. v. F.D.I.C.*, 514 F. App'x 853, 856 n.2 (11th Cir. 2013) ("As requested by [the

case notes, grievances, disciplinary reports, and mental health summaries. The defendants shall also produce documentation of programming and the inmates who participated in and completed each class.

### 6. *Early Warning Signs of the Defendants' Lack of Commitment*

Before the settlement agreement was adopted by the Court, the plaintiffs wrote the defendants on January 24, 2019 about apparent breaches of the settlement agreement's requirements that inmates receive out-of-cell time; that inmates receive GOAL devices and twice-weekly kiosk access; that the defendants ensure staffing sufficient to satisfy their obligations; and that inmates not be held in the SMU beyond 24 months. Doc. 305-10. The plaintiffs sent a second letter five days later noting additional violations related to staffing, inadequate out-of-cell time, and lack of access to kiosks and the library. Doc. 305-11.

During the settlement approval process, some class members also claimed that the defendants were not meeting or were unable to meet their obligations in their objections to the settlement agreement. *See generally* Docs. 218; 219; 220; 221; 222; 223; 224; 225; 226; 227; 229; 230; 231; 232; 233; 234; 235; 236; 238. According to the defendants, "careful review of these filings reveal[ed] that they [were] not actually objections to the fairness of the agreement itself rather they [were] expressions of concern about Defendants' ability to carry out the agreement or their failure to abide by same." Doc. 239 at 6. The plaintiffs' counsel also characterized the objections "not [as] dissatisfaction with the terms of the agreement itself, but rather dissatisfaction with the Defendants' alleged failure to comply thus far with the terms of the agreement." Doc.

---

plaintiff], for purposes of this appeal we take judicial notice of the information found on the FDIC's website.").

252 at 16:25-17:3.  The Court agreed[12] and noted that a "common thread" among all objections was "allegations that staffing [was] inadequate" to implement the settlement agreement.  *Id.* at 15:14-19, 16:3-6, 17:4-5.

The Court addressed these concerns at the fairness hearing on April 30, 2019.  Docs. 250; 252.  At that hearing, the Court made clear that "insufficient resources or staffing or funding is not an excuse or reason for not complying with the agreement."  Doc. 252 at 15:24-16:10.  The defendants agreed.  *Id.* at 16:2-10.

Based on the defendants' assurances that they would soon be in full compliance, the settlement agreement was adopted by the Court, and a permanent injunction was entered on May 7, 2019.  Docs. 256; 256-1.

Problems soon arose.  On December 16, 2019, the plaintiffs wrote the defendants about the same issues raised in their January 2019 letters.  Doc. 305-12.  The plaintiffs documented "several violations of the Agreement that stemmed from [alleged] chronic understaffing in the SMU, including lack of officer rounds, lack of officer supervision while class members were using the restraint tables, and the [recent] suicide of [a] class member."  Doc. 308-1 at 7-8 (citing Doc. 305-12).  The plaintiffs also claimed inmates "were not receiving four hours of out-of-cell time; lived in unsanitary conditions exacerbated by inadequate opportunities for cell cleanout; and lacked access to the book cart, GOAL devices, kiosk, programming, laundry, adequate clothing and

---

[12] *See*, *e.g.*, Doc. 252 at 16:16-17 ("THE COURT: … most of the objections address[ed] what [inmates] s[aw] as inadequacies in the implementation."); *see also* Doc. 237 at 1 ("Class members objected in particular that Defendants have not yet fully implemented particular terms regarding out-of-cell time (and the staffing required to facilitate it), certain conditions of confinement, and procedures for placement and retention in the SMU.").

personal hygiene items, and appropriate mental healthcare."[13] *Id*. at 8 (citing Doc. 305-12 at 4-6, 8-11).  Finally, the plaintiffs alleged that the defendants were violating "the procedural safeguards built into the Agreement, including the failure to provide class members with pre-assignment review hearings and Offender Management Plans."  *Id*. (citing Doc. 305-12 at 8-9).

The Court pauses to note the defendants' response to their failure to provide out-of-cell programming.  They represented that "televisions were then being installed," and "programming would soon begin 'throughout the SMU.'"  Docs. 305-1 at 40; 305-13 at 7 ("The televisions are in the final stages of installation and Defendants expect that installation will be completed within the next several weeks.").  Of course, in-cell television programming does not satisfy the defendants' obligation to provide out-of-cell programming, but the pertinent point here is the representation that inmates would have television access "within the next several weeks."  Providing television access to eligible inmates is an important element of the scheme to ameliorate the deleterious effects of solitary confinement and to provide incentives for movement through phases, although perhaps less critical than other injunction requirements.  Doc. 256-1 ¶ 26.  As will be discussed, the defendants have repeatedly promised, and repeatedly broken their promises, to provide eligible inmates access to television.

The plaintiffs' December 16, 2019 letter raised a new issue: the misuse of "strip" cells, including the routine placement of new SMU inmates in strip cells.  *See* Doc. 305-12 at 11-12 ("[W]e have heard reports that prisoners frequently are denied bedding and

---

[13] The Court continued to receive letters from inmates claiming the conditions at the SMU had not improved.  *See*, *e.g.*, Docs. 284; 290; 299.

other property, sometimes for weeks at a time, upon arrival at the SMU.").  Because of the significance this issue will assume, a brief discussion of terminology is appropriate.

According to the GDC, a "strip" cell is a short-term (no more than eight hours) non-disciplinary measure to isolate inmates who threaten themselves or others.  Doc. 457-1 (SOP 209.05) at 1, 4 ("Stripped Cells and Temporary Confiscation of Personal Property").  When placed in a strip cell status, inmates receive only a paper gown and may or may not have some sort of suicide mattress; all other property is confiscated. Docs. 429 at 31:8-14; 430 at 47:15-22; 457-1 at 1-2; *see also* Doc. 421 ¶ 23 ("Stripped cells are cells lacking all personal property.").  An observation cell is supposedly only used for mental health purposes and requires documentation by mental health providers.  Docs. 457-9 (SOP 508.28) at 7; 477 at 7.  Inmates in both strip and observation cells require monitoring every fifteen minutes which shall be documented in writing.  Docs. 457-1 (SOP 209.05) at 4; 457-9 (SOP 508.28) at 7.  The defendants attempt to distinguish a strip cell from a mental health observation cell, even though they admit that the GDC's policies related to those differences have not been followed. *See* Docs. 429 at 80:4-82:22, 105:6-106:7; 430 at 45:1-13, 46:22-47:22; 432-16 at 104:20-105:4.  However, as current Warden Williams acknowledged, there is in practice no difference between the two.  Doc. 432-16 at 108:24-109:8.  In fact, the defendants primarily use the same cells—A-107 and A-108—as strip and observation cells.  For this order, the bottom line is this—when an inmate is locked in a bare cell in violation of the injunction, it makes no difference what label the defendants use.  Certainly, the label used makes no difference to the inmates in those cells.  The Court uses the term

generally used by the parties and by inmates—strip cells—to refer to both strip and observation cells.

Since first raising the issue of improper use of strip cells, the plaintiffs have struggled to obtain evidence, other than inmates' accounts, of strip cell abuse. Only in the final stages of enforcement did the Court learn the truth.

After the plaintiffs' December 16 letter, the parties "held a monitoring meeting to discuss the[se] issues on February 26, 2020." Doc. 305 at 4. But "[n]ot long thereafter, the [Covid-19] pandemic brought a temporary halt to [the plaintiffs'] monitoring efforts as the Department restricted all visitation and (for a period) telephone calls." Doc. 305-14 at 3. Because "the Covid-19 pandemic created unforeseen challenges," the plaintiffs allowed the defendants "a reasonable amount of time … to adapt." Doc. 308-1 at 8. On January 28, 2021, the plaintiffs informed the defendants that in their view the defendants had been afforded sufficient time "to implement new, pandemic-related policies," and thus "insist[ed] on compliance with the settlement terms that the Department negotiated and agreed to follow" going forward. Doc. 305-14 at 2. The January 28, 2021 letter reiterated concerns expressed in the January and December 2019 letters. The letter identified multiple alleged violations of the settlement agreement—lack of out-of-cell time, lack of access to books and GOAL devices, lack of proper sanitation and hygiene, lack of out-of-cell programming, inadequate review and transfer procedures, understaffing, and inadequate responses to mental illness issues. *Id.* at 3-7.

The parties met and conferred on March 3, 2021. Doc. 305 at 4. At that meeting, the plaintiffs claimed that the defendants informed them "that all movement … including

movement for outdoor recreation, out-of-cell programming, and table time—had been stopped for several months due to unspecified security concerns." Docs. 308-1 at 15; 308-3 at 7-8. The defendants did not notify the plaintiffs of these cancellations—a clear violation of the Court's injunction. *See* Docs. 256-1 ¶¶ 14, 59; 305-1 at 7 ("We were not notified of this directive until well after it had been issued, and we have never been provided documents, on a monthly basis or otherwise, concerning denials of out-of-cell time as a result of Holt's directive.").

Over the next few months, the plaintiffs continued to monitor compliance, looking, futilely according to the plaintiffs, for signs that conditions had improved. Doc. 305 at 4. On December 30, 2021, the plaintiffs formally moved for a status conference with the Court to enforce the settlement agreement. Doc. 302. The plaintiffs reported they were preparing to file a motion for an order directing the defendants to show cause why they should not be held in contempt. *Id.* at 2. In response, the defendants claimed "that a conference to address that … motion [was] premature and should be denied," suggesting that there had been no substantive communications between counsel. Doc. 303 at 2. Assuming that to be the case, the Court denied the plaintiffs' motion and ordered the parties to meet and confer. Doc. 304.

The plaintiffs immediately moved for reconsideration and documented the parties' extensive substantive communications. Doc. 305. The parties had met in person on December 14, 2021, and "conferred for several hours regarding the alleged violations" that would be the subject of the plaintiffs' motion for a show cause order. *Id.* at 3. "The meeting was also attended by Georgia Department of Corrections (GDC) lawyers Jennifer Ammons and Bryan Wilson, and by GDC Field Operations Director Robert

Toole." *Id*. "On December 22, 2021, Plaintiffs' counsel wrote an 8-page letter to Defendants memorializing Defendants' positions with respect to each unresolved matter discussed at the conference." *Id*. As mentioned above, the alleged violations were also discussed during at least two monitoring meetings and raised by at least five separate letters dated January 24, 2019; January 29, 2019; December 16, 2019; January 28, 2021; and November 5, 2021. Docs. 305-1; 305-10; 305-11; 305-12; 305-14.

## B. 2022 Contempt Proceedings

Upon learning that the plaintiffs had pursued substantive discussion with the defendants to address alleged longstanding violations of the injunction, and given the looming May 7, 2022 expiration of the injunction, the Court convened a conference on January 27, 2022, and ordered the parties to conduct limited discovery. Doc. 306 at 1. On January 28, 2022, the plaintiffs moved for the entry of an order directing the defendants to show cause why they should not be held in contempt for violating the terms of the settlement agreement. Doc. 308. The plaintiffs alleged violations related to out-of-cell time (¶¶ 11-14, 16, 18); library, book carts, and GOAL devices (¶¶ 19-21); programming (¶¶ 22-23); sanitation, hygiene, and clothing (¶¶ 31, 34, 36-38); assignment and periodic review (¶¶ 48-54, 56); access to records and data (¶ 60(a)); and interference with communications between class counsel and inmates (¶ 63). Docs. 308 at 1; 308-1 at 5. Inmates claimed that they continued to be held in unsanitary isolation cells for between 22 and 23 hours per day, had limited or no access to programming, lacked necessities such as clean clothing, and were denied meaningful review procedures both before and after they were placed in the SMU. *See* Doc. 308-1 at 4 ("[T]he present conditions in the Special Management Unit bear a dismaying

likeness to those described in the plaintiffs' complaints (Doc. 73; Doc. 140) and motion for preliminary injunction (Doc. 154; Doc. 154-1).").  The plaintiffs also claimed that individuals with serious mental illness remained in the SMU even after the extreme conditions of the Tier III program caused them to decompensate and engage in acts of self-harm, citing the suicides of two SMU inmates.  *Id.* at 4; Doc. 312-1 at 4-5, 7-8.

In response, the defendants essentially argued that the doctrines of laches and unclean hands prevented findings of contempt.  Doc. 325.  First, the defendants argued that they should not be held in contempt for violations described in the plaintiffs' December 16, 2019, and January 28, 2021 letters because the plaintiffs did "not diligently pursue[] relief" for those violations.  *Id.* at 4.  Then, citing the contractual principle of good faith and fair dealing, the defendants argued inmates' "affirmative interference with [their] ability to carry out [their] duties under the Agreement preclude[d] a finding that Defendants [] violated its terms."  *Id.* at 9.

1. *Show Cause Hearing*

On April 26, 2022, the Court convened a hearing on the plaintiffs' motion for a show cause order.  Doc. 342.  The evidence taken is summarized below.

**Out-of-Cell Time.**  Through the testimony of Holt, Caitlin Childs,[14] and various video depositions of SMU inmates and staff, the plaintiffs presented overwhelming evidence that inmates remained in their cells between 22 and 24 hours per day and

---

[14] From June 18, 2018, to January 5, 2024, Childs was employed as a paralegal by the Southern Center for Human Rights and served as the plaintiffs' lead investigator.  Docs. 308-5 ¶¶ 1-2; 344 at 4:17-18; 446-1 ¶ 2.  She regularly reviewed documentation produced by the defendants to determine whether the defendants were complying with their obligations under the settlement agreement.  Doc. 344 at 15:11-16:4 ("I go to the prison, and I meet with class members, and then I review, digest, and summarize records.").

thus did not receive four hours of out-of-cell time as required by the settlement agreement.  *See* Docs. 256-1 ¶¶ 12-18; 344 at 7:18-8:2.

**Table Time.**  Restraint tables are the primary means for providing inmates with out-of-cell time.  But by the time of the hearing, both inmates and staff testified that the defendants had stopped or all but stopped table time.  *See*, *e.g.*, Docs. 340-11 at 92:12-24, 93:8-11; 340-16 at 80:22-81:1.  In fact, staff could not recall when the last time the restraint tables were used.  Docs. 340-11 at 92:21-24 ("Q: If there were evidence that the restraint tables have not been used in say the last six months, would you have any reason to dispute that?  A: No."), 93:8-11; 340-16 at 81:2-4.  The defendants' April 4, 2022 brief acknowledged that they stopped offering table time but claimed table time presented a security issue, citing five alleged incidents involving restraint tables. *See* Doc. 325 at 13-15.  In the very same filing, however, the defendants cited then Warden Joseph Polite's February 24, 2022 deposition testimony that table time occurs and attached an affidavit from Holt dated April 4, 2022, claiming "the restraint tables are currently in use and access to them is offered to all the inmates housed in the SMU."[15] Docs. 325-3 ¶ 10; 340-15 at 60:5-9 ("Q: So anybody who wants the three hours a day of table time gets it?  A: If they want it.").

The Court made two points about the failure to provide table time.  First, if there were incidents that justified the broad suspension of table time, the defendants should have produced the documentation that necessarily would have been generated had

---

[15] Inmates testified that the defendants stopped offering table time sometime in 2020.  *See*, *e.g.,* Docs. 340-1 at 32:14-16 ("Q: Have you ever been offered table time? A: No, ma'am."), 32:17-19 ("Q: Have you ever asked to go to the tables?  A: They said they don't do that."), 33:5-10; 340-2 at 33:11-34:5 ("I think they stopped running table time like 2020, September or October, something like that.  They stopped running table time completely."); 340-9 at 25:14-26:2; 340-19 at 16:25-17:2 ("Q: [T]hey don't offer tables? A: No, ma'am."); 340-20 at 26:15-27:13; 340-21 at 15:13-23.

there been such incidents.  Second, the defendants knew when they entered into the settlement agreement that SMU inmates were difficult to manage.  The defendants made no further effort to prove their unclean hands defense.[16]

**Cage Time.**  Heather Barber was employed as a correctional officer within the SMU from May 16, 2019, until December 16, 2021, when she became an SMU behavioral health counselor.  Doc. 340-11 at 10:18-11:21.  Barber testified that during her time as an SMU correctional officer outdoor recreation was left to officers' discretion and that SMU policy was to offer inmates only one hour per day in the yard cages.  *Id.* at 86:15-87:1, 91:20-23.  Another counselor testified that inmates typically spent 23 hours in their cells per day and were entitled to only one hour of out-of-cell time.  Doc. 340-16 at 46:15-16, 75:10-13, 75:21-24.  This was consistent with inmate testimony that they regularly spent 23 to 24 hours per day in their cells.[17]  Although some inmates testified that they were regularly offered outdoor time, these inmates testified that they

---

[16] Since the settlement agreement took effect, the defendants claimed major incidents in the SMU had tripled, asserting that there had been approximately 646 major incidents in the SMU from January 1, 2019, to early March 2022.  Doc. 325 at 8.  But the list of "major incidents" produced by the defendants included numerous routine entries for "keys/tool," "shakedown," "institutional drills," and "failure to execute policy."  *See* Doc. 325-3 at 99.  Some of these entries had the same incident number and refer to the same event.  According to the plaintiffs, "[t]here were 359 unique incident report numbers in the approximately 34-month period from May 7, 2019, when the Agreement was adopted by the Court, and February 28, 2022 (the last full month covered by Defendants' records)," which is approximately half the number of incidents the defendants represented to the Court.  Doc. 329 at 4 (citing Doc. 325-3 at 35-99).

[17] *See, e.g.*, Docs. 308-4, N.H. Decl. at 7 ¶ 19 ("Officers let people in D-Wing go to the yard cages for about an hour a day on weekdays. Officers do not announce when it's yard time."), C.J. Decl. at 22 ¶ 18 ("[F]or almost the entire month of June 2021, I received almost no out-of-cell time because officers were not offering table time and I was not allowed to go out to the yard."), K.M. Decl. at 28, 30 ¶¶ 8, 19 ("I did not regularly receive 4 hours of out-of-cell time when I was at the SMU because I was never offered table time …. I have only gone to yard one time since I got here.  I spend all day locked up alone in my cell.  I only come out for showers three times per week."); 340-1 at 6:16-19 ("Q: About how many hours do you spend in your cell every day?  A: Twenty-four hours."); 340-19 at 16:9-24 ("Q: [H]ow many hours are you inside your cell on a weekday? … A: I'll be in my room 24 hours."); 340-20 at 6:12-14 ("Q: In the SMU, approximately how many hours a day do you spend in your cell?  A: Possibly all day."); 340-21 at 15:1-3 ("Q: [H]ow many hours are you spending inside … of your cell on a weekday?  A: Twenty—about 23, 24.").

were not offered four hours of out-of-cell time per day as required by the settlement agreement.[18]

**Out-of-Cell Time Generally**.  The defendants' documentation, or lack thereof, confirmed that they were not complying with the settlement agreement's out-of-cell time requirements.  *See* Doc. 256-1 ¶¶ 12-18.  Based on her review of documents produced by the defendants, Childs testified that it was common for the defendants' documentation of out-of-cell activities to be left blank for days or weeks at a time and "that out-of-cell activities … were regularly cancelled."  Docs. 308-5 ¶¶ 9, 28; 344 at 18:4-20:9, 29:10-21, 30:3-8, 31:3-32:21, 33:1-24, 34:5-6 ("I found very few door sheets that included time out and time in.").  "For instance, the east and west control logbooks indicate[d] that outdoor recreation and table time were cancelled for the full week beginning March 29, 2021."[19]  Doc. 308-5 ¶ 9.  "For this same week, the west-side logbook [did] not contain any entries for outdoor recreation or table time" and "[o]n Wednesday, March 31 of that week, the logbook state[d]: 'No movement this week except for showers.'"  *Id.* ¶ 10.  Individual inmate files suffered from the same flaws, confirming that the defendants were not providing inmates with the minimal amount of out-of-cell time required by the settlement agreement.[20]

---

[18] *See* Docs. 340-1 at 6:16-19, 31:14-22; 340-2 at 32:3-24, 33:3-13, 45:13-23; 340-9 at 23:24-25, 55:20-25; 340-19 at 15:22-23, 16:9-11, 29:15-17, 32:6-10; 340-20 at 25:7-12 ("We get like a hour.  No more than two hours."); 340-21 at 14:3-15:15, 49:5-11.

[19] "[T]he SMU is divided into two sides, the east side and the west side. The east side contains A-, B- and C-Wings, the west side is D-, E-, and F-Wings."  Doc. 344 at 20:23-25.

[20] Childs testified that for one inmate in particular, records produced in February 2021 showed that "table time was cancelled for two consecutive weeks in March 2020; one full week that was undated; two full weeks in April 2020; one full week in June 2020; one full week in July 2020; one full week in September 2020; two full weeks in November 2020, and four out of five days during the last week of November; almost all of December 2020; and two weeks in January 2021."  Doc. 308-5 ¶ 28.  "These same records … show[ed] that yard call was cancelled for the week of October 25, 2020."  *Id.*

The defendants did not deny that they cancelled out-of-cell time; nor could they. SMU staff, including then Warden Polite, testified that out-of-cell time was cancelled due to understaffing—a clear violation of the settlement agreement.  Doc. 340-15 at 43:15-18 ("Q: Has there ever been an instance where they have not been provided out-of-cell time because of understaffing?  A: Yes."); *see also* Docs. 340-11 at 100:24-101:1 (Barber testifying that the out-of-cell time was cancelled due to lack of staff); 340-16 at 77:9-23, 78:6-10 (Former SMU behavioral health counselor Kendra McBurnie testifying that she was told there would be no yard call due to understaffing that day).

Holt testified that the tactical assistance ("TACT") squad and Interdiction Response Team ("IRT") were sent to provide support to staff at the SMU and "ensure that class members receive the four hours of out-of-cell time that they're entitled to under the agreement."  Docs. 340 at 108:11-22; 344 at 49:20-50:2.  But on days the TACT squad or IRT team was not present, out-of-cell time was sometimes cancelled. *See*, *e.g.*, Docs. 308-5 ¶ 9 ("On Thursday, April 1, 2021, the logbook states, 'No movement b/c Tact squad not working.'"); 340-11 at 40:13-19, 138:20-139:10; 340-16 at 80:7-14 ("Q: Do you know if yard time would be canceled if IRT or TAC couldn't make it?  A: Sometimes.  Not always.").  McBurnie testified that "there weren't enough correctional officers to" feed or transport inmates "for showers, yard call, [and/or] kiosk" without their assistance.  *See* Doc. 340-16 at 78:14-79:21.  This was consistent with inmate testimony.[21]

---

[21] *See* Docs. 308-4, D.H. Decl. at 13 ¶ 12 ("Yard call is offered when the tactical squad is at the SMU on Mondays, Wednesdays, and Fridays.  But yard call is not usually offered on Tuesdays and Thursdays."), N.S. Decl. at 37 ¶ 14 ("While yard time is sometimes offered, officers routinely take away yard time with no explanation.  Sometimes they don't have enough staff and have to use yard staff to run showers."); 340-2 at 65:1-7 ("Like, if the TACT squad don't come, we won't get nothing.  Because they'll complain about the shortage of staff and so – whatnot."); 340-9 at 24:1-15.

The defendants also failed to notify the plaintiffs of out-of-cell time cancellations lasting 72 hours or more in violation of paragraph 14 of the settlement agreement. Holt admitted that he unilaterally issued a directive to stop all movement within the SMU for a week or more on at least four occasions without notifying the plaintiffs. Docs. 340 at 116:5-117:4; 344 at 50:10-24, 90:12-91:25. Despite acknowledging the requirement to report the cancellation of out-of-cell activities lasting 72 hours or more, Holt testified that paragraph 14 did not apply to him and did not require him to notify the plaintiffs of his decision to cancel out-of-cell time. Docs. 340 at 118:9-22; 344 at 90:11-20.

**Programming**. Inmates did not receive weekly at least 120 minutes of out-of-cell programming.

First, the defendants conducted out-of-cell programming in one classroom that could accommodate only four to five inmates at a time and that served only one wing. *See* Docs. 340-11 at 96:5-97:9; 340-16 at 84:20-25. Therefore, it was physically impossible to offer each inmate 120 minutes of out-of-cell programming per week. During an onsite inspection, "Plaintiffs' counsel requested to inspect all the areas used for out-of-cell programming in the SMU." Doc. 308-5 ¶ 35. "GDC's Deputy General Counsel, Bryan Wilson, stated that there [wa]s only one classroom in the SMU … located in B-Wing." *Id*. "The classroom had [only] four cages along the back wall that contained a writing surface and a seating surface." *Id*. SMU Unit Manager Charles Hargrove testified that the only out-of-cell programming offered over the past year was an education class taught in this classroom. Doc. 340-3 at 124:6-7, 126:16-22.

Even if the defendants had offered out-of-cell programming at the restraint tables, they did not have the staff to do so. Hargrove testified that "there was nobody

available to teach the OUT program" "between July and December" 2021. *Id*. at 76:3-14, 78:6-8. McBurnie testified that "there wasn't enough adequate staff to pull the offender out of the cell to do the class." Doc. 340-16 at 11:14-22, 29:7-30:2, 86:14-15. When she left the SMU in September 2021, she had never taught a class. *Id.* at 11:20-22, 29:13-14.

Holt, with some understatement, admitted at the show cause hearing that "[t]here were some challenges with staffing as it related to education." Doc. 344 at 49:12-13. But he claimed that the GDC "came up with a way to provide education via satellite" to the SMU on a "weekly" basis. *Id*. at 49:14-18. Perhaps Holt was the source for this representation in the defendants' brief filed before the show cause hearing: "While there have been occasions when there have not been instructors available to offer out-of-cell programming, in-cell programming has continuously been offered to class members." Docs. 325 at 16. That representation was not true—the evidence established that there was virtually no out-of-cell programming and that inmates in E- and F-Wings still did not have television access. *See* Docs. 340-11 at 109:5-20, 110:1-7; 340-16 at 91:8-14; 344 at 34:7-19, 34:23-35:4. Yet, there was evidence that door sheets for inmates in those wings falsely documented that programming was provided by television. Doc. 340-3 at 120:2-123:5.

**Library, Book Cart, and GOAL Devices**. The plaintiffs did not receive weekly book cart access, library access, or a GOAL device as required by the settlement agreement.

Barber testified that book carts were not used regularly within the SMU until late 2021, and, even then, not weekly as the injunction requires. *See* Docs. 340-11 at

117:7-18, 118:22-25, ("Q: Right now how often do you provide book carts to each wing? A: It's a 2-week period.  Every other week."), 119:5-23; *see also* Doc. 340-16 at 96:11-22.  This was confirmed by Childs's declaration that the defendants' documentation did not contain any entries for book cart access.  Doc. 308-5 ¶ 17 ("Of the logbooks I reviewed, I did not see any entries documenting the book cart on the floor of either the east-side or the west-side.").  Inmates testified that they had never seen a book cart and did not know how to request books from the library.[22]

GOAL devices were not issued to inmates in violation of paragraphs 20 and 21 of the settlement agreement, ostensibly because the provider no longer manufactured them.  *See* Docs. 340-11 at 111:6-9, 113:11-18, 113:22-24 ("Q: Tablets are not available?  A: Yes, sir."); 344 at 68:8-69:10.  However, Holt testified that the GDC had secured a new provider and GOAL devices would be distributed in May 2022.  Docs. 340 at 124:21-125:20; 344 at 68:12-19.

**Sanitation, Clothing, and Hygiene**.  The plaintiffs presented substantial evidence of violations related to cell sanitation, clothing, and hygiene.  Doc. 256-1 ¶¶ 31, 36-38.

The defendants' logbooks documented unsanitary conditions, describing the SMU as "not clean," "filthy," "disgusting," "dirty," and "trashed."  *See* Docs. 308-5 ¶ 12; 340-11 at 36:22-37:9 (explaining that logbook entry regarding "trash everywhere" in D-, E-, and F-Wings meant that "the [previous] shift did not clean.").  This was consistent

---

[22] *See* Docs. 308-4, N.H. Decl. at 8 ¶ 23 ("I have never seen a book cart in D-Wing, and I have never been offered a book, and I do not know how to request one."), D.H. Decl. at 14 ¶ 16 ("I have not seen a book cart since returning to the SMU."); 340-20 at 33:19-23 ("I ain't seen no book cart.").

with inmates' testimony that the defendants were not providing them with regular opportunities to clean their cells.[23]

The defendants also failed to provide basic necessities such as clean clothing. The settlement agreement requires the defendants to provide inmates with "the same laundry [] services" and "issue[] and exchange[] clothing on the same basis as inmates in general population." Doc. 256-1 ¶ 38. Counselors acknowledged in their depositions that inmates complained about laundry services and lack of clothing. Docs. 340-11 at 134:7-10; 340-16 at 113:17-19 ("Q: Did people ever tell you that they didn't have enough clothing? A: Yes."), 114:9-23. One counselor testified that the SMU did not have enough clothing to provide inmates. Doc. 340-16 at 113:17-114:8 ("Q: So the SMU didn't have enough clothing? A: … The warehouse next door would not provide enough or have enough."). The plaintiffs' counsel "encountered class members wearing nothing but underwear during legal visits." Doc. 308-1 at 24 (citing Doc. 305-1 at 9); *see also* Doc. 308-4 at 23 ¶ 22 ("I did not have a jumpsuit or any other clothing to wear, so I was just wearing boxer shorts and a t-shirt … I was able to change into the jumpsuit before I met with my lawyer."). Inmates also testified that they lacked sufficient clothing items and that their requests for items like underwear went unanswered.[24]

---

[23] *See, e.g.,* Docs. 340-20 at 35:3-7; 340-21 at 25:11-14 ("Q: How are you able to keep your cell clean? A: I have to rip one of my towels and sweep the floor with a rag."); Doc. 308-4, N.S. Decl. at 39 ¶ 21 ("Since I arrived at the SMU in February 2021, I have only been given two opportunities to do a cell cleanout."), N.H. Decl. at 8 ¶ 25 ("Cell cleanout does not occur regularly in D-Wing. The last time was in mid-December.").

[24] *See, e.g.,* Docs. 340-2 at 62:3-7 (C.J.) ("It's hard to get clothes."); 340-9 at 29:10-18 ("Q: What clothing did you have when you were sent to the – when you got here at the SMU? A: What I had on."); 340-21 at 10:1-3 (N.S.) ("Q: What clothing were you provided while you were in A-Wing during that week? A: Nothing."); 340-19 at 28:7-16 (L.W.); *see also* Doc. 308-4, D.H. Decl. at 14 ¶ 18, K.M. Decl. at 28 ¶ 10, N.S. Decl. at 39 ¶ 23.

Personal hygiene services also seemed lacking. *See* Doc. 308-4, D.H. Decl. at 14 ¶ 14 ("I need a haircut and a shave but have not received one since getting to the SMU."), K.M. Decl. at 29 ¶ 13 ("I was not able

**Assignment and Periodic Review**.  The defendants violated most of the settlement agreement's requirements regarding assignment to the SMU and periodic review.  Most notably, and of particular concern to the Court, the defendants ignored the Court's order that each inmate must have a detailed offender management plan setting out individualized goals for the inmate and explaining the steps necessary to qualify for a transfer from the SMU.  Doc. 256-1 ¶ 53.  Holt testified that a detailed individualized offender management plan for each inmate was not necessary because "the management plan was the same for every inmate at the SMU."  Doc. 344 at 69:19-20.

That cavalier attitude permeated the entire assignment and review process.  Childs's review of inmate files produced by the defendants in February 2021 and February 2022 confirmed that half were missing assignment paperwork.  *Id*. at 27:20-28:11.  Inmates also confirmed that they did not receive assignment hearings before their assignment to the SMU.[25]

The defendants claimed, without supporting documentation, that inmates were not afforded assignment hearings because the assignments were "emergency transfers."  Docs. 340 at 86:5-13 ("I know of no placements at the SMU that I have not deemed an emergency transfer."); 344 at 72:10-19.  This bald, unsupported assertion that most SMU assignments were "emergencies" was neither credible nor warranted by the settlement agreement.  As discussed, there is no "emergency exception" to the pre-

---

to shave or get a haircut on a regular basis in the SMU.  I received about three to four shaves and haircuts during my entire time there."), N.S. Decl. at 39 ¶ 22 ("The prison has only provided me with the opportunity to shave and have a haircut one time since I have been housed at the SMU."); *see also* Docs. 340-2 at 42:5-6 ("I was lucky – lucky if I shave once a month."); 340-19 at 26:24-25 ("It takes weeks to get your laundry back."); 340-21 at 27:16-17 ("Q: Has the SMU ever offered you a haircut?  A: Yeah, once in 2021.").

[25] *E.g.*, Docs. 308-4, D.H. Decl. at 13 ¶ 11, C.J. Decl. at 18 ¶ 3, K.M. Decl. at 27 ¶ 3, N.S. Decl. at 34 ¶ 4; 340-2 at 48:8-22; 340-9 at 44:21-45:14; 340-21 at 36:15-24.

assignment hearing requirement.  A "disruptive" inmate may waive his right to attend his pre-assignment hearing and after the hearing he may "in emergency situations, be transferred before the time for the inmate to submit objections expires."  Doc. 256-1 ¶ 48(b), (e).  Even if there was a general emergency exception, there was no evidence that every transfer was an emergency.  Also, circumventing the pre-assignment process required by the injunction undercuts a critical element of the settlement agreement—"an out-of-cell mental health evaluation performed by a licensed mental health provider … to determine whether the inmate is, by reason of mental illness or disability, precluded from being placed" in the SMU.  *Id.* ¶ 49.

The plaintiffs also adduced evidence that the defendants routinely failed to conduct the 60- and 90-day review hearings required by paragraph 54.  *See*, *e.g.*, Docs. 340-2 at 20:9-11 ("Q: When you were at the SMU, did you ever hear of something called periodic review hearings?  A: No."); 340-16 at 69:25-70:24 (testifying inmates often complained about not receiving review hearings).[26]

Even worse, there was considerable evidence that the defendants were falsifying documentation of review hearings.  McBurnie testified that she refused to sign off on review forms because she was asked to sign when inmates were not present.  Doc. 340-16 at 69:11-16 ("Because the offenders were not there.  So I don't want to sign something when they are not there.").  She stopped signing such review forms but testified that it was common for other counselors to sign review forms for inmates on her

---

[26] *See also* Doc. 308-4, N.H. Decl. at 5 ¶ 8 (class member still in the SMU despite not having a disciplinary report in six or seven years), C.J. Decl. at 18 ¶¶ 5-11 (claiming review does not occur regularly), K.M. Decl. at 27 ¶¶ 6-7 (claiming to have had only one review hearing during an entire year at the SMU), N.S. Decl. at 34-35 ¶¶ 6-8 (claiming to have never had a formal hearing and simply told to sign a form).  By failing to conduct these reviews, the plaintiffs claim that inmates are left confused as to why they remain in the Tier III program and what they must do to be transferred out.

caseload.  *Id.* at 68:22-69:7.  Inmates also testified that they were routinely instructed to sign but not date review forms, apparently to allow backdating so it would appear that a review hearing was timely held.[27]

As part of the 60- and 90-day review hearing process, inmates must receive a mental health evaluation to determine whether the inmate is precluded from remaining in the Tier III program.  Doc. 256-1 ¶ 49.  The defendants failed to conduct these evaluations as required by the settlement agreement.  In part, but only in part, this was a consequence of the defendants' failure to provide adequate staffing.  Childs testified that "[n]otations about staffing would frequently come up in individual records in relation to the out-of-cell mental health evaluations being canceled or postponed due to a lack of security escorts as well as individual counseling sessions being canceled for the same reason."  Doc. 344 at 38:16-20.  Childs also testified that these records often contained entries about "mental health rounds that were not able to be conducted due to a lack of staff."  *Id.* at 38:20-22.  For one inmate, in particular, Childs testified that there were "eight weeks of canceled mental health rounds and one canceled individual counseling session" "due to security issues."  *Id*. at 39:2-10.  When asked if cancellations appeared in other inmates' files, Childs testified that they did and that "[i]t was frequent."  *Id.* at 39:11-15.  Dr. Gweneth Hayes, a psychologist who conducted mental health evaluations of SMU inmates, confirmed this—she lodged complaints because appointments were cancelled or had to be rescheduled because of staffing issues.  Doc. 340-10 at 65:12-18, 98:5-23, 99:7-15, 99:22-100:2, 102:17-103:9.  Dr. Hayes added that

---

[27] *E.g.*, Docs. 340-1 at 13:5-24, 54-57 (testifying that he was given two review hearing forms to sign at the same time); 340-2 at 16:9-17:9, 18:5-19:5, 19:10-25, 20:4-11, 67:25-69:21 (testifying that he was asked to sign two review hearing forms at the same time, and was instructed to not write in the date on forms); 340-19 at 11:15-17, 12:12-20, 13:24-14:1, 14:17-19 (testifying to lack of 60- and 90-day review hearings).

the issue improved in February 2022, after the plaintiffs moved for sanctions, when the SMU provided additional "security officers." *Id.* at 100:3-101:23, 102:7-9, 104:5-20.

Documentation, or lack thereof, confirmed the defendants' failure to provide mental health evaluations in connection with periodic review hearings. Childs testified by declaration that "[r]ecords [did] not show that mental health evaluations [were] consistently provided or properly documented in conjunction with 60- and 90-Day Reviews." Doc. 308-5 ¶ 30. She testified that "[f]or several class members, no paperwork related to their mental health evaluations was provided." *Id.* This was consistent with inmates' testimony that they did not regularly receive an out-of-cell mental health evaluation in connection with their 60- to 90-day reviews.[28] Hargrove, who also chaired the classification committee that conducted review hearings, testified that the committee did not even look for a copy of the inmate's mental health evaluation before filling in the date of the last purported mental health evaluation on the inmate's review form. Doc. 340-3 at 105:3-11, 106:18-22, 108:17-109:20 ("Q: [S]o you said that for the mental health review, that you don't actually look at the evaluation? A: I don't."). Hargrove testified that the committee simply looks at the last time the inmate was scheduled for a mental health evaluation, which apparently is not always correct and may not account for cancellations. *Id.* at 108:23-109:17; *see also* Doc. 308-5 ¶¶ 30-31 ("[O]ne man's 90-Day review paperwork … indicated that a Mental Health Evaluation had occurred on September 11, 2020 … the same man's mental health records stated

---

[28] *E.g.,* Docs. 308-4, D.H. Decl. at 14 ¶ 17 ("I have not received an out-of-cell mental health evaluation since returning to the SMU."), C.J. Decl. at 22 ¶ 17 ("I did not consistently receive out-of-cell mental health evaluations every 60 to 90 days. In total, I think I saw a psychiatrist about three times while I was at the SMU, including the time I was placed on suicide watch."), N.S. Decl. at 36 ¶ 10 ("I did not receive an out-of-cell mental health evaluation in connection with my November 2021 review hearing.").

that a September 11, 2020, appointment with a psychologist had not in fact occurred due to '*significant shortages of security staff*.'") (emphasis added).

The defendants routinely breached their obligations regarding transfers from the SMU.  The settlement agreement mandates that inmates transferred from the SMU must be placed in a STEP program or an SMHTU.  Doc. 256-1 ¶ 56.  In violation of that provision, the defendants transferred approximately 21 inmates to solitary confinement units in other prisons.  Doc. 325 at 23-24.  The defendants took this action even though the inmates' 90-day reviews recommended transfer to a STEP program.  Doc. 329 at 20 (citing Doc. 332-1).  Holt made no effort to justify the defendants' violation of this provision; he simply maintained that the inmates could be "better managed at a Tier II [solitary confinement] setting."  Doc. 344 at 73:1-16.  As will be discussed, the defendants later turned to another artifice to keep inmates in solitary confinement.

**Absence of Documentation and False Documentation.**  The Court has noted the defendants' repeated failure to comply with the injunction's documentation requirements and their falsification of documents.  Because of the role documentation—and misrepresentations about documentation—have played in the Court's conclusion that the defendants must be sanctioned, the subject merits detailed discussion.

As discussed, the plaintiffs, more precisely Childs, painstakingly reviewed reams of documents before the April 26, 2022 show cause hearing to determine whether the defendants were complying with the injunction.  By the time of that hearing, it was evident to the Court that the defendants were figuratively thumbing their noses[29] at the Court and its injunction requiring documentation.  But GDC administration, including

---

[29] An apt, if not legally based, expression of contempt or disrespect.

Holt, knew much earlier of the SMU's contemptuous conduct because, fittingly enough, GDC auditors were documenting the SMU's failure to document.

On December 17 and 18, 2020, GDC auditors conducted an "Annual Assessment" of the SMU.  Doc. 483.  Overall, the audit paints a depressing picture suggesting that conditions in the SMU were even worse than the conditions Dr. Haney documented in 2017.[30]  The relevant findings are:

| Requirement | Observation |
|---|---|
| Walkthrough Inspection | B-Range: Trash was all over range. All offender cells were in need of cell clean-up. Food trays and chemical bottles were left unattended. There is what appears to be mold on the ceilings, in several offender cells and in the shower area. The range floor was sticky and black in color. Floors are in need of sweeping, mopping and buffing, A4-Range: Shower on lower level runs continuously. Prison officials advised that this has been an issue for three month. Staff was advised to submit a work order as soon as possible. C-110- There is what appears to a mold like substance on the wall. Vents were black in color. Several cells plexi glass missing from the doors. Several lights were out throughout the unit. <br><br> F2-Range: There was trash and debris all over the range. The floors were sticky and dirty. There was a strong smoke in the unit. There is what appears to be a mold like substance in the shower area. Floors need to be swept, mopped and in need of waxing. Several cells need to be painted and maintenance needs to fix holes in the walls. The door in the kiosk area needs to be repaired. |
| Is a weekly and monthly written report of the Safety/Sanitation inspections noting all deficiencies, forwarded to the Warden or Superintendent for review and action? | There was no documentation provided for review. Training was conducted with Officer Sanders. |
| Is a daily Safety/Sanitation inspection report forwarded to the Shift Supervisor for review and action | The only documentation provided was dated December 12, 2020 from Central Control. The shifts are not completing and submitting documentation as needed. |
| Are inmates provided the opportunity to have three complete sets of clean clothing per week? <br> • Does the facility provide this clean clothing in several ways, including access to self-serve washer facilities, central clothing exchange, or a combination of the two? <br> • Are washbasins in cells or rooms not compliant? | There was no documentation provided to show that laundry is being offered and completed. |
| Is there a written policy, procedure, and practice that provides that hair care services that comply with applicable health requirements are they available to inmates? | There was no documentation provided to show that health requirements are available to inmates. |

---

[30] The auditors were not assessing compliance with the injunction, but the substance of their findings match relevant Injunction requirements.  Only the most relevant findings are listed.

| | |
|---|---|
| Has the Regional Director approved or disapproved the assignment request to Tier III within (7) calendar days? (209.09) Special Management Unit- Tier III Program, (VI.C.4) | King, Todd 1001401255 – No Newton, Cedric 1218943 – No Hiley, Dorente 1155393 – No Cash, Dianco 1002093422 - No Hill, Christopher 1001416503 - No |
| If the Regional Director approves the request for assignment to the Tier III Program, is the offender served with a copy of this action (Attachment 2), and is that service documented? (209.09) Special Management Unit- Tier III Program, (VI.C.5) | Compliance could not be verified. Attachment 2 has not been consistently served to offenders after the Regional Director approves the request. FY19 Finding. |
| Are the offenders assigned to the Tier III program reviewed by a Counselor as to their mental status every (7) days for the Warden and are the results entered into scribe case notes? (209.09) Special Management Unit – Tier III Program | A review of SCRIBE case notes revealed that status reviews are not consistently conducted every (7) days. FY19 Finding. |
| Are all offender cells equipped and furnished (running water, hardened lockers, beds, ventilated, lighted, heated, and maintained in a sanitary manner, beds that are securely fastened to the wall or floor) according to the Tier III Policy? (209.09) Special Management Unit – Tier III Program (IV.E.1.b) | There is no evidence that sanitation is maintained in the cells. Also, offenders expressed concerns about there being no ventilation in the cells and about the walls being moist. FY19 Finding. |
| Are offenders provided the opportunity to shower (3) times per week? (209.09) Special Management Unit – Tier III Program (IV.E.1.e) | Rounds conducted in B – C – E – and F Wings. Attachment 10, Special Management Unit: Tier III Program Checklist was not present at any of the cells. Showers are to be documented on the checklist; however, the checklists were in the Control Room in a folder and they were blank except for Breakfast logged on Tuesday & Wednesday, December 15th and 16th. |
| Do offenders receive a minimum of one (1) hour of recreation per day, Monday through Friday, unless security or safety considerations dictate otherwise, and is it documented? (209.09) Special Management Unit – Tier III Program (IV.E.1.k) | Rounds conducted in B – C – E – and F Wings. Attachment 10, Special Management Unit: Tier III Program Checklist was not present at any of the cells. Recreation is to be documented on the checklist; however, the checklists were in the Control Room in a folder and they were blank except for Breakfast logged on Tuesday & Wednesday, December 15th and 16th. FY19 Finding. |
| Is the Tier III Program adequately staffed by Correctional Officers specifically assigned to this unit by the Warden or his designee? (209.09) Special Management Unit – Tier III Program | Documentation indicates that the Tier III program is not adequately staffed. FY19 Finding. |
| Does the shift supervisor conduct at least (1) visit to the Tier III Housing Unit during his/her shift? (209.09) Special Management Unit – Tier III Program (IV.Q.2.a) | Reviewed the Record of Staff Visits logbook for November 2020, visits have not been consistently documented by the Shift Supervisors. |
| Do Health Care Officials conduct an initial medical review within 24-hours after initial placement in the Tier III Housing Unit and then daily? (209.09) Special Management Unit – Tier III Program (IV.Q.2.b) | Compliance could not be verified. Daily medical visits are to be documented on Attachment 10, Special Management Unit: Tier III Program Checklist; the checklists are not present at each cell door. |
| Does the Mental Health Counselor personally interviews and prepares a report in any offender remaining in Tier III Program for more than 30 days? (209.09) Special Management Unit – Tier III Program (IV.Q.2.e) | No documentation was provided to verify compliance. |
| Does the Chief of Security conduct visits to the Tier III housing unit at least (1) time daily, excluding weekends and holidays? (209.09) Special Management Unit – Tier III Program (IV.Q.2.g) | Reviewed the Record of Staff Visits logbook for November 2020, visits have not been consistently documented by the Chief of Security. |
| Does the Special Management Duty Officer visit the Tier III housing unit daily? (209.09) Special Management Unit – Tier III Program (IV.Q.2.i) | Reviewed the Record of Staff Visits logbook for November 2020, visits have not been consistently documented by the SMU Duty Officer. FY19 Finding. |

| | |
|---|---|
| Does the Warden at the Special Management Unit conduct daily visits to the Tier III Housing Unit daily excluding weekends and holidays? (209.09) Special Management Unit – Tier III Program (IV.Q.2.j) | Reviewed the Record of Staff Visits logbook for November 2020, visits have not been consistently documented by the Warden. |
| When an offender is assigned to a cell in the Tier III Administrative Housing Unit does the correctional officer complete a Cell Check Form (Attachment 9) before placement in and movement from the offender's assigned cell? (209.09) Special Management Unit – Tier III Program (IV.R.1) | Attachment 9 was not presented for review. |
| Does the assigned Correctional Officer of a Tier III Administrative housing unit record his/her (30) or (15) minute watch on attachment (10) in real-time and not at the end of their shift? (209.09) Special Management Unit – Tier III Program (IV.R.2) | Attachment 10 is not used at SMU to record (30) or (15) minute checks. SMU utilizes an electronic system; however, the checks are not being conducted. Reviewed printouts that verified that checks are consistently being missed for hours. FY19 Finding. |
| When conducting rounds in Administration Segregation are staff utilizing the Behavior Screen Checklist?<br>•Are checklist collected weekly and placed offender's institutional file? (209.06) Administrative Segregation, Attachment 13 (PIB 03/02/20) | Attachment 13 is not present at any of the cell doors.<br>Note:  When conducting rounds in Administration Segregation & Tier II/III staff are to utilize the Behavior Screen Checklist. |
| Are individual records maintained on all activities for each offender assigned to the Tier III Program? (209.09) Special Management Unit – Tier III Program (IV.R.4) | Attachment 10 is not present at any of the cell doors.<br>Note: Individual records providing a listing of daily activities must be maintained for each offender in the Tier III Program. (Attachment 10) |
| Are the staffs that visit a Tier III Administrative Segregation housing unit documenting using the Performance Recording Sheet Attachment 11? (209.09) Special Management Unit – Tier III Program (IV.R.4) | Attachment 11 is not present at any of the cell doors.<br>Note: The floor officers and staff must maintain a cumulative record of all offender activities for the duration of an offender's confinement in the unit and must record any deviations from normal along with the explanations and reasons on Attachment 11, Performance Recording Sheet. |
| Does the housing unit officer maintain an accountability log accurate to the minute, making it possible to give an accountability of the whereabouts of each offender assigned to that housing unit? (209.09) Special Management Unit – Tier III Program (IV.R.5) | Reviewed accountability logs, the whereabouts of each offender assigned to the units have not been documented. All the logs reviewed were completely blank. |

*Id.*  In sum, the GDC's internal audit largely confirmed the plaintiffs' allegations that the defendants violated the injunction.[31]

At the show cause hearing, Holt, eventually, "acknowledged even after three years [the defendants were] still struggling with how to document compliance."  Doc. 344 at 76:25-77:8.  Struggling puts it mildly.  As the Court said, it is "greatly disturbing

---

[31] Childs, for instance, testified by declaration that "[l]ogbooks provided under Paragraph 60 of the Settlement Agreement indicate[d] either that certain tasks [were] not being completed or that officers [were] not consistently recording those tasks."  Doc. 308-5 ¶ 7.  For instance, she testified that "east-side logbooks for February 28 to April 22, 2021, contained numerous lengthy gaps between entries" and that "[i]t was not unusual for the logbooks to have gaps of several hours between entries."  *Id.*  She testified that "the east-side logbook had no entries between 1447 hours on Monday, March 22, 2021, and 1819 hours on Tuesday, March 23, 2021"; "[t]here were [also] no entries between 1444 hours on Tuesday, October 26, 2021, and 0859 on Thursday, October 28, 2021."  *Id.*

that here we are, nearing what would be the end of the Settlement Agreement, that somebody is finally telling the Court that the defendants, who are under an injunction, cannot document compliance with this Settlement Agreement."  *Id.* at 92:8-24.

In their response brief, the defendants admitted, in a backhand way, their breach: "Defendants have struggled with getting the officers assigned to the SMU to adhere to the provision regarding completion of the paperwork."  Doc. 325 at 9.  Perhaps, their officers' "struggles" could be attributed to the defendants' failure to comply with the injunction's mandate that they train their "officers" on how to implement injunction mandates.  Doc. 483 at 2 (December 2020 GDC Audit) ("No documentation was provided to show training for anyone."); *see also* Docs. 340-11 at 135:6-136:5, 143:9-21 (Barber testifying that she had been provided with a copy of the settlement agreement but could not recall instructions or training in it); 340-15 at 29:18-30:25 (Then Warden Polite testifying that the training of officers consists of providing "post orders" that they can use to "train themselves"); 340-16 at 117:5-120:2 (McBurnie testifying that supervisor gave her a copy of the settlement agreement but "didn't give [her] any guidance," and that she could not recall any meetings discussing the settlement agreement); 340-22 at 55:11-56:14, 85:5-15, 87:9-88:25 (Toole testifying that he does not know "for a fact" that staff members are trained in the settlement agreement; that he did not know whether anyone at the GDC Central Office monitored day-to-day compliance with the settlement agreement; and that he does not know whether anyone at the GDC Central Office is responsible for overseeing or monitoring training at the SMU).

Given this evidence, capped by Holt's admissions, the Court was satisfied that contempt citations for GDC Commissioner "Ward on down" were warranted.  Doc. 344 at 92:25-93:2.  Still, the Court wanted to know more.  Accordingly, the Court ordered the defendants "to immediately commence a review of all sources of information for each class member to determine, for the 60 days preceding the date of th[e] order [February 25, 2022 – April 26, 2022], the extent to which the requirements of the Settlement Agreement have been met … [and] report their findings for each class member."  Doc. 343 at 2.  As an example, the Court said that "for each class member, the report shall precisely summarize the nature and extent of a class member's out of cell time."  *Id.*  Then Warden Polite was present when the Court ordered the audit.  Polite had not testified, but the Court had read his deposition and found, as the Court told Polite, that his testimony "did not reflect a helpful attitude at all."  Doc. 344 at 93:25-94:10.  Noting that the defendants were facing "serious consequences," the Court wanted Polite to understand that the Court expected a thorough and honest audit.  *Id.* at 94:6-20.

   2.  *June 2022 Audit*

   On June 6, 2022, the defendants submitted that audit; it was not thorough or honest.  Docs. 352; 353; 482.  The audit consisted of five facility audit checklists, one for each wing, and offender audit checklists for each SMU inmate.  *See* Doc. 482.  The defendants produced with the checklists over 1,000 pages of inmate records, logbook records, and programming documents.  *Id*.  Neither the defendants nor their counsel provided any analysis or summary of the documents.  The Court assumed that the produced documents contained the information upon which the auditors relied to complete the checklists.  However, the auditors' overwhelmingly "yes" responses to

compliance checklist items were not helpful because rarely did they cite the basis for their conclusions.  *See, e.g.*, Doc. 482-2 at 1.  The plaintiffs, on the other hand, dug into those documents.  Doc. 357.  Based on that review and a review of subpoenaed records produced by the defendants on June 16, 2022,[32] the plaintiffs filed their response to the audit.  *Id*.  The following is the Court's summary of the audit.

**Programming.**  For programming, the offender audit checklist posed this question: "Is the offender receiving access to programming?"  *See, e.g.,* Doc. 482-6 at 1.  That question as phrased was a calculated dodge, albeit a feeble one, to divert attention from the true issue—whether inmates were receiving a minimum of 120 minutes per week of *out-of-cell* programming.  Doc. 256-1 ¶ 22.  The reason for that dodge is found in the auditors' answers to that question.  For inmates housed in B-, C-, and D-Wings, the auditors gave identical answers for each inmate: "Programming is being offered via Channel 32 which is an educational channel."  *E.g.,* Doc. 482-6 at 1. Because E- and F-Wings did not have televisions, and because there was no out-of-cell programming, the auditors presumably concluded that they had no choice but to acknowledge that inmates in those wings had no access to programming.  Docs. 357-2 ¶ 7; 482-6 at 268-407.  In short, the audit confirmed that inmates did not have access to out-of-cell programming.

Childs, however, reviewed the documents produced along with the audit.  Doc. 357 at 1-13.  In the offender files, she found program checklists for E-Wing inmates documenting that programming was provided by Channel 32, thus confirming the

---

[32] "These records included an electronic folder of documents called 'OMS Schedules,' which consists of five folders, (B-Wing, C-Wing, D-Wing, E-Wing, and F-Wing)" and "two PDF files: one labeled 'Morning Minutes – SMU' and another labeled 'Shift Briefing Log - SMU.'"  Doc. 357-2 ¶ 3.

defendants were falsifying records.  Doc. 357-2 ¶¶ 11, 14.  Childs also reviewed 146

OMS schedules produced by the defendants in response to the plaintiffs' subpoena and

discovered that "only four individuals … were enrolled in programming or classes."  *Id*. ¶

18.  Logbooks reviewed by Childs confirmed that virtually no out-of-cell programming

was offered.  *Id.* ¶ 7.  For C-, D-, E-, and F-Wings, the logbooks recorded no out-of-cell

programming.  *Id*.  Only in B-Wing—the wing that had a classroom—did the logbooks

reflect that a "few" class members left their cells for programming.  *Id*.

**Out-of-Cell Time.**  The Court had ordered that "for each class member, the

report shall precisely summarize the nature and extent of a class member's out-of-cell

time."  Doc. 343 at 2.  The defendants and their auditors completely ignored that direct

order.  Childs, on the other hand, "reviewed every program checklist contained in the E-

Wing Offender Files and out of 160 program checklists, [she] found only 29 entries (out

of 800 available entries) where a staff member recorded the time out and the time back

in for outdoor recreation" and "only 2 instances where a program checklist stated that a

class member received table time."  Doc. 357-2 ¶ 10.  Otherwise, Childs testified that

"[n]early every entry under table time state[d] either 'refused' or 'N/A.'"  *Id*.  Program

checklists from other wings suffered from the same flaws.[33]  *Id*. ¶¶ 13-15.  Thus, the

audit did not address, much less refute, the testimony of staff and inmates that the

defendants failed to comply with the injunction's out-of-cell time requirement.

---

[33] Many of these inmates maintained that they were never offered table time, and therefore did not refuse it.  Docs. 357-3, C.B. Decl. ¶ 3; 357-4, W.D. Decl. ¶ 7; 357-6, D.H. Decl. ¶ 3; 357-8, A.P. Decl. ¶ 5; 357-9, J.V. Decl. ¶ 4.  The same inmates claimed that they had never refused kiosk or programming, but their door sheets represented that they repeatedly refused to go to the kiosk and programming during the audit period.  Docs. 357-3, C.B. Decl. ¶ 5; 357-4, W.D. Decl. ¶¶ 8, 10; 357-6, D.H. Decl. ¶ 4; 357-7, N.H. Decl. ¶ 3; 357-8. A.P. Decl. ¶ 5; 357-9, J.V. Decl. ¶ 8.

**Book Cart Access.** The audit confirmed, though not directly, that the defendants had not complied with the injunction mandate to offer inmates access to the book cart weekly. Instead of reporting that failure to comply, auditors reported that inmates received book cart access monthly. *E.g.*, Doc. 482-2 at 2. Once a month, though, was better than nothing. Unfortunately, the more truthful response was, in fact, next to nothing. For the period of February 24, 2022 through May 11, 2022, the "East Wing logbooks contain[ed] only one entry documenting book cart, and this occurred on March 4, 2022 in B-Wing," and from February 25, 2022 through May 13, 2022, the "West Wing logbook [did] not have any entries documenting book cart." Doc. 357-2 ¶¶ 5, 8.

**Sanitation, Hygiene, and Clothing.** The facility audit checklist posed one question to cover the injunction's several mandates on sanitation: "Are offenders offered cell cleanout?" *E.g.*, Doc. 482-2 at 2. The auditors responded: "Yes. Current door sheets and logbook entry revealed cell clean out is being offered." *Id*. But records showed otherwise. "The sanitation logbook" produced by the defendants consisted "of only one page" with "handwritten entries for four dates in late March 2021, and then skipp[ed] to entries for November 27, 2021." Doc. 357-2 ¶ 9. "After that, the next entry is from March 1, 2022," and had "four additional entries from March 2022. The remaining entries [were] from April 2022." *Id*. According to the E-Wing program checklists, "cell cleanout occurred during the following dates: March 1, 2022 (3 people); March 9, 2022 (3 people); March 29, 2022 (5 people); April 6, 2022 (2 people); and an unknown date during the week of May 1, 2022 (1 person)." *Id*. ¶ 12. "Ten people," however, "had no entries indicating they had received cell cleanout." *Id*.

**Mental Health.**  In response to the checklist question of whether inmates received a mental health evaluation "at the time of their assignment" and in connection with 60- and 90-day reviews, the auditors almost invariably answered with a simple "yes."  *E.g.*, Doc. 482-6 at 2, 8, 11, 13.  Once again, the underlying documents demonstrate the opposite.  For instance, nine files for inmates housed in E-Wing "did not contain a mental health evaluation or documented refusal, even though those class members' periodic review forms claimed that a mental health evaluation was offered or took place on a specified date."  Docs. 357 at 8; 357-2 ¶ 16.  Seven inmates "did not have any mental evaluations or refusals referenced anywhere in their file."  Docs. 357 at 8; 357-2 ¶ 16.  Yet, the offender audit checklists represented that these inmates received or were offered mental health evaluations in conjunction with their periodic reviews.  *See, e.g.,* Doc. 482-6 at 272, 274, 277, 303, 309, 313, 315, 318.  Records for inmates housed in B-, C-, D-, and F-Wings contained other "instances of missing mental health evaluations or documented refusals."[34]  Docs. 357 at 9; 357-2 ¶ 17.  The auditors still reported compliance for those inmates.  *See, e.g.,* Doc. 482-6 at 66, 119, 125, 139, 171, 222, 225, 343, 346.

**Injunction Mandates Not Audited.**  The audit failed to address the injunction's mandate that the defendants maintain adequate staffing levels, but the documents produced by the defendants confirmed that the SMU was understaffed.  From February 24, 2022, to May 11, 2022, for instance, the "East Wing logbook contain[ed]

---

[34] On B.M.'s offender audit checklist, for instance, auditors deemed the defendants were in compliance with paragraph 49 of the settlement agreement and claimed that he received an evaluation on March 8, 2022.  Doc. 482-6 at 243.  "However, B.M.'s records do not contain any mental health evaluations, and the periodic review form included with B.M.'s records states that his last mental health evaluation occurred on January 12, 2022, which means that B.M. did not receive an evaluation in conjunction with his most recent 60-day review hearing."  Doc. 357 at 9.

approximately 49 entries stating that there were no floor officers and/or control booth officers present, that posts were empty, and that the control booth was shut down due to understaffing during the audit period." Doc. 357-2 ¶¶ 5, 6. From February 25, 2022 through May 13, 2022, the "West Wing logbook [also] contain[ed] approximately 15 similar entries related to understaffing." *Id.*

The audit also failed to document whether the defendants complied with requirements that inmates receive an operable GOAL device and twice weekly kiosk access (*id.* ¶ 20); that inmates be provided laundry services and clothing on the same basis as inmates in the general population (*id.* ¶ 38); that inmates be transferred to an appropriate treatment facility if they are "decompensating" or "reasonably likely to decompensate in the SMU environment" (*id.* ¶ 50); that inmates receive a detailed Offender management plan (*id.* ¶ 53); that inmates receive four hours of out-of-cell time per day (*id.* ¶ 12); that inmates receive at a minimum the privileges set out in the Tier III program privileges chart (*id.* ¶ 26); that inmates receive written acknowledgement of programs, classes, and similar activities completed while in the Tier III Program (*id.* ¶ 24); that inmates receive cells equipped and furnished in a manner consistent with cells in the general population (*id.* ¶ 33); that inmates receive "toiletries and personal hygiene items—including toilet paper, soap, toothbrushes, toothpaste, and similar items—on the same basis as inmates in the general population" (*id.* ¶ 35); and that inmates be placed in either a STEP or SMHTU program when transferred from the SMU (*id.* ¶ 56), among other things.

### 3. Show Cause Order and Addendum Agreement

Although the Court did not have the benefit of the plaintiffs' analysis of the audit until June 21, 2022, the Court's initial review of the audit confirmed that clear and convincing evidence established that the defendants violated and were continuing to violate the Court's injunction.  Accordingly, on June 7, 2022, the Court ordered the defendants to show cause why they should not be held in contempt at a hearing set for June 22, 2022.  Doc. 354.

The day before the show cause hearing, the parties jointly moved to modify the settlement agreement and permanent injunction.  Doc. 362.  On June 24, 2022, the Court entered its Order and Permanent Injunction adopting the settlement agreement as modified by the addendum agreement.  Docs. 364; 364-1; 364-2.  The addendum agreement incorporated and reaffirmed the original settlement agreement and injunction.  Doc. 364-2 ¶ 1.  The parties also agreed to extend the settlement agreement and injunction until January 6, 2024—18 months from the date that it was set to expire. *Id.* ¶ 5.

To address the more egregious violations of the injunction, the addendum agreement amplified key mandates.  The defendants were ordered to (1) implement modified recordkeeping procedures to document out-of-cell time, out-of-cell programming, and other activities; (2) implement an Offender management plan that identified "individualized goals and objectives for each class member"; (3) implement a "training program to ensure that all individuals responsible for implementing the Settlement Agreement and the Addendum Agreement understand the terms of the

Agreements"; (4) assign "one experienced corrections official[35] to supervise and monitor compliance" with the agreements; and (5) "file quarterly reports with the Court identifying all provisions of the Settlement Agreement and Addendum Agreement with which they have failed to achieve full compliance in the preceding quarter, all steps that they have taken or intend to take to achieve full compliance, and the timeframe in which they expect to achieve full compliance." *Id.* ¶¶ 6-11. Finally, the addendum provides that a status conference would be convened once every 90 days. *Id.* ¶ 13.

## C. October 2022 Status Conference

On September 26, 2022, the defendants submitted their first quarterly compliance report. Doc. 366-3 at 6. The six-page report was conclusory and largely did not address whether the defendants were complying with the Court's injunction. For example, the defendants reported: "All offenders are being offered out-of-cell programming opportunities." *Id.* at 4. If the defendants were providing *any* out-of-cell programming, that would have been an improvement, but the relevant question was whether the defendants were providing 120 minutes of out-of-cell programming per week.

The plaintiffs filed their quarterly compliance report, buttressed by 16 exhibits, on October 3, 2022. Docs. 366; 369. Since the extension of the injunction, plaintiffs' counsel interviewed inmates weekly, reviewed voluminous documents produced by the defendants in August 2022, and held a monitoring meeting with the defendants on August 25, 2022. Doc. 366 at 1-2. The plaintiffs acknowledged "*very recent*," albeit "inconsistent" compliance with some requirements of the injunction. *Id.* at 2. Otherwise,

---

[35] The GDC's Deputy General Counsel Bryan Wilson is the "experienced corrections official" the defendants designated to supervise and monitor compliance. Doc. 452 at 29:6-7.

they reported that the defendants' violation of most requirements "continued unabated."[36]  *Id.*  Relying primarily on records produced by the defendants, the plaintiffs documented violations of out-of-cell time, staffing, programming, book cart, GOAL devices, sanitation and hygiene, privileges, assignment and periodic review, and duration of confinement requirements.  *See* Doc. 366 at 3-15.  One stark example—the programming records in the August 2022 production revealed "that only four class members had attended out-of-cell programming."  *Id.* at 6.

Because the plaintiffs' thorough quarterly compliance report and the defendants' spare report raised "serious concerns about the defendants' good faith effort to comply with the Settlement Agreement," the Court ordered the defendants to reply to the plaintiffs' report and to appear for a status conference on October 6, 2022.  Doc. 370 at 2.

In their response and at the October 6 status conference, the defendants argued they were being judged unfairly.  Docs. 373; 452 at 13:2-23, 26:7-27:19. Acknowledging that "the documents at that point in time didn't support what we were saying was occurring," the defendants believed they were entitled to a "re-start or re-boot" and should be judged only on their post-addendum performance.  Doc. 452 at 13:13-18.  That position was a little puzzling because the plaintiffs' quarterly compliance report was mostly based on documents produced in August 2022 and interviews

---

[36] For instance, inmates reported they were told to sign blank offender management plans without individualized goals or objectives.  *See* Doc. 369-2, T.G. Decl. at 4 ¶ 3 ("I do not know what an Offender Management Plan is, and I have not received an Offender Management Plan since my transfer to the SMU in November 2020."), L.H. Decl. at 13 ¶ 20 ("I was brought an Offender Management Plan to sign, but the individual recommendation section was blank."), E.H. Decl. at 15-16 ¶ 3 ("I received a blank document titled 'Offender Management Plan' and Counselor Reynolds requested that I sign it."), D.W. Decl. at 25 ¶ 8 ("I received an [offender management plan] Counselor Smith asked me to sign it. The individual recommendation section was blank.").

conducted after the effective date of the addendum.[37]  Still, the defendants argued that

the purpose of the 18-month extension was to provide them an opportunity to remedy

deficiencies—"to put together a plan, to put together paperwork, to improve on all these

things, to give an opportunity to demonstrate that it can be done."  *Id*. at 27:14-19.

Essentially, the defendants argued they needed more time to comply, and they should

not be judged on what had happened, or not happened, during the short period since

the addendum.

But the defendants made one clear, substantive representation—GOAL devices

would "roll out" on November 14, 2022.  *Id.* at 25:23-26:5.

The Court agreed that the defendants had made *some* effort to comply with the

Court's injunction and further agreed, reluctantly, that the defendants should be allowed

a brief "ramping-up process" to achieve compliance.  *Id.* at 35:24-36:21.  However, the

Court warned, the ramp was short—by the time of the next status conference the Court

expected that the defendants would "be pretty close to the end of the ramp."  *Id.* at

36:10-11.  After all, the defendants had had over three years to ramp up.

## D. February 2023 Status Conference

The defendants filed their next quarterly compliance report on February 13, 2023.

Docs. 380; 381.  This report also made conclusory assurances with few representations

of compliance.  The defendants' one-sentence report on out-of-cell programming was

the same as their previous report: "All offenders are being offered out-of-cell

programming opportunities."  Doc. 380 at 3.  Other assurances were similar—

---

[37] Mental health records, for instance, continued to show that counselors could not conduct mental health rounds at various times throughout June and July due to staffing.  Doc. 369-5 at 9, 13; *see also* Doc. 369-4 at 2, 5-6, 9-10, 12-15 (logbooks stating only one or no officers present).

counselors were seeing inmates "on a regular basis"; a "marked improvement" in documentation; inmates were "provided use of the book carts"; and "[i]t is the hope" that inmates will have a GOAL device "*in the near future*." *Id.* at 2-3 (emphasis added). The one clear representation from the October 2022 compliance review—GOAL devices would "roll out" on November 14, 2022—had suffered the same fate as other firm dates for reaching compliance. *See* Docs. 344 at 68:12-19; 452 at 25:23-26:5. As for the failure, since the entry of the injunction, to provide eligible inmates with television access, the defendants had a new representation: the "GDC has recently obtained an estimate for the installation of TVs." Doc. 380 at 2.

The plaintiffs' response, like their October quarterly report, told a much different story. Since the October 6, 2022 status conference, the plaintiffs interviewed nearly 70 class members, reviewed records produced by the defendants and twice met with the defendants to discuss alleged violations. Doc. 382 at 1-2. While the plaintiffs again acknowledged "some improvement," they reported that substantial violations continued. *Id.* at 2. For example, numerous periodic review forms recorded denials of SMU transfers because inmates failed to take certain classes. Doc. 381-2 at 16, 35, 50, 52, 86. Yet, those classes were not offered or were not available at the SMU. *See* Docs. 382 at 18; 384 at 5:2-14. Similarly, some offender management plans chided inmates because they were not availing themselves of programming that was not available at the SMU. Docs. 380-31 at 3, 17, 78, 123; 380-32 at 25, 27, 30, 32, 38, 40, 44, 71, 127. Nor was it true, the plaintiffs insisted, that the defendants were "unaware of any current issues with plaintiffs receiving out-of-cell time." *Id.* at 3 (quoting Doc. 380 at 2). The defendants' documentation revealed numerous instances of broad cancellation of out-

of-cell time and logbook entries and door sheets confirmed that inmates did not receive out-of-cell time.  *See, e.g.*, Docs. 382 at 3-4; 380-2 at 90; 380-3 at 7-8, 20, 117, 146; 380-6 at 20; 380-35 at 21; 380-37 at 28-29, 46; 380-38 at 123; 382-3.  Further, the defendants failed to report compliance with the requirement "that they hire and retain sufficient staff 'to carry out the terms of this agreement.'"  Doc. 382 at 8 (quoting Doc. 256-1 ¶ 18).  The plaintiffs raised this recurrent issue because the defendants' records demonstrated that they cancelled out-of-cell time to free staff to perform other routine functions.[38]  *Id.* at 8-9.  And once again, there was no evidence supporting the representation that all inmates were offered out-of-cell programming much less 120 minutes per week of out-of-cell programming.  *Id.* at 9.

Most significantly, the plaintiffs argued that the defendants were not complying with assignment and periodic review requirements.  The records the defendants produced with their compliance report revealed that no inmate "received notice of his Tier III assignment or a hearing *prior* to his placement in the SMU."  Doc. 382 at 16 (citing Doc. 380-30).  The records also revealed that the plaintiffs were not receiving out-of-cell mental health evaluations before their assignment to Tier III and in conjunction with 60- and 90-day review hearings.  *Id*. at 2, 18-19.  The plaintiffs identified 22 inmates who were overdue for their out-of-cell mental health evaluations.  *Id*. at 19.  Finally, the defendants were increasingly holding inmates in the SMU for more than 24 months even though those inmates "had completed the Tier III program by maintaining Phase 5 status for three months or longer," and, thus, should have been

---

[38] *See*, *e.g.*, Doc. 380-35 at 21 (only one officer present on floor), at 33 ("This shift is super short.  I am the only officer here on the east side booth.  No one is on the floor unless I shut down the booth down and go and relieve main control to conduct rounds."), at 44 ("I … took over post inside east control.  I did not relieve anyone because no one was in the booth when I arrived.").

eligible for transfer.  *Id.* at 21.  In the September compliance report, the defendants reported 40 inmates in that category; by February the number had increased to 60.  *See* Docs. 366 at 14-15; 382 at 21-23.

At the February 22, 2023 status conference, there were two signs, which the Court did not then fully appreciate, of even more serious problems.  In defense of their failure to provide the pre-assignment process required by the injunction, the defendants again argued that all assignments in question were emergency assignments which they contended were allowed by the settlement agreement.[39]  Doc. 384 at 32:5-33:11.  As for holding inmates beyond 24 months, the defendants referenced a "no pending charges" criterion for release from the SMU that had been adopted by the defendants after the entry of the injunction.  Doc. 381-2 at 2, 52, 56, 68, 70, 76, 86.  The plaintiffs suspected serious misconduct in assignments to the SMU and the application of the "pending charges" criterion.  See Doc. 384 at 57:2-58:14.  Their suspicions, it will be seen, were well-founded.

As for staffing, the defendants flatly denied that staffing in any way played a role in noncompliance.  Doc. 384 at 23:11-15, 64:25-65:22.  To be certain, the Court asked Holt, "Are staffing issues preventing compliance or interfering or making compliance difficult?"  *Id*. at 23:12-14.  "They are not," Holt responded.  *Id*. at 23:15.

---

[39] Holt gave an example of an emergency that would warrant deprivation of pre-assignment process:

> Your Honor, if I may, sometimes if we have a homicide that occurs at 2:00 o'clock in the morning, and it's between two particular gang offenders. So, if a Blood has killed a Crip, there are any number of Crips inside of that dorm, and a lot of times it creates a situation where a disturbance could occur if that offender remained at that facility.

Doc. 384 at 34:13-19.  Even if the injunction permitted deprivation of all assignment rights in "emergency situations," the Court should have recognized then not every assignment could possibly have involved facts as extreme as Holt's example.

Based upon the defendants' assurances, the Court concluded that the defendants were still making sincere efforts to comply. *Id*. at 71:5-21. The Court was wrong.

## E. July 2023 Status Report

The parties filed their quarterly compliance reports on July 14, 2023. Docs. 390; 392. The defendants continued their conclusory representations: "All offenders are being offered out of cell programming opportunities"; they were "unaware of any current issues with Plaintiffs receiving out-of-cell time"; counselors were "seeing inmates on a regular basis"; inmates were "provided use of the book carts"; they hoped that inmates will have a GOAL device "in the near future"; and they "hope[d] to be in a position to move forward [on television access] to resolve this issue within the next month or two." Doc. 392 at 2-4. The defendants acknowledged some deficiencies with cell sanitation and "a significant number of [periodic] reviews … not signed by the offenders"; the defendants claimed these "deficiencies" were discussed with the warden and upper management without further elaboration. *Id*. at 3-4. The defendants acknowledged that inmates complained about "linens and clothing" too, but "maintain[ed] that each offender is provided with these items in accordance with" standard operating procedure. *Id*. at 2. The defendants once again conceded that some inmates assigned to the SMU did not receive timely pre-assignment hearings without offering a solution to fix the problem. *Id*. at 4. Finally, the defendants claimed that there was "a marked improvement in the records keeping of out-of-cell time, showers, haircuts, programming, and book cart use." *Id*. at 1.

The plaintiffs' report again painted an altogether different picture. Since February, the plaintiffs continued to routinely interview and correspond with inmates, review records produced by the defendants, and met and conferred with the defendants' counsel on June 21, 2023. Doc. 390 at 1-2. The plaintiffs reported numerous violations of the settlement agreement. *Id*. at 2. Between March and April 2023, the defendants cancelled all movement within the SMU to conduct "mental health evaluations, classification hearings, shakedowns, or for no noted reason at all" on at least six occasions. *Id*. at 5. And contrary to the defendants' representations, "Plaintiffs ha[d] seen a significant decline in Defendants' documentation of out-of-cell time and the other settlement provisions." *Id*. at 2. The plaintiffs documented numerous instances where inmates did not have any NoteActive entries for days at a time or indicated an inmate was in two different places at the same time. *Id*. at 3-5. In response to the plaintiffs' request for programming documentation showing what classes are offered, where they occur, who teaches them, and which class members attend them, the defendants produced documents that "seemingly show dozens of people scheduled to attend class at the same time, in the same location, and taught by the same counselor, which would seem to be impossible given the SMU's physical layout and limited class space." *Id*. at 9 (citing Doc. 395-12 at 26-27).

The plaintiffs continued to uncover evidence of strip cell abuse. *Id*. at 6-8. The plaintiffs raised the misuse of strip cells on May 3 and May 31, 2023—identifying four inmates placed in strip cells "where they [were] denied showers, clothing, mattresses and bedding, out-of-cell time, cell sanitation, and programming and kiosk access." Doc. 395-1 at 4-6, 21-23. Three inmates reported that they did not have running water, the

toilets did not flush and were filled with feces from prior occupants, and the floors were covered with trash and human waste.  *Id*. at 5.

The defendants did not deny these inmates were placed in strip cells but simply claimed that there was no support for the allegations about the conditions inmates allegedly endured.[40]  *Id*. at 13, 29-30.  When asked to disclose the basis for this conclusion, the defendants produced six affidavits they had claimed they procured from inmates about the conditions in observation cells A-107 and A-108.  *Id*. at 32-37.  Two of these inmates later claimed the affidavits were false and one of those inmates said his signature was forged, leading the plaintiffs' counsel to move for a protective order barring coercive communications with class members.  Docs. 408; 411 ¶¶ 4-5; 411-1 ¶¶ 12-14.

Finally, inmates reported they were told, as the plaintiffs' counsel had suspected, that they were categorically ineligible for release from the SMU because they had pending criminal charges.  Doc. 390 at 14.  Thus, there now were 61 inmates "who have maintained Phase 5 status for more than three months, meaning that they cannot progress further in the Tier III Program."  *Id*.

Given these longstanding violations, the plaintiffs announced that they intended to move the Court to enforce the settlement agreement.  *Id.* at 17.

## II. STANDARD

"[C]onsent decrees, like all injunctions, are to be enforced through the trial court's civil contempt power."  *Reynolds v. McInnes*, 338 F.3d 1201, 1208 (11th Cir. 2003); *In re*

---

[40] The defendants also claimed that these placements were consistent with GDC policy yet produced documentation for only one inmate which showed anything but compliance with strip cell policy.  *See* Docs. 395-1 at 13, 22; 395-11.

*Grand Jury Proceedings*, 142 F.3d 1416, 1424 (11th Cir. 1998); *Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000) (explaining procedural process). "[T]he petitioner in a civil contempt proceeding must establish by clear and convincing evidence that the alleged contemnor violated the court's earlier order." *United States v. Roberts*, 858 F.2d 698, 700 (11th Cir. 1988). "The clear and convincing evidence must establish that: (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2022). "In determining whether a party is in contempt of a court order, the order is subject to reasonable interpretation, though it may not be expanded beyond the meaning of its terms absent notice and an opportunity to be heard." *Id*. Courts "apply the same rules that govern contract interpretation when [they] interpret a consent decree." *McInnes*, 338 F.3d at 1211. Here, it is undisputed that the Court's injunction was valid and lawful, and that the defendants had the ability to comply with it. Doc. 441 at 6 ("Defendants do not dispute that the Court's Order was valid and lawful."). And with only two exceptions, discussed below, the defendants do not dispute that the Court's injunction was clear and unambiguous.

"Once the petitioner makes a prima facie showing of a violation, the burden shifts to the alleged contemnor to produce detailed evidence" showing compliance or an inability to comply.[41] *Roberts*, 858 F.2d at 701; *Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir. 1990); *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998); *see United States v. Rylander*, 460 U.S. 752, 757 (1983) ("Where compliance is impossible, neither

---

[41] However, the Court elects to keep the burden of proof on the plaintiffs.

the moving party nor the court has any reason to proceed with the civil contempt action.").

This "burden of production is not satisfied by a mere assertion of inability." *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 740 (11th Cir. 2006). Rather, "in this circuit, a party subject to a court's order demonstrates inability to comply only by showing that he has made 'in good faith all reasonable efforts to comply.'" *Roberts*, 858 F.2d at 701 (quoting *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976)). Indeed, this requirement is construed "strictly." *Combs v. Ryan's Coal Co., Inc.*, 785 F.2d 970, 984 (11th Cir. 1986); *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 740 (11th Cir. 2006). Even if the alleged contemnor shows "substantial," "diligent," or "good faith" efforts to comply, "the fact that he did not make 'all reasonable efforts' establishes that [the contemnor] did not sufficiently rebut the prima facie showing of contempt." *Id.* (cleaned up). "Therefore, the focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990).

"A court that invokes equity's power to remedy a constitutional violation by an injunction … has the continuing duty and responsibility to assess the efficacy and consequences of its order." *Brown v. Plata*, 563 U.S. 493, 542 (2011). "Federal courts are not reduced to approving consent decrees and hoping for compliance." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004).

## III. FINDINGS AND CONCLUSIONS

On July 25, 2023, the plaintiffs moved the Court to order the defendants to show cause why they should not be held in contempt.  Doc. 400.  The Court found that the plaintiffs had satisfied their burden, and ordered the defendants to show cause why they should not be held in contempt for violating the injunction, and set an evidentiary hearing on the plaintiffs' motion.  Doc. 420.  For the reasons discussed, the Court finds the defendants have violated the Court's injunction.

### A. The Plaintiffs' Show Cause Motion

In their show cause motion, the plaintiffs alleged that the defendants were violating key provisions of the settlement agreement, which they divided into nine categories:

- The defendants violated the duration-of-confinement and periodic review provisions in paragraphs 45 and 53-54, by failing to provide meaningful review hearings and imposing categorical bars on certain class members' eligibility for transfer;

- The defendants used so-called strip cells punitively, depriving class members of their out-of-cell time and other rights under paragraphs 12, 14, 16, 19-20, 22, 26-27, 33, 34-38, and 52;

- The defendants routinely cancelled out-of-cell time and out-of-cell movement for foreseeable reasons within the defendants' control, in violation of paragraphs 12, 14, and 18;

- The defendants still do not consistently offer 120 minutes of out-of-cell programming per week to all class members, inform class members about available programs, or document program completion, in violation of paragraphs 22-24;

- The defendants do not provide class members the privileges associated with their respective phases in the Tier III program, in violation of paragraph 26;

- The defendants do not provide GOAL devices to class members, in violation of paragraphs 20 and 22;

- The defendants do not consistently issue class members sufficient clothing, in violation of paragraph 38;

- The defendants do not consistently transfer class members to transitional STEP units or SMHTU units, in violation of paragraph 56; and

- The defendants do not consistently document compliance with the settlement agreement's provisions, in violation of paragraphs 12-13, 17, 22, and 59-60.

Docs. 400-1 at 13-14.[42]  The plaintiffs submitted over 115 pages of sworn testimony in support of their allegations.[43]  *See* Docs. 403-1; 403-2.

The Court allowed the parties time to conduct discovery on these allegations. Doc. 404 at 1.  After that discovery, which included 22 depositions, the defendants responded to the motion with a five-page affidavit from their "internal compliance monitor," LaTonya King.  Docs. 419; 419-1; *see also* Doc. 423.  King's affidavit acknowledged that all class members were deprived of outdoor recreation from mid-July 2023 to mid-September 2023 because it was hot; inmates in E- and F-Wings were being denied privileges they were entitled to under the settlement agreement; some class members had been held in the A-107 and A-108 strip cells upon arrival to the

---

[42] The plaintiffs wrote the defendants about these violations in correspondence dated June 29, 2022; July 15, 2022; August 3, 2022; August 8, 2022; August 19, 2022; August 24, 2022; September 23, 2022; October 21, 2022; November 9, 2022; November 23, 2022; December 20, 2022; January 20, 2023; March 17, 2023; May 3, 2023; May 31, 2023; and June 30, 2023.  Doc. 403.  They were also discussed by the parties at meetings on August 25, 2022; January 27, 2023; and June 21, 2023.  Doc. 400-1 at 14.

[43] *See*, *e.g.*, Doc. 403-2, A.M. Decl. at 10 ¶¶ 10-14 (placed in strip cell for "two weeks" total, divided between two cells), A.R. Decl. at 19-20 ¶¶ 19-22 (placed in strip cell for one week after engaging in self-harm), C.R. Decl. at 24-25 ¶¶ 3-10 (placed in strip cell for "seven days"), C.T. Decl. at 31 ¶ 15 (describing inmates being placed in strip cells "for as long as a week or two weeks at a time"), D.J. Decl. at 43-44 ¶ 3 (placed in strip cell for "eight or nine days"), L.H. Decl. at 57-58 ¶¶ 7-8 (placed in strip cell for "ten days"), R.D. Decl. at 72 ¶¶ 18-21 (placed in strip cell for "about two weeks").

SMU; there was confusion about the proper use of a "Strip cell" but "remedial training" was conducted; and out-of-cell time was and may be cancelled again in the future to complete routine tasks required by the settlement agreement.  Doc. 419-1 ¶¶ 5-6, 9, 12, 15.

In short, to the extent King addressed the alleged violations, she largely confirmed that the defendants were and would continue to violate the injunction.[44] Accordingly, the Court found the plaintiffs had met their burden and ordered the defendants to show cause why they should not be held in contempt.  Doc. 420.

## B. Show Cause Hearing

The show cause hearing was held on November 30, December 1, and December 8, 2023.  Docs. 429; 430; 433.

At the hearing, the plaintiffs presented the testimony of ten inmates by video deposition, the testimony of Childs, and excerpted deposition testimony of current Director of Field Operations Shepard, former Director of Field Operations Toole, and two SMU counselors.  Docs. 429; 430; 433.  The plaintiffs introduced numerous exhibits.  *See, e.g.,* Docs. 424; 432.

---

[44] Perhaps that was the reason the defendants did not put King on the stand.  Somewhat more puzzling though is that the defendants more or less claim she had nothing relevant to say. The parties seemingly "agreed that the relevant records were those" in the plaintiffs' possession when they moved for contempt on July 25, 2023"; because "King was not employed as a Facility Monitor until a time at or near July 2023," the parties agreed not to call her as a witness.  Doc. 477 at 1.  Why the defendants would attach an affidavit in their response to the plaintiffs' motion from someone without relevant information is unknown to the Court.  Logic suggests that the official responsible for supervising and monitoring compliance with the Court's injunction would be a necessary witness.  Most notably, though, the defendants declined to call on King just moments after the Court ordered the defendants to produce and audit NoteActive and SCRIBE data for the month of November 2023.  Doc. 429 at 209:10-211:13.

The defendants called Holt, current Warden Williams, and current SMU Unit Manager Alexander Tillman. *See* Docs. 429; 430; 433. They identified but did not introduce one exhibit. Doc. 429 at 200:6-201:5; Def. Ex. 2A.

Both parties, without objection, cited other matters in the record. Also, the Court at the show cause hearing ordered the defendants to produce specific information. Docs. 427 at 2-3; 428; 431 at 2. The parties addressed that information in their post-hearing briefs. Docs. 438; 441; 445; 446; 450; 460; 461; 477; 478.

The Court finds that the plaintiffs have established by clear and convincing[45] evidence that the defendants have long violated and continue to violate numerous mandates imposed by the Court's injunction. The Court addresses those violations by category.

1. *The Court finds by clear and convincing evidence that the defendants are in contempt for violating paragraphs 12, 13, 14, 16, and 17 (out-of-cell time);19 and 20 (library, book carts, and GOAL devices); 22, 23, and 24 (programming); 33, 34, 35, 36, 37, and 38 (cell conditions, hygiene, and clothing); and 59 and 60 (access to records and data) of the settlement agreement.*

As discussed in detail above, the defendants, throughout the term of the injunction, have not produced required documentary evidence of their compliance with injunction mandates. *See*, *e.g.*, Docs. 308-5; 344 at 92:8-24. Thus, because they lacked documentation of out-of-cell time, programming, pre-assignment proceedings, assignment and periodic review, mental health evaluations, and various other injunction mandates, the defendants have never been able to refute the plaintiffs' considerable evidence that the defendants failed to comply with the injunction. Also, and again as

---

[45] As noted, the Court elects to keep the burden of proving the defendants' noncompliance on the plaintiffs.

discussed above, the defendants, their staff, and their documentation repeatedly admitted noncompliance with documentation requirements and substantive requirements imposed by the injunction. *See, e.g.*, 325 at 9; 344 at 76:25-77:8. Eventually, the defendants promised that their new electronic recordkeeping program, NoteActive, would solve these problems. *See*, *e.g.*, Docs. 380 at 1; 392 at 2. The issue of documentation came to a head at the show cause hearing.

Much of the testimony taken on the first day of the show cause hearing addressed documentation and the absence of documentation. *See*, *e.g.,* Doc. 429 at 136:10-137:16. Childs had reviewed NoteActive data produced by the defendants before the hearing. Doc. 403-1. Childs testified that the data revealed "no class member was offered recreation, table time, programming, kiosk, haircuts, showers, shaves, sanitation, or book cart at the intervals required under the Settlement Agreement."[46] Docs. 403-1 ¶ 20; 429 at 232:2-235:10; *see also* Docs. 432-37; 432-38; 432-39; 432-40; 432-41; 432-42; 432-43; 432-44; 432-45; 432-46. For days and sometimes weeks, records were simply blank. *See, e.g.*, Docs. 403-1 ¶¶ 5-22; 429 at 230:6-21.

In short, the NoteActive records established clearly and convincingly that the defendants were still violating the injunction's documentation mandates. NoteActive, far from solving the problem, had revealed even more shortcomings. As the Court put it, "here we are at the end of day one … [and] the documentation of the necessary activities to comply with the Settlement Agreement, if anything, indicates … it's worse –

---

[46] For example, "the NoteActive records for class member A.R. showed—for the entire month of May—no documentation of programming, book cart, shaves, or haircuts. There was only one entry documenting kiosk time. And there were nine days without a single entry that was relevant to the Settlement Agreement." Doc. 446-1 ¶ 10; *see also* Docs. 432-21; 432-37; 432-38.

it was worse … than it was when Holt testified that [documentation] did not meet the requirements of the agreement."  Doc. 429 at 260:4-12.  This was a reference to Holt's testimony at the April 26, 2022 hearing which, in substantial part, led to the extension of the injunction to allow the defendants an opportunity to demonstrate they could comply with the injunction.  *See* Doc. 344 at 92:19-93:2, 93:12-22.

The defendants claimed they had an explanation.  They had produced to the plaintiffs only NoteActive data for May 2023, and they claimed that since then officers had received additional training on the use of NoteActive.  Doc. 429 at 137:12-138:3, 209:4-21.  This prompted the Court to question Warden Williams and Tillman:

|  |  |
|---|---|
| THE COURT: | Now, NoteActive, or the tablet that is used to document daily activities, I believe you told us that you review that documentation on a regular basis. |
| WILLIAMS: | Yes. |
| THE COURT: | How does it come to you?  How do you get that? |
| WILLIAMS: | I am able to get a tablet and review my notes, and also in my office I can use my desktop. |
| THE COURT: | In a previous hearing, we were told that – assuming a connection – that there would be realtime access to NoteActive documentation.  Has that proved to be correct? |
| WILLIAMS: | Yes, sir. |
| THE COURT: | Now, do you have a particular routine that you follow regarding reviewing your officers' documentation on NoteActive? |
| WILLIAMS: | Yes, sir. |
| THE COURT: | What is that routine? |
| WILLIAMS: | As soon as I get to work, the first thing I do is I pull up my cameras and I pull up NoteActive to make sure – because I can see them moving guys to the showers or to the yard.  So I am just making sure they sign them out as they move them, as they go.  And then I come out, do my morning meeting, we talk about things that will go on throughout the day.  I go on inspection.  Once I go on inspection, I ask the officer to give me a tablet.  Once they give me a breakdown and I review the movement then as well.  Once I complete inspection, I go back to my office.  If I'm not in a meeting, I review the cameras and the system again and continue to watch the NoteActive. |

| THE COURT: | Now, as I understand it, the documentation that is found on NoteActive with regard to a particular inmate would tell us for any given day whether there had been out-of-cell time. |
|---|---|
| WILLIAMS: | Yes, sir. |
| THE COURT: | Whether there had been programming. |
| WILLIAMS: | Yes, sir. |
| THE COURT: | Whether there had been showers. |
| WILLIAMS: | Yes, sir. |
| THE COURT: | Meals would be documented. |
| WILLIAMS: | Yes, sir. |
| THE COURT: | Do those – it sounds to me like the documentation includes any activity the inmate would have outside of his cell. |
| WILLIAMS: | Yes, sir. |
| THE COURT: | Are you still reviewing it on a regular basis? |
| WILLIAMS: | Yes, sir. |
| THE COURT: | Has it reached the point where it is being done properly? |
| WILLIAMS: | Yes, sir. |
| THE COURT: | So, if we were to look at the documentation for the month of November [2023], which ends today, it should record for every inmate all the activities that are required by the Settlement Agreement to be provided. |
| WILLIAMS: | Yes, sir. |
| THE COURT: | So, the various things that are required by the Settlement Agreement regarding day-to-day activities of inmates in the SMU would all be documented, if they occurred, in NoteActive? |
| WILLIAMS: | Yes, sir. |
| THE COURT: | You recognized that after the roll-out – and I understand, too, that it was in early May or maybe May 1st – that there was the need for additional training? |
| WILLIAMS: | Yes, sir. |
| THE COURT: | And I think at least some of that training took place after your deposition. |
| WILLIAMS: | Yes, sir. |
| THE COURT: | Now, after that training, has the documentation improved? |
| WILLIAMS: | Yes, sir. |

Doc. 429 at 145:16-148:11.  In sum, Warden Williams swore that officers had now been trained, that officers documented compliance with injunction mandates, and that he reviewed the NoteActive data daily.  *Id.* at 118:12-119:2, 134:6-16, 145:16-19.

Tillman gave similar assurances:

| THE COURT: | Mr. Tillman? |
|---|---|

| TILLMAN: | Yes, sir. |
|---|---|
| THE COURT: | SCRIBE, is that a computer-based program? |
| TILLMAN: | Yes, sir. |
| THE COURT: | A note-taking program? |
| TILLMAN: | Yes, sir. It has all their information or a lot of their information. |
| THE COURT: | Used in medical-related practices. |
| TILLMAN: | It will have medical profiles, but it's very limited on the medical part due to HIPAA. |
| THE COURT: | It's, like, a computer chart. |
| TILLMAN: | Yes, sir. |
| THE COURT: | And the things you have been talking about with regard to the programming that your office does will be recorded in SCRIBE? |
| TILLMAN: | Yes, sir. |
| THE COURT: | And in addition to that, your office enters notes on the NoteActive tablets. |
| TILLMAN: | Yes, sir. |
| THE COURT: | So, just as I asked Warden Williams, if we were to look at the NoteActive documentation for the month of November, it would show that the programming that you had described on the schedule that was posted was performed during that month? |
| TILLMAN: | It should. |
| THE COURT: | And, of course, the SCRIBE program would have the offender's specific information about programming? |
| TILLMAN: | Yes, sir. |

Doc. 429 at 195:4-196:6.

The Court informed the parties that it was "relieved to hear that we've got sworn testimony that at least for the month of November [2023], we can have documentation that shows us that things are on track." *Id.* at 260:19-21. Accordingly, the Court ordered the defendants to produce November 2023 NoteActive and SCRIBE data so the parties could determine whether Warden Williams and Tillman had truthfully testified that not only were the injunction's documentation mandates being followed but also that the defendants were, in fact, in compliance with other injunction mandates. Docs. 429 at 260:22-25; 433 at 21:4-25; *see also* Docs. 427 at 2-3; 431 at 2.

That, though, was not the only issue regarding documentation. The injunction requires the defendants to produce certain documentation at specified intervals—most notably a roster of SMU inmates, required notices for failures to provide out-of-cell times, and, for representative segments of the SMU population, SCRIBE data, mental health records, assignment and review records, and logbooks. Doc. 364-1 ¶¶ 59, 60. Childs testified that SMU rosters were incomplete and inaccurate and, thus, she often cannot determine who is in the SMU. *See, e.g.,* Docs. 403-1 ¶¶ 8-9; 430 at 10:3-13:14. One inmate's institutional file contained multiple assignment dates, showing he "was assigned the SMU as early as December 29, 2020, yet [he] did not appear on Tier III rosters until April 2021, when he was identified as being in Phase 5 of the Tier III program." Docs. 403-1 ¶ 8; 430 at 10:10-12:23; 432-75. At other times, Childs testified rosters falsely indicate inmates are housed outside of the SMU further frustrating plaintiffs' efforts to monitor compliance and communicate with class counsel.[47] Doc. 430 at 8:21-9:2 ("I have learned that there are people who [are] listed as being housed outside the SMU who are in fact in the SMU."). Defendants did not rebut this testimony.[48]

---

[47] *See* Doc. 430 at 13:3-14 ("We rely on the rosters for much of the work we do on behalf of the class in this case. We use the rosters to figure out who to request legal visits with. When we're identifying the 20 individuals who we want to receive the individual institutional files for, we rely on the rosters to make those determinations. We use the rosters to monitor the duration of confinement. And then we – also, we send a lot of class-wide mailings to notify our clients about their rights under the settlement, update them on the status of things such as this hearing. And I rely on the rosters when we send those mailings to know who is a class member that should even receive that information.").

[48] Instead, the defendants' counsel speculated that an inmate assigned to the SMU may be "out to court" on the date a roster is produced. Doc. 430 at 26:17-27:23.

a. Out-of-cell time generally and out-of-cell programming

Although the Court had sworn assurances that the November 2023 NoteActive and SCRIBE data would demonstrate that the defendants were complying with out-of-cell time requirements, the plaintiffs presented evidence of specific violations of those requirements.

The injunction allows cancellation of out-of-cell time for only two reasons: (1) an inmate's commission of a great or high-level disciplinary offense during out-of-cell time; or (2) for "unanticipated safety or security considerations."  Doc. 364-1 ¶¶ 12, 16.  At the hearing, the defendants admitted they often cancelled out-of-cell time to conduct routine tasks, including tasks required by the Court's injunction, and for other anticipated reasons.  Doc. 429 at 18:6-20, 19:24-20:21.  First, Shepard admitted that he unilaterally cancelled all outdoor recreation from July 21, 2023, until September 18, 2023, due to hot weather.  Doc. 421 ¶ 16.  Shepard testified that he checked the weather every day and that for every day from July 21 until September 18 "extreme heat" required the cancellation of recreation time.  Doc. 432-13 at 71:13-76:13.  He did not consider "running yard call" during cooler parts of the day and he did not consider any alternatives to cancelling yard time.  *Id.* at 76:14-77:23.

Second, from January 2023 through September 2023, the defendants stipulated[49] that they cancelled out-of-cell activities at least 23 times, including three days for depositions, four days for periodic reviews or classification hearings, and six

---

[49] The parties entered into stipulations of fact before the hearing.  Doc. 421.

days for mental health evaluations.  Doc. 421 ¶ 18.  Childs elaborated based on her review of the defendants' records.  Childs testified that between November 2022 and April 2023, "out-of-cell time was cancelled on at least 22 days: 12 days to conduct mental health evaluations or periodic reviews, 2 days for shakedowns, 4 days for unknown reasons … [and] 8 days because of a state holiday."[50]  Doc. 403-1 ¶ 22. "Because out-of-cell time is not offered on weekends, during this 181-day period, out-of-cell time was unavailable on 78 days, meaning that class members were locked in their cells on 43 percent of the days in that period."  *Id*.  This led the Court to inquire further.

The Court first questioned Holt:

| | |
|---|---|
| **THE COURT:** | Well, let's be sure that I know what we're talking about. If I understood what was going on, Mr. Holt, apparently until recently out-of-cell time was canceled while mental health evaluations were being done. |
| **HOLT:** | Correct. |
| **THE COURT:** | And that, you say, was because of staffing issues.[51] |
| **HOLT:** | Well, not staffing issues but in order to – really, honestly, it was to try to become more efficient in that process. |
| **THE COURT:** | Of course, mental health evaluations are not unanticipated; are they? |
| **HOLT:** | No. |
| **THE COURT:** | Why would you cancel out-of-cell time for mental health evaluations that you know you're going to be doing? |
| **HOLT:** | Well, honestly, it was in order to make sure that they got all of them done at the correct time. |
| | … |
| **THE COURT:** | Well, would you agree that canceling out-of-cell time because of mental health evaluations is not in compliance with the agreement? |
| **HOLT:** | I would not, um, simply because the agreement actually talks about us notifying in the event that we do. |

---

[50] The defendants insist that they do not have to provide out-of-cell time on weekday holidays.  They are wrong.  See Docs. 256-1 ¶ 12; 364-1 ¶ 12.  That is another example of their cavalier attitude toward injunction requirements.

[51] The Court asked about "staffing issues" because Holt had just testified that the "practice" of cancelling out-of-cell time to conduct mental health evaluations and periodic reviews "is no longer a practice that they do now because of staffing."  Doc. 429 at 18:23-29:1.

Doc. 429:19:24-21:2.

Nothing in the settlement agreement or the Court's injunction allows defendants to cancel out-of-cell time for anticipated events, such as mental health evaluations. Doc. 364-1 ¶¶ 12, 16. On the contrary, that "practice" is expressly prohibited. *Id*. To be sure that the defendants understood that, the Court asked Wilson, the designated monitor, to stand, had him placed under oath, and asked him the same question. Doc. 429 at 21:3-19. He stated: "I don't believe it's a violation as far as what we were trying to do to fix the problems that were brought forth during the hearings here." *Id.* at 22:2-4. As best the Court could tell from that, the person charged with ensuring and documenting compliance, did not consider a violation to be a violation if someone was trying to fix the violation. Holt later was clearer on the subject:

> **Q:** And so, mental health evaluations and classification reviews, they are not unanticipated security or safety considerations; correct?
> **A:** No, they are not unanticipated.
> …
> **Q:** They are not reasons to cancel out-of-cell time; correct?
> **A:** Correct.

Doc. 429 at 94:2-10.

Apart from the concern that the defendants didn't seem to grasp that cancelling out-of-cell time for mental health evaluations was a violation of the injunction, the Court was concerned that Holt blamed staffing issues for the improper cancellation of out-of-cell time. Recall the exchange with Holt at the February 2023 status conference:

> **THE COURT**: Well, let's just pose the question directly to Mr. Holt.… Are staffing issues preventing compliance or interfering or making compliance difficult?
> **MR. HOLT**: They are not.

Doc. 384 at 23:11-15.[52]  When Holt gave the Court that assurance, the defendants, as

the Court had just learned, had a "practice" of cancelling out-of-cell time because of

staffing issues.  The Court has long suspected that the defendants', particularly Holts',

assurances of adequate staff were based not on fact but on the knowledge that the

injunction mandates sufficient staffing and, thus, the admission that the SMU was short-

staffed was tantamount to an admission that the defendants were violating the

injunction.

One final note on the defendants' "practice" of cancelling out-of-cell time for

anticipated events such as mental health evaluations. Holt's testimony that the

"practice" had recently stopped led to an objection from the plaintiffs.  Doc. 429 at 19:2-

3.  The defendants had refused to produce documentation of events occurring after the

plaintiffs filed their show cause motion because the defendants' counsel claimed, "that

things happening after the filing of the motion are not relevant."  *Id.* at 19:2-9.  The

defendants' counsel confirmed taking that position.  *Id*. at 19:20.  That seemed

strange—why would the defendants object to current information?

Fortunately, though, the Court had sworn assurances that the November

NoteActive and SCRIBE data would establish that all is well.  Doc. 429 at 145:16-

148:11, 195:4-196:6.

Next, the plaintiffs adduced evidence that the defendants cancelled out-of-cell

time for minor disciplinary infractions that did not occur during out-of-cell time.  On May

3, 2023, the plaintiffs' counsel notified the defendants that inmates reported being

---

[52] Recall too that the defendants' records and staff have repeatedly noted staffing problems.  *See, e.g.*, Docs. 369-4 at 2, 5-6, 9-10, 12-15; 369-5 at 9, 13, 16, 31-33, 57, 64.

denied out-of-cell time for not being "inspection ready."  Docs. 395 at 6; 438 at 4-5.  The

defendants' counsel responded on May 18:

> Defendants have no knowledge of staff denying out of cell time based on
> an offender's failure to be cell inspection ready.  Regardless, Defendants
> have reminded the staff at the SMU that offenders are not to be denied
> yard time and/or table time for any reason unless the offender commits an
> offense of great or higher severity during yard/table time, or while being
> escorted to/from same.  Defendants agree that not being inspection ready
> does not meet that criteria.

Doc. 395 at 14.  Of course, "Defendants" include Warden Williams.  Yet, Warden

Williams sent to all inmates on August 14, 2023, the following memorandum:

> Effective immediately, all offenders are to be inspection ready every
> Monday through Friday 8:45 a.m. – 4:00 p.m.  This includes [individuals]
> to be fully state dressed, beds made, neat locker box, and no paper over
> windows or lights. No clothes lines are to be hanging.  *Failure to comply
> will result in disciplinary action and not allowed out of cell time*.

Doc. 421 ¶ 17 (emphasis added).  The significance of this memorandum to the Court

cannot be understated.  A named defendant, in blatant violation of the Court's injunction

and after he, according to his lawyer, had informed SMU staff that inmates could not be

denied out-of-cell time because they were not "inspection ready," told inmates out-of-

cell time would be cancelled if they were not inspection ready.  When confronted,

Warden Williams assured the Court there was no cause for concern—no one was

actually denied out-of-cell time as a result of his improper memorandum.  Doc. 429 at

112:22-25.  The Court later learned the defendants' records show that on November 30,

2023, an inmate was "removed from yard due to room not being inspection ready."

Doc. 457-31 at 1545.  Inmate testimony confirmed that the defendants cancelled out-of-

cell time for disciplinary reasons not permitted by the injunction.[53]

---

[53] *E.g.,* Docs. 432-1 at 22:4-16 (testifying he was denied out-of-cell time for having paper in his window);
432-7 at 15:12-23 (testifying he was denied out-of-cell time for "not being inspection ready or having

At that point in the show cause hearing, the plaintiff had established by clear and convincing evidence that the defendants had improperly cancelled out-of-cell time.  The question then was whether the November NoteActive and SCRIBE data would confirm, for the first time since the entry of the Court's injunction, that the defendants were offering inmates four hours of out-of-cell time per weekday.

Since the entry of the injunction, the defendants have never provided evidence that SMU inmates received or were offered 120 minutes of out-of-cell programming per week.  The plaintiffs, on the other hand, have again and again demonstrated that inmates are not receiving the out-of-cell programming required by the injunction.  *See, e.g.*, Docs. 357-2 ¶¶ 7, 11, 14, 18; 344 at 34:7-19

Going into the show cause hearing the defendants knew this was a critical issue—their documented history of noncompliance and the plaintiffs' show cause motion made that clear.  *See* Doc. 400-1 at 28-29.  Yet, at the show cause hearing, the defendants once again offered virtually no evidence that they were providing the required out-of-cell programming.  The programming witness the defendants called at the hearing, Tillman, who is responsible for programming within the SMU, testified at length but he never testified that inmates were receiving 120 minutes of out-of-cell programming.[54]  *See* Doc. 429 at 151:2-197:15.  In fact, Tillman testified on October 17, 2023, at his deposition that only 40-50 inmates were enrolled in out-of-cell programming.  Doc. 432-14 at 149:8-17.  The defendants' post-hearing brief, which also

---

something in [his] window."); 432-9 at 8:1-14 (testifying inmates are denied out-of-cell time due to something they had done the previous day).

[54] Four inmates, though, testified that they either were never given the opportunity to take out-of-cell classes or were not consistently allowed to leave their cells to participate in classes.  *See, e.g.*, Docs. 432-5 at 37:17-21; 432-7 at 17:11-18:5; 432-8 at 36:11-22; 432-9 at 13:18-14:21.

did not claim that the inmates were receiving the required programming, cited the deposition testimony of two counselors. Doc. 441 at 16-17. Their testimony was mixed at best. SMU counselor Shavari Reynolds testified that she was the only SMU counselor for most of 2022 and, as a result, out-of-cell programming was offered only to inmates in B- and C-Wings. Doc. 432-12 at 65:17-24, 68:9-24. Thus, inmates housed in D-, E-, and F-Wings did not receive out-of-cell programming for most, if not all, of 2022. *Id.* at 68:4-24. However, both Reynolds and Counselor Jeannette Estrada testified that more recently inmates began receiving some out-of-cell programming. Docs. 432-11 at 30:19-31:21, 42:4-6, 211:15-21; 432-12 at 72:23-74:24, 76:24-77:9. But neither testified that the defendants were complying with the injunction's mandate that inmates receive weekly 120 minutes of out-of-cell programming. Docs. 432-11 at 56:4-6; 432-12 at 65:17-24, 73:14-25.

But the Court had Tillman's assurances that the NoteActive and SCRIBE data would demonstrate compliance. Doc. 429 at 195:23-196:6.

b. November 2023 NoteActive and SCRIBE data

The Court's repeated references to the defendants' assurances about the November 2023 NoteActive and SCRIBE data no doubt suggest some skepticism that the data would deliver as promised—promised under oath. After all, the Court had heard for over four years, promises, assurances, and representations that all would be well, all of which proved to be hollow.

With some prodding from the Court, the defendants produced the November NoteActive data and some SCRIBE activity rosters on December 7, 2023.[55]  Docs. 446

---

[55] The order to produce and audit the November 2023 NoteActive and SCRIBE data was discussed at the hearing on all three days and memorialized in the minute sheets for December 1 and December 8. See,

at 4; 446-1 ¶¶ 4, 12; 477 at 6.  The data did not deliver as promised.  First, Tillman testified that the SCRIBE data would "have the offender's specific programming information.  Doc. 429 at 196:4-6.  The SCRIBE data produced did not contain that information.  Rather, the data revealed the absence of entries documenting inmates' access to outdoor recreation, table time, programming, kiosk, cell sanitation, showers, haircuts, shaves, and weekly book cart(s).  *See* Docs. 446 at 5-9; 446-1 ¶ 17 (Childs Decl.) ("Of the November 2023 NoteActive records I reviewed where complete weeks of data were available, there was not a single week where every Settlement Agreement requirement was documented."); 446-2 ¶ 13.

Second, Childs testified that "many of the deficiencies [she] documented in the May NoteActive records—for instance, multiple consecutive weeks without entries for programming, haircuts, shaves, and kiosk for certain class members—persist in the November 2023 records."[56]  Doc. 446-1 ¶ 18.  For one inmate, NoteActive records "from both May and November show no entries for programming, haircuts, and shaves, all month long."  Docs. 432-45 at 2; 432-46 at 2; 446 at 9; 449-1 at 1-2.  The defendants continued to cancel out-of-cell time to conduct foreseeable tasks throughout November, including those mandated by the injunction,[57] and out-of-cell programming seemed to

---

*e.g.*, Docs. 427; 431.  Nevertheless, the Court had to order the parties to comply.  Doc. 440.  The Court also had to order the defendants to produce SCRIBE data and then show cause when they failed to do so.  Docs. 433 at 21:22-25; 440; 451.  The Court entered two additional orders directing the parties to respond and address issues raised by the post hearing production of documents.  Docs. 458; 466.

[56] *See* Doc. 446-2 ¶ 6 ("The reports I reviewed do not show consistent documentation of Settlement Agreement requirements.  Instead, they show many days, and in some cases weeks, where Settlement Agreement requirements are not documented at all.").

[57] *See*, *e.g.*, Doc. 457-31 at 792, 825, 1559, 1568-69, 1981, 2060, 2066.  "There were also many missing entries for recreation time and table time … and at least two entries where a class member was marked as being in his cell and out of his cell at the same time."  Doc. 446-2 ¶ 11.

be unavailable for the entire month in E-Wing, due to maintenance.  *See* Docs. 446-2 ¶ 20; 449-2 at 108-112; 457-31.  The defendants made no mention of this "maintenance" at the hearing.  Otherwise, "programming records do not show how long the programs lasted; whether the programs were completed in-cell or out-of-cell; or what programs certain class members took."  Docs. 446-2 ¶ 21 (internal citation omitted); 449-2 at 102-121.  Many entries and documents are in direct conflict, indicating, for example, that inmates both refused and participated in out-of-cell activity on the same day.[58]  *See*, *e.g.*, Docs. 457-31 at 1387; 449-2 at 113, 119; 461-1 ¶¶ 23-25.  As a whole, the documentation is not only insufficient but also unreliable and does not show full compliance—contrary to what the defendants testified to at the hearing.

Thus, the November 2023 data confirmed that the defendants have failed to document compliance with the settlement agreement's provisions and that they were not providing mandated out-of-cell time and out-of-cell programming.  For these reasons, the Court finds by clear and convincing evidence that the defendants are in contempt for violating paragraphs 12, 13, 14, 16, and 17 (out-of-cell time);19 and 20 (library, book carts, and GOAL devices); 22, 23, and 24 (programming); 33, 34, 35, 36, 37, and 38 (cell conditions, hygiene, and clothing); and 59 and 60 (access to records and data) of the settlement agreement.

> 2. *The Court finds by clear and convincing evidence that the defendants are in contempt for violating paragraphs 12, 14, and 16 (out-of-cell time);19 and 20 (library, book carts, and GOAL devices); 22 (programming); 33, 34, 35, 36, 37, and 38 (cell conditions, hygiene, and clothing) of the settlement agreement.*

---

[58] One inmate, for instance, was on yard restriction until November 20 according to the logbook, yet the individualized inmate data indicates he refused out-of-cell time every single day for the entire month of November.  *Compare* Doc. 457-31 at 1537, row A43890 ("Offender on Yard Restriction until the 20th of November.") *with* Doc. 474 at 4, row 12.

Dr. Haney noted in his May 2, 2018 report that the practice at the SMU was to completely deprive new inmates of "personal property," "access to out-of-cell exercise or recreation," phone calls, and visitation.  Doc. 142 ¶ 28.  The settlement agreement and the injunction put a stop to that, or so the Court thought.

As discussed, the plaintiffs have during earlier enforcement proceedings and in quarterly reports adduced evidence and documentation of improper strip cell use.  *E.g.,* Docs. 305-12 at 11-12; 390 at 6-8.  They have also voiced suspicions at various times that the defendants routinely placed new SMU arrivals in strip cells.  Docs. 369 at 24; 395 at 4-6.  The defendants assured the plaintiffs that their suspicions were unfounded.  *See*, *e.g.*, Docs. 395 at 13, 29-30; 419 at 11.

At the show cause hearing, the plaintiffs supported their suspicions with evidence.  They introduced the deposition testimony of six inmates who testified in graphic detail about their confinement in strip cells, naked or nearly naked, for days in a row.[59]  Four of six were new arrivals.[60]  All six testified about the horrific conditions they endured, and they claimed they were denied virtually every right assured by the injunction.  A summary of the testimony of one inmate, A.Me., is illustrative:

> A.Me. was placed in observation cell A-107 for 5 days when he first arrived in the SMU in November 2022.  A.Me. did not receive notice of his SMU assignment or a hearing before being transferred.  A.Me. was held in a county jail for 7.5 years as a pre-trial detainee before entering GDC custody and never received a disciplinary report before he was assigned to the SMU.  While in A-107, A.Me. did not receive showers, out-of-cell time, programming, cell cleanout, kiosk or book cart access.  The cell was covered in trash, and the toilet was broken and filled to the brim with feces and urine from prior occupants.  Because he could not use the toilet, he

---

[59] Docs. 432-1 at 14:2-18:24 (R.D.); 432-2 at 8:5-12:23 (D.G.); 432-4 at 8:2-16:4 (D.J.); 432-5 at 26:6-30:21 (A.Me.); 432-7 at 8:2-14:15 (C.R.); 432-8 at 27:6-32:18 (A.R.).

[60] Docs. 432-2 at 8:10-15 (D.G.); 432-4 at 8:2-13(D.J.); 432-5 at 21:1-10 (A.Me); 432-7 at 8:9-15 (C.R.)

was forced to urinate in a cup and pour it in the sink or defecate on toilet paper and dispose of it on his food tray to have it removed from his cell. The cell was filthy and fly-infested. During his time in cell A-107, he did not have a mattress or any clothing and described the temperature as freezing. He was only provided a suicide blanket. After refusing to eat, A.Me. was moved to cell A- 207, where he continued to be deprived of out-of-cell recreation, programming, and opportunities to clean his cell.

Docs. 403-2 at 9-11, ¶¶ 4, 6-7, 10-13; 432-5 at 21:4-28:6. After each inmate's testimony was played, the Court asked the defendants' counsel if she had any rebuttal; she did not.[61] *See, e.g.,* Doc. 430 at 32:17-19.

The Court tried to learn more from the defendants themselves. Warden Williams admitted that A.Me. upon his arrival had been put in an "observation cell … just to watch his behavior." *Id.* at 32:24-33:4. The Court asked Warden Williams if he knew why the second inmate, C.R., "was placed in a strip cell" upon arrival; he did not. *Id.* at 38:8-10. The Court asked if any representative from the department knew; there was no response. *Id.* at 38:11-13. This led the Court to address Warden Williams:

| | |
|---|---|
| **THE COURT**: | Do you agree that it's protocol that people new to the SMU were placed in the strip cell? A strip cell? Mr. Williams? |
| **MR. WILLIAMS**: | It was brought to my attention one time, and Mr. Holt addressed me about it, and I know temporary inmates after that point in time have went to A-Wing in entering SMU. |
| | … |
| **MR. WILLIAMS**: | It was brought to my attention that guys were coming in from other facilities, wherever they come from, they was being placed in A-107/108. Mr. Holt and my supervisors, they addressed me about it, and at that time no other inmates have came in the SMU and went straight to 107 and 108 unless they belong to A-Wing. |

---

[61] To the extent any rebuttal was offered, it did not undermine these inmates' testimony about being placed in strip cells or the conditions that they endured. *See* Doc. 430 at 38:5-13, 48:16-52:11, 56:3-58:22, 61:7-70:21.

*Id*. at 38:16-39:4.  The Court then asked Holt if he had reason to doubt the inmate's

testimony; he did not.  *Id*. at 40:10-14.  By the time the third inmate, D.G., finished

testifying, the Court had this to say:

> **THE COURT**: Okay.  Now, we have heard from three so far, we may be hearing some more testimony of inmates who say upon their arrival – one said he was told it was a matter of protocol – that they were placed in the cell in A-Wing, and it was what I think we all understand now to be a strip cell, because at the very least they were provided only a smock and a suicide mattress.  They say not even that.  But – is that a situation – is that – are those the situations that you said you had addressed and made some changes?
>
> **MR. HOLT**: Correct.

*Id*. at 53:10-20.  The defendants produced no documentation from mental health

providers that would have been generated had inmates' mental condition required

"observation."

The detail and consistency of the inmates' testimony, the absence of any

meaningful cross-examination or rebuttal,[62] and the defendants' vague explanations

again aroused the Court's suspicions.  Accordingly, the Court ordered the defendants to

produce the following information for every inmate placed in the SMU since July 1,

2021: "the cell to which the inmate was assigned"; "whether, at that time, that cell was

designated and/or used as either a security or observation cell"; if the inmate "was

assigned to either a security or observation cell, all the conditions of the inmate's

confinement, i.e., whether the inmate was allowed clothing, bedding, and/or personal

effects."  Doc. 428.

---

[62] *See, e.g.*, Docs. 429 at 28:3-30:6, 33:6-13, 80:4-81:25, 174:2-5; 430 at 44:21-47:22, 53:4-24.

The defendants produced documents in response to the Court's Order on December 8, 2023.  *See* Doc. 457.  The plaintiffs produced factual analyses of the documents, the accuracy of which the defendants do not dispute.  Docs. 461; 461-1; 465-1; 465-2.  First, the documents confirmed that the defendants routinely place new SMU inmates in cells A107 or A108, the A-Wing strip/observation cells, and in other cells used as strip/observation cells.[63]  Docs. 457-20; 457-27; 475.  For example, 49 inmates were held in A-107 and A-108 upon their arrival at the SMU.[64]  Doc. 475; *see also* Doc. 460-1.  The defendants' documents failed to reveal whether the inmates were "allowed clothing, bedding and/or personal effects," as the Court's order required.  Docs. 428; 458 at 4; 460 at 4-5.  The most common reasons given for assignment to those cells were "administrative" and "disciplinary."  Docs. 461-1 ¶ 11; 465-1.  In their post-hearing brief, the defendants, citing pages 106 through 109 of Warden Williams's deposition testimony, claimed that strip cells could be used for disciplinary purposes.  Doc. 460 at 4.  First, Warden Williams gave no such testimony.  *See* Doc. 432-16 at 106:4-109:24.  Second, Holt made clear that GDC policy prohibits using strip cells for disciplinary purposes.  Docs. 429 at 29:17-30:2; 457-1.  In that instance, he was telling the truth.  Yet the records revealed that inmates were repeatedly thrown in strip cells for discipline.  *E.g.,* Doc. 457-27 at 1 (citing "disciplinary" as a "move reason").

---

[63] The documents indicated that inmates were housed in other cells designated as strip and/or observation cells—including A-201, A-216, B-209, E-102, E-203, E-108, and E-211.  *See* Docs. 457-25; 457-26; 457-27 at 1, 3.  For instance, four inmates listed in an Excel sheet labeled "SMU Movement Activity since 070121 - A-107 and A-108" involve other cells in A and E Wings.  Doc. 457-27 at 1, 4.

[64] The defendants produced only four inmate-specific documents that could conceivably justify these placements; two of these documents refer to the same (now deceased) SMU inmate.  Docs. 457-6; 457-21; 457-23; 457-24.

In short, the documents produced by the defendants confirmed that they routinely placed new arrivals to the SMU in strip cells.  The conditions of confinement in those strip cells violate multiple injunction mandates.  Accordingly, the Court finds that the plaintiffs have established by clear and convincing evidence that the defendants improperly placed SMU inmates in strip cells in violation of paragraphs 12, 14, and 16 (out-of-cell time);19 and 20 (library, book carts, and GOAL devices); 22 (programming); 33, 34, 35, 36, 37, and 38 (cell conditions, hygiene, and clothing) of the settlement agreement.

3. *The Court finds by clear and convincing evidence that the defendants are in contempt for violating paragraph 48 (assignment) of the settlement agreement.*

The plaintiffs have long alleged that the defendants were not abiding by the pre-assignment process required by paragraph 48.  *See, e.g.*, Docs. 344 at 27:20-28:11; 384 at 8:11-17.  At the show cause hearing, some inmates placed in strip cells also testified that they did not receive assignment paperwork or a hearing before being placed in the SMU.[65]  Thus, the Court ordered the defendants to produce documentation showing compliance with paragraph 48 of the settlement agreement for every inmate placed in the SMU since July 1, 2021.  Doc. 428.

In response, the defendants produced assignment documents and a spreadsheet that purported to summarize the documents.  *See* Docs. 457-2; 457-3; 457-20; 475. Since July 1, 2021, 132 inmates have been assigned to the SMU.  Docs. 457-20; 460 at 2.  The defendants produced assignment documents for only 125 inmates; seven

---

[65] *See, e.g.*, Docs. 403-2, A.M.2 Decl. at 10 ¶¶ 10-14, C.R. Decl. at 24 ¶¶ 3-10; 432-5 at 18:25-19:3, 32:21-24, 38:8-21; 432-7 at 7:9-8:13, 9:19-10:3.

inmates had no paperwork.  Docs. 457-2; 457-3; 461-1 ¶ 19.  "[O]f the 125 class

members whose assignment paperwork was produced: 100 class members likely had

no hearing prior to their transfer to the SMU; 64 class members were transferred to the

SMU on the same date as their assignment or assignment request; and only seven

class members' records included documentation of an appeal."  Doc. 461-1 ¶ 17.  In the

spreadsheet, the defendants labeled all but 13 transfers as emergencies and, thus, they

claim only 13 inmates were entitled to a pre-assignment hearing.  Docs. 460 at 6; 475.

The spreadsheet does not state the source or basis for the 119 "emergency" labels.[66]

The assignment documents reference an emergency transfer for only two inmates, yet

officials requested an emergency placement for neither.  Docs. 461-1 ¶ 18; 457-3 at 60-

62, 96-97.

The assignment documents confirm that they routinely and systematically

deprive inmates of pre-assignment process in violation of paragraph 48.[67]  Docs. 457-2;

457-3; 457-20; 475.  First, for the reasons stated, the Court's injunction does not permit

deprivation of *all* pre-assignment process for any reason, including "emergencies."

Second, even if the defendants' interpretation of paragraph 48 were correct, the Court

---

[66] The Court intends to investigate the preparation of the spreadsheet.  Specifically, the Court will compel the defendants to disclose the source of the undocumented assertion that 119 transfers were "emergencies."

[67] At the February 2023 status conference, plaintiffs' counsel informed the Court of issues related to A.Me.'s SMU assignment—specifically, he did not receive notice or a hearing before he was transferred, nor did he receive the opportunity to appeal.  Doc. 384 at 50:18-51:3.  A.Me. submitted a declaration claiming he had personally spoken with Holt about the issue.  Doc. 403-2 at 9-10 ¶¶ 7-10.  At the February 2023 status conference, Holt assured the Court he was personally looking into the matter.  Doc. 384 at 51:17-52:6.  Months later, A.Me. still had not been given the opportunity to appeal.  Doc. 390 at 15-16.  When he finally received the process required by the injunction, he successfully appealed his assignment illustrating that he never should have been assigned to the SMU.  *Id*.  A.Me committed a serious crime and he will be punished.  But depriving A.Me of his pre-assignment rights, putting him in a strip cell for no reason, and improperly holding him in the SMU, all in direct violation of the Court's injunction, is a grave injustice.

does not find it credible that 119 of 132 inmates were transferred because of some unspecified and unidentified emergency that is noted only on the spreadsheet but not in the assignment documents upon which the spreadsheet is purportedly based.  Third, of the 13 inmates the defendants admit were entitled to pre-assignment process, only three received a hearing prior to their transfer to the SMU.  Docs. 460 at 6; 475 at 1, 3.

Accordingly, the Court finds the plaintiffs have established by clear and convincing evidence that the defendants violated Paragraph 48 of the Settlement Agreement.  Doc. 364-1 ¶ 48.

> 4. *The Court finds by clear and convincing evidence that the defendants are in contempt for violating paragraphs 45 (24-month review); 53 (offender management plan); and 54 (periodic review) of the settlement agreement.*

The Court has noted that the plaintiffs suspected the defendants were improperly using a "no pending charges" requirement to keep inmates in the SMU longer than 24 months.  The settlement agreement, and hence the injunction, absolutely bars holding inmates in the SMU for longer than 24 months unless one or more of six criteria are met:

(1) The inmate committed a murder while incarcerated;

(2) The inmate escaped outside the secure fencing of a GDC facility;

(3) The inmate caused serious bodily injury to another inmate or a GDC employee, contractor or volunteer;

(4) The inmate took another inmate or GDC employee, contractor, or volunteer hostage;

(5) The inmate's crime was so egregious that the person was placed in the Tier III program immediately upon being placed in GDC custody;

(6) The inmate due to his unique position, influence and authority over others, poses such an exceptional, credible, and articulable risk to the

> safe operation of the prison system or to the public that no facility other
> than the Tier III program facility is sufficient to contain the risk.

Doc. 364-1 ¶ 44*; see also* Doc. 429 at 47:6-11, 51:21-52:1.

Inmates held in the SMU beyond 24 months must be reviewed quarterly by a panel of prison officials to determine whether the inmate should remain within the SMU. Doc. 364-1 ¶ 45.  "The criteria governing the panel's determination shall include: (a) length of time in current phase; (b) perceived risk of release from the SMU; (c) number, type, and frequency of disciplinary reports; (d) involvement in self-improvement activities; (e) behavior while in the SMU; (f) the person's 60-day or 90-day mental health evaluation; (g) progress on the person's Offender Management Plan; and (h) the total duration of the person's confinement in the SMU."  *Id*.  The panel must provide specific and detailed reasons for retaining inmates in the SMU.  *Id*. ¶ 53.  For instance, the defendants must provide each inmate with "a detailed [OMP] setting out individualized goals" explaining the steps that the inmate must take to qualify for transfer from the SMU.  *Id*.  These requirements ensure that assignment and duration of confinement in the Tier III Program are subject to periodic review and that specific criteria govern the decision-making process.[68]

In 2022, the defendants circumvented injunction mandates by adopting a rule providing that an inmate is not eligible for transfer from the SMU if he had "any pending charges related to [his] original assignment to the Tier III program and/or any pending charges that resulted in a new assignment to the Tier III program."  Doc. 432-76 (SOP

---

[68] Prior to the settlement agreement, plaintiffs claimed that "despite various iterations of a written policy, the actual practice of Defendants [was] to keep prisoners in the SMU indefinitely due solely to past misconduct … [without] meaningful review of prisoners' placement, [and] only nominal hearings that [had] little or no bearing on a prisoner's release."  Doc. 346-4 at 2.  Therefore, the settlement agreement provisions were intended to guard against arbitrary retention in the SMU.

209.09) at 27-28.  The defendants amended their offender management plan forms to make this clear.  *Id.* at 55.  The mandate to provide each inmate with "individualized goals" obviously contemplates that inmates will be provided goals that they can accomplish, which is illustrated by the injunction's requirement that "progress on the person's [OMP]" must be considered as a criterion during periodic reviews.  Doc. 364-1 ¶ 45.

The new policy clearly states that one fact—pending charges—renders an inmate ineligible for transfer.  Apart from violating the injunction, the obvious problem, which the defendants and their counsel have admitted, with this absolute bar to a transfer is that inmates have no control over the prosecutors who decide when to bring inmates to trial.  Doc. 384 at 30:25-31:6.  As a practical matter, once an inmate is in the prison system, particularly if he is in the SMU, there is little incentive for busy prosecutors to clear such backlog cases.

At the show cause hearing, the defendants attempted to argue, through the testimony of Holt, that pending charges would not alone preclude transfer from the SMU.  *See* Doc. 429 at 55:18-56:11, 77:24-78:12.  If that was Holt's point, his testimony was false.  First, it conflicts with the clear language of the new policy—an inmate is ineligible for transfer if "one or more" of the stated criteria exists, including pending charges.  Docs. 429 at 258:1- 259:17; 432-76 (SOP 209.09) at 27-28, 55.  Second, the evidence adduced at the hearing established beyond doubt that the defendants repeatedly used the "pending charges" criterion to block the transfer of inmates otherwise eligible to leave the SMU.[69]  Docs. 429 at 243:19-21, 245:7-247:5; 432-49

---

[69] *See* Docs. 430 at 71:4-7 ("[W]e see that the warden's review recommended release to the StepDown, and then Toole disagreed with that. The reason, quote, 'Remain in Tier III program due to pending

(showing 46 of 69 inmates denied transfer because of pending charges); *see, e.g.*, Doc. 432-51 at 5.  This violates paragraphs 45, 53, and 54 of the settlement agreement because it imposes a transfer requirement which the inmate cannot meet.  It is an absolute bar to transfer that negates the periodic review for transfer from the SMU.  The evidence was so clear that the Court ruled from the bench:

| | |
|---|---|
| **THE COURT**: | First, for the reasons that we have discussed, the new SOP setting the criteria for admission to the Tier III STEP Program is clearly contrary to the Settlement Agreement; specifically, it provides that offenders are ineligible for admission to the Tier III STEP Program solely because they have pending charges related to their original assignment to the Tier III and/or any pending charges that resulted in a new assignment to the Tier III program.  Mr. Holt's testimony notwithstanding, it is clear that inmates are being denied the ability to move to the Tier III STEP Program solely because they have pending charges. We saw that time and time again.  We may have further discussions about how that came about and what plaintiffs' counsel's role in that was, but that is a glaringly obvious violation of the Settlement Agreement and henceforth it will not be applied. Any questions about that Ms. Crowder? |
| **MS. CROWDER**: | No, sir. |

Doc. 430 at 79:23-80:15.

The Court reiterates that the plaintiffs have established by clear and convincing evidence that the defendants have violated paragraphs 45, 53, and 54 of the settlement agreement by adopting a requirement for transfer not permitted by the injunction to confine inmates in the SMU longer than 24 months and negated the meaningful periodic review required by the Court's injunction.[70]  *See, e.g.*, Docs. 364-1 ¶¶ 45, 53-54; 429 at

---

charges.'); 433 at 11:4-18 (testimony from behavioral counselor Jeannette Estrada that pending charges means an inmate "cannot be moved to next level").

[70] Even when inmates are being transferred out of the SMU, there is evidence that they are being transferred improperly to solitary confinement units in other prisons in violation of paragraph 56 of the

245:7-247:5; 432-49; 432-51 at 5.  Specifically, the defendants violated paragraph 45 by

adopting a requirement for transfer not permitted by the injunction and they used that

requirement to confine inmates in the SMU longer than 24 months.  Docs. 364-1 ¶ 45;

429 at 243:19-21, 245:7-247:5; 432-49; 432-76 (SOP 209.09) at 27-28, 55.  The

defendants have violated paragraphs 45 and 54 by failing to articulate specific and

detailed reasons for retaining inmates in the SMU.[71]  Doc. 364-1 ¶¶ 45, 54.  They have

also violated the duration-of-confinement and periodic-review requirements under

paragraphs 45 and 53 by failing to articulate individualized goals and the "steps" that

these inmates "must take to qualify for a transfer."  *Id*. ¶¶ 45, 53.

Finally, the plaintiffs also claim that the defendants violated paragraph 53 by

listing programs on inmates' offender management plans that are not offered at the

SMU.  Docs. 364-1 ¶ 53; 429 at 254:11-254:19; 432-50; 438 at 18-22; *see also* Docs.

432 at 272:11-16, 276:17-277:6, 277:5-279:1; 432-12 at 139:17-140:21.  Paragraph 53

requires that "each inmate will be provided a detailed [OMP] setting out individualized

goals for the inmate and explaining the steps that the inmate must take to qualify for a

transfer from the SMU/Tier III program."  Docs. 364-1 ¶ 53; 364-2 ¶ 7.  Because an

inmate's progress on his offender management plan must be considered by the

classification committee during periodic reviews, the plaintiffs contend the offender

management plans are meaningless because they set goals inmates cannot meet.

Doc. 438 at 18-21.  The defendants deny that SMU counselors as a matter of course

---

settlement agreement.  Docs. 356-1 ¶ 56; 403-2 at 35 ¶¶ 3-4; 429 at 58:5-61:19.  There is apparently only
one STEP unit located at GDCP with room for only 15 inmates at a time.  Doc. 429 at 60:11-19.

[71] *See, e.g.* Docs. 432-51; 432-52; 432-53; 432-54; 432-55; 432-56; 432-57; 432-58; 432-59; 432-60;
432-61; 432-62; 432-63; 432-64; 432-65; 432-66; 432-67; 432-68; 432-69; 432-70; 432-71; 432-72.

set goals that inmates cannot complete.  Doc. 441 at 9-10.  Although they admit that

offender management plans may include classes not offered at the SMU because

offered programs may change.  Docs. 429 at 158:8-23, 159:17-20 (SMU Unit Manager

Alexander Tillman) ("Q: Have you ever noticed that there are classes listed on the

offender management plan that are not currently offered in the SMU?  A: Yes, ma'am."),

185:14-21, 254:11-255:23; 432-50; 432-76 (SOP 209.09) at 27-28, 55.  But they claim

this does not necessarily mean that inmates cannot leave the SMU.  Docs. 429 at

188:12-20; 441 at 9-10.

The evidence does not allow the Court to find by clear and convincing evidence

that listing a class not offered at the SMU on offender management plans rises to the

level of a violation of paragraph 53.  But now the problem has been identified, the Court

is confident that it will be fixed.

5. *The Court finds by clear and convincing evidence that the defendants are in*
   *contempt for violating paragraphs 20 (GOAL devices) and 26 (privileges) of*
   *the settlement agreement.*

Since May 7, 2019, the defendants have had "an unambiguous obligation" to

provide inmates with operable GOAL devices, an obligation that Holt conceded to at the

show cause hearing.  Doc. 429 at 89:20-90:3.  Five years later, the defendants have yet

to comply with this mandate—nor have they made any meaningful effort to explain their

failure.  The Court has yet again been given only empty promises, unsubstantiated

assertions, and conclusory or vague assurances.  The defendants produced no

documentary evidence confirming their vague excuses.  In April 2022, Holt testified that

GOAL devices would "roll out" in May 2022.  Doc. 344 at 68:12-19.  In October 2022,

Wilson claimed the new completion date was November 14, 2022.  Doc. 452 at 25:15-

26:5.  By February 2023, Holt claimed the defendants were no longer "rolling out tablets at any facility" due to "some security concerns," which "other legal considerations" prevented them from being more specific.  Doc. 384 at 18:7-19:14.  Both the plaintiffs and the Court then heard for the very first time at the show cause hearing on November 30, 2023, that the defendants and their vendor agreed to mutually terminate their contract for GOAL devices.  Doc. 429 at 87:4-88:3.  The defendants have never offered any detail yet alone any documentary evidence to corroborate these claims.  Even if Holt were a credible witness, and he is not, his vague excuses, with no supporting evidence, do not excuse the defendants' failure to comply with the injunction.

The same holds for the defendants' failure to provide television access for eligible inmates.  Paragraph 26 requires the defendants to provide inmates the privileges set out in the Tier III privileges chart, which provides television access for inmates in phase three and above.  Docs. 364-1 ¶ 26; 432-76 (SOP 209.09) at 48.  It is undisputed that the defendants house eligible inmates in E- and F- Wings where they do not have access to television.  Doc. 429 at 92:12-24, 97:9-21.  As discussed, the defendants have repeatedly promised to provide television access and they have repeatedly broken those promises.

Accordingly, the Court finds by clear and convincing evidence that the defendants are in contempt for violating paragraphs 20 (GOAL devices) and 26 (privileges) of the settlement agreement.

## C. Contempt Sanctions

Despite clear and unambiguous directives aimed at improving conditions and procedural safeguards at the SMU, the defendants have failed to implement reforms

that were agreed upon by the parties and ordered by the Court, thereby negating the required relief.  Failure to enforce the injunction would not only undermine the parties' consensual resolution and the Court's integrity, but would also jeopardize the constitutional rights that the injunction seeks to protect.  Accordingly, the Court finds it necessary to impose the following sanctions: (1) an extension of the injunction, (2) the appointment of an independent monitor, and (3) a daily fine to ensure compliance that will be purged upon the defendants' compliance.  The Court also awards the plaintiffs their attorney's fees and costs.

The imposition of these sanctions must comply with the general rules governing civil contempt, and the extension of the injunction and appointment of a monitor must further comply with Federal Rule of Civil Procedure 60 and the Prison Litigation Reform Act ("PLRA").  For the following reasons, the Court finds that they do.

1. *General Rules of Contempt*

Contempt sanctions are a critical tool that courts utilize to enforce compliance with their orders.  "District courts are afforded wide discretion in fashioning an equitable remedy for civil contempt."  *McGregor v. Chierico*, 206 F.3d 1378, 1385 n.5 (11th Cir. 2000).  "The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief."  *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949).  "[S]anctions in civil contempt proceedings may be employed 'for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.'"  *Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 443 (1986) (quoting *United States v. Mine Workers*, 330 U.S. 258, 303-04 (1947)); *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d

1539, 1545 n.4 (11th Cir. 1996).  The Eleventh Circuit has "repeatedly stressed that 'the district court's discretion in imposing non-coercive sanctions is particularly broad and only limited by the requirement that they be compensatory.'"  *F.T.C. v. Leshin*, 719 F.3d 1227, 1231 (11th Cir. 2013) (quoting *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1521 (11th Cir. 1990)).  Coercive sanctions are more limited—"once a contemnor's contumacious conduct has ceased or the contempt has been purged, no further sanctions are permissible."  *Id*.  A court can award equitable remedies, legal remedies, or both, "so long as it [does] not permit double recovery."  *Id*. at 1232.

As a preliminary matter, the Court notes that the defendants do not dispute that the Court has broad discretion to impose civil contempt sanctions.  Docs. 333 at 1-2; 441 at 22 ("This Court has broad discretion in imposing civil contempt sanctions, including modification of the Agreement.").  In any event, the Court finds that the "requirements of full remedial relief" necessitate these sanctions.  They will not only remedy the defendants' longstanding noncompliance, but they will also discourage future noncompliance and provide the plaintiffs with the relief initially intended by the parties and ordered by the Court.  The extension and the appointment of an independent monitor also fall well within the Court's "particularly broad" discretion, and the daily fines are properly limited because the defendants may purge the fines by ending their contumacious conduct.  The daily fines too are necessary to compel the defendants' compliance, and fines of this nature have been approved by the Supreme Court.  *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994) ("[P]er diem fine[s] imposed for each day a contemnor fails to comply with an affirmative court order" are permitted because "such fines exert a constant coercive

pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged."). Finally, no two of the three sanctions result in "double recovery." Accordingly, the Court finds that the imposition of these sanctions falls well within its inherent authority.

### 2. Federal Rule of Civil Procedure 60

Because an extension and the appointment of an independent monitor modify the injunction, the Court must comply with Federal Rule of Civil Procedure 60. "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding [if] … applying it prospectively is no longer equitable." F.R.C.P. 60(b)(5). Rule 60(b)(5) "provides a means by which a party can ask a court to modify" its order. *Horne v. Flores*, 557 U.S. 433, 447 (2009). Indeed, "Rule 60(b)(5) serves a particularly important function in what [the Supreme Court has] termed 'institutional reform litigation.'" *Id.* (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 380 (1992)). "The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." *Plata*, 563 U.S. at 542 (citation omitted); *see also Rufo*, 502 U.S. at 381 ("The experience of the [district courts] in implementing and modifying such decrees has demonstrated that a flexible approach is often essential to achieving the goals of reform litigation."). However, district courts must "apply[] a flexible standard that seeks to return control to state and local officials as soon as a violation of federal law has been remedied." *Horne*, 557 U.S. at 450-51.

In *Rufo*, the Supreme Court established a two-part standard for modification of consent decrees in institutional litigation. 502 U.S. at 383-93. First, "a party seeking modification of a consent decree bears the burden of establishing that a significant

change in circumstances warrants revision of the decree." *Id.* at 383. That party "may meet its initial burden by showing either a significant change either in factual conditions or in law." *Id.* at 384. If the moving party meets this burden, then "the district court should determine whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at 391. The district court should proceed with modification "when enforcement of the decree without modification would be detrimental to the public interest." *Id.* at 384. The Eleventh Circuit has recognized "that an injunction may be modified to impose more stringent requirements on the defendant when 'the original purposes of the injunction are not being fulfilled in any material respect." *Sizzler Family Steak Houses v. W. Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1540 (11th Cir. 1986) (citing *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 252 (1968)).

In determining whether the modifications are suitably tailored to the changed circumstance, "three matters should be clear." *Rufo*, 502 U.S. at 391. First, "a modification must not create or perpetuate a constitutional violation." *Id.* Second, "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor." *Id.* And third, "[w]ithin these constraints, the public interest and '[c]onsiderations based on the allocation of powers within our federal system' require that the district court defer to local government administrators, who have the 'primary responsibility for elucidating, assessing, and solving' the problems of institutional reform, to resolve the intricacies of implementing a decree modification." *Id.* at 392 (quoting *Bd. of Educ. of Okla. Pub. Schs. v. Dowell*, 498 U.S. 237, 248 (1991); *Brown v. Bd. of Educ.*, 349 U.S. 294, 299 (1955)). This deference is not "involved" in the "threshold inquiry" of whether a modification is warranted. *Id.* at 392 n.14. Rather,

"once a court has determined a modification is warranted, … principles of federalism and simple common sense require the court to give significant weight to the views of the local government officials who must implement any modification." *Id*. Finally, a court should not grant a modification "where a party relies upon events that actually were anticipated at the time it entered into a decree."[72] *Id*. at 385.

The plaintiffs have satisfied their burden of showing that modification of the Court's injunction is warranted given the significant change in factual conditions—the defendants' substantial noncompliance. *See Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) ("Under well established law, substantial violation of a court order constitutes a significant change in factual circumstances.").[73] The purpose of the injunction was to remediate the unusually harsh conditions and the lack of due process protections within the SMU. To further that purpose, the Court's injunction mandates constitutionally minimal conditions of confinement and due process protections for assignment to and retention in the SMU. But, as explained, the defendants have ignored these mandates. Thus, modification is not only proper under Rule 60, but it is necessary to fulfill the original purposes of the Court's injunction.

Moreover, the modifications are suitably tailored to the changed circumstance— the defendants' noncompliance. As noted, the extension and appointment of an

---

[72] This is not at issue here. If the plaintiffs anticipated the defendants' substantial noncompliance, they would not have entered into the agreement with the defendants.

[73] *See also Chrysler Corp. v. United States*, 316 U.S. 556, 563-64 (1942) (affirming extension of consent decree); *Thompson v. United States Dep't of Hous. and Urb. Dev.*, 404 F.3d 821, 828-29 (4th Cir. 2005); *David C. v. Leavitt*, 242 F.3d 1206, 1213 (10th Cir. 2001) (holding the district court did not abuse its discretion in extending the parties' consent decree under its modification power due to the state's "significant non-compliance"); *Holland v. N.J. Dep't of Corrs.*, 246 F.3d 267, 281-82 (3d Cir. 2001) (holding the district court possesses the power to extend consent decrees based on a party's noncompliance).

independent monitor are necessary to remedy the defendants' past, present, and future noncompliance, and no other less-restrictive sanctions would be adequate. Also, the three "matters" cited in *Rufo* —the creation or perpetuation of a constitutional violation, conforming to the constitutional floor, and deference to the local officials—are of no concern here. 502 U.S. at 391-92. Quite the opposite. The primary purpose of the sanctions is to force compliance with the injunction, which is in place to correct constitutional violations. And the modifications leave the power to implement the injunction completely in the hands of the defendants. Accordingly, the Court further finds that the imposition of these sanctions comply with Rule 60.

### 3. The PLRA

Because this case involves a challenge to prison conditions, the Court must comply with the PLRA. 18 U.S.C. § 3626. The PLRA's limitations apply to consent decrees and limit the grant of prospective relief. 18 U.S.C. § 3626(c)(1), (g)(7) ("[T]he term 'prospective relief' means all relief other than compensatory monetary damages."). Under the PLRA,

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of a Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). Together, these requirements are commonly referred to as the "need-narrowness-intrusiveness" requirements. *Cason v. Seckinger*, 231 F.3d 777, 784 (11th Cir. 2000). "Narrow tailoring requires a 'fit between the remedy's ends and

the means chosen to accomplish those ends.'" *Plata*, 563 U.S. at 531 (quoting *Bd. of Trs. Of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). "This means only that the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court." *Id*.

In *Cason*, the Eleventh Circuit established that district courts need not enter or make particularized findings for facts not in dispute.[74]  231 F.3d at 785 n.8.  A district court may rely on the parties' "concessions" and "stipulations" concerning those criteria, just as it would any other undisputed facts.  *Id*.  Thus, when a defendant expressly concedes that the PLRA's need-narrowness-intrusiveness requirements are met, the Court need not make the particularized findings that are otherwise required.

a. The extension meets the PLRA's requirements.

The extension complies with the PLRA.  The parties have twice stipulated that the injunction is narrowly drawn, extends no further than necessary to correct the violation of federal rights, and employs the least intrusive means to achieve this correction, and thus satisfies the requirements of the PLRA.  Docs. 256-1 ¶ 7; 364-1 ¶ 7.  When the parties originally entered into the settlement agreement and when the parties supplemented and extended the settlement agreement with the addendum, the defendants agreed that the SMU's conditions presented a substantial risk of serious harm to inmates in violation of the Eighth Amendment and that the procedures for placing prisoners in the SMU were in violation of the Fourteenth Amendment's Due

---

[74] The Eleventh Circuit later held that *Cason*'s particularized-finding requirement applies not just to termination but also to entry of prospective relief under 18 U.S.C. § 3626(a).  *See United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1228 (11th Cir. 2015) (involving contested motion for preliminary injunction sought by United States in case challenging Florida's failure to provide kosher meals to prisoners).

Process Clause.  Docs. 207 at 11; 256-1 ¶ 7; 362 ¶ 7; 364-1 ¶ 7.  The defendants do not now dispute or challenge those stipulations.  Nor do they argue in their post hearing brief that the PLRA bars the extension of the injunction.  In short, the defendants do not contend that the extension of the term of the injunction contravenes the PLRA.

Although *Cason* permits reliance on the parties' stipulations, the Court has again independently reviewed the record and again finds that the settlement agreement aligns with the PLRA's need-narrowness-intrusiveness requirements for several reasons. First, the agreement's specific provisions pertaining to out-of-cell time, in-cell conditions, and overall management of confinement directly address the constitutional issues identified in this litigation.  Second, the agreement does not compromise public safety or the operation of the criminal justice system.

The Court further finds that extending the injunction is narrowly drawn, extends no further than necessary, and is the least intrusive means necessary to remedy the violations of the plaintiffs' federal rights.  An extension is necessary because the plaintiffs have yet to receive what the parties agreed to: substantial compliance with the Court's injunction.  The extension is also narrowly drawn and extends no further than necessary because it is limited in time and may terminate earlier if the defendants achieve substantial compliance.  Moreover, the defendants themselves negotiated the agreement and have largely incorporated the requirements of the agreement into their standard operations procedures.  Therefore, the Court finds that extending the injunction complies with the PLRA.

    b. The appointment of an independent monitor meets the PLRA's requirements.

The PLRA's limitations on appointing a special master in prison cases are inapplicable to neutral third-party monitors who do not exercise quasi-judicial authority under Federal Rule of Civil Procedure 53 or the Court's inherent authority.[75]  *See Benjamin v. Fraser*, 343 F.3d 35, 44-47 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63, 70 (2d Cir. 2009).  However, if the appointment constitutes "prospective relief," then it must satisfy the needs-narrowness-intrusiveness inquiry.  *See Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1282 (M.D. Ala. 2019).  For the following reasons, the Court finds the appointment of the independent monitor satisfies these requirements.

The independent monitor is necessary because the parties have agreed to, and the Court has mandated, certain reforms within the SMU, but the defendants' have failed to comply with the injunction's mandates.  The appointment of an independent monitor is narrowly drawn, extends no further than necessary, and is the least intrusive means to ensure compliance with the injunction.  The monitor will observe and report the defendants' efforts to comply with the injunction.  The monitor will not have direct involvement in or authority over SMU operations.  The monitor will have no enforcement power.  Moreover, because the defendants have largely incorporated the injunction's

---

[75] The PLRA imposes requirements on a district court appointing a special master.  18 U.S.C. § 3626(f).  The PLRA defines a "special master" as "any person appointed by a Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, regardless of the title or description given by the court."  18 U.S.C. § 3626(g)(8).  Under Rule 53, a special master, *inter alia*, "hold[s] trial proceedings," imposes non-contempt sanctions, "conduct[s] evidentiary hearing[s]," and, with the parties' consent, makes final factual findings.  Thus, special masters operate in a "quasi-judicial" capacity.  *See Laube v. Campbell*, 333 F. Supp. 2d 1234, 1239-40 (M.D. Ala. 2004); *Newman v. State of Ala.*, 559 F.2d 283, 290 (5th Cir. 1977) (recognizing distinction between a monitor and a master), *reversed in part by Alabama v. Pugh*, 438 U.S. 781 (1978).

In this case, the independent monitor would exercise functions quite different from those of a special master under Rule 53.  Thus, the requirements for special masters under the PLRA are inapplicable.

requirements into their standard operating procedures, the monitor will, in effect, simply observe compliance with the defendants' policies. The need for a monitor is further demonstrated by the fact that the defendants have failed to achieve compliance thus far, notwithstanding the appointment of an experienced correctional officer to monitor compliance and an internal onsite facility monitor. Docs. 419-1 ¶¶ 3-4; 452 at 29:4-11. Clearly, internal monitoring efforts have proved insufficient. Accordingly, the Court finds the appointment of an independent monitor is necessary, narrowly tailored, and the least intrusive means to correct the violation of the federal rights by achieving compliance with the Court's injunction.

Finally, neither the extension of the injunction nor the appointment of an independent monitor will have an adverse impact on public safety or the operation of the criminal justice system. Rather, the intended effect is just the opposite. Accordingly, the Court finds that the extension of the injunction and the appointment of an independent monitor comply with the PLRA.

## IV. CONCLUSION

The defendants are held in **CONTEMPT** for the reasons stated throughout this Order. The injunction and the terms of the underlying parties' agreements are **EXTENDED** and **MODIFIED** as set forth in this Order.

Because of the defendants' longstanding and flagrant violations of the Court's injunction, it is hereby **ORDERED:**

- The Court will appoint an independent monitor, at the defendants' expense, to assist the defendants in achieving compliance. The defendants have made clear that they cannot monitor compliance internally. The parties shall confer and propose by May 4, 2024, a candidate to serve as independent monitor. The parties shall further

confer and propose procedures allowing the independent monitor access to all information necessary to monitor compliance.

- The term of the settlement agreement, the addendum agreement, and the Court's injunction are extended.  That term shall expire six months after the appointment of the independent monitor.  However, any party may move for the extension of the term.

- Because of the defendants' longstanding and flagrant violations of the Court's injunction, the Court finds that coercive sanctions are necessary to compel compliance.  The Court imposes a daily fine of $2,500.00.  That fine will be payable upon the termination of the Court's injunction.  The defendants shall be purged of payment if they comply with the injunction. Beginning May 20, 2024, and every thirty days thereafter, the defendants shall deposit with the Clerk of Court the sum of $75,000.

- The Court awards the plaintiffs reasonable attorney's fees and expenses incurred during the enforcement of the injunction.  Plaintiffs' counsel shall submit their fee request with supporting evidence by May 4, 2024.

**SO ORDERED**, this 19th day of April, 2024.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT